# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| GUARANTEED RATE, INC., | ) | |
| | ) | Case Number:  22 CV 2342 |
| | ) | |
| Plaintiff, | ) | Judge:  Robert W. Gettleman |
| | ) | |
| v. | ) | Magistrate Judge:  Jeffrey Cummings |
| | ) | |
| EIRIK RORVIG and NATIONS LENDING | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND DEMAND FOR JURY TRIAL

Guaranteed Rate, Inc. ("GRI" or the "Company"), by and through its attorneys, brings this Complaint against Eirik Rorvig ("Rorvig") and Nations Lending Corporation ("Nations") (collectively, the "Defendants"), and alleges as follows:

### NATURE OF THE CASE

1.     GRI brings this action to stop Defendants from misusing GRI confidential information and systematically, methodically, and purposefully pilfering entire groups of GRI employees.

2.      GRI brings claims of breach of contract, misappropriation of trade secrets, and breach of fiduciary duty against Rorvig. GRI's claims against Rorvig stem from his misuse of GRI confidential information, which is a trade secret under both Federal and Wisconsin law, to improperly solicit GRI employees that he managed or worked with at GRI to resign and join him at Nations. Rorvig's actions also violated the contractual non-solicitation and confidentiality obligations Rorvig owed GRI. To the extent this misconduct occurred while he was still employed

and being paid by GRI, GRI brings a claim against Rorvig for breach of his fiduciary duty of loyalty to GRI.

3.     More specifically, Rorvig is a former GRI employee who is now employed by Nations, a direct competitor of GRI. In the span of one month, eight (8) GRI employees, including Rorvig, abruptly resigned from GRI and moved to Nations. Shortly thereafter, six (6) additional GRI employees who worked with or under Rorvig resigned to move to Nations, and several other GRI employees received communications from Rorvig soliciting them to work at Nations.

4.     The GRI employees received communications from Nations soliciting them to work for Nations because, at Nations' direction, Rorvig compiled a "wish list" of GRI employees who could possibly join Rorvig at Nations.

5.     Rorvig compiled Nations' "wish list" of GRI employees by using his knowledge of and access to GRI confidential information about employee compensation, contact information, benefits, training, hiring techniques, and other personnel matters.  Rorvig then provided this information to Nations' recruiters and the recruiters used the confidential information to solicit GRI employees.

6.     Rorvig knew that creating and providing the "wish list" to Nations violated his GRI Agreement.

7.     In fact, Rorvig told Nations that creating and providing the "wish list" violated his GRI Agreement. Disturbingly, Nations essentially responded that it did not care about GRI's Agreements and, as such, Rorvig should move forward with creating and providing the "wish list" to Nations, which Rorvig did.

8.     Naturally then, GRI brings claims of tortious interference with contract, tortious inducement of breach of fiduciary duty, and misappropriation of trade secrets against Nations.

2

GRI's claims against Nations stem from Nations' knowing and intentional encouragement and inducement of former and current GRI employees, including but not limited to Rorvig, to breach the contractual and fiduciary obligations they owe GRI by soliciting and/or helping to solicit GRI employees to join Nations.

9.      For example, and in addition to the illegal activities mentioned above, Nations, through former GRI employee and current Nations Vice-President/Midwest Regional Manager Timothy Dowling ("Dowling"), conspired with Rorvig and potentially others to solicit GRI employees to move to Nations since at least November 2021. In the span of a few short months, fourteen (14) GRI employees from the same branch and/or region, including Rorvig, resigned from GRI to join Nations.

10.     As discussed above, Nations also knowingly encouraged and induced Rorvig and potentially other former GRI employees to help solicit current GRI employees to join Nations in violation of their contractual obligations to GRI by instructing the GRI employees to create and provide to Nations a "wish list" of GRI employees that Nations could solicit to join Nations.

11.     Despite receiving multiple cease and desist letters from GRI regarding this misconduct, Rorvig and Nations (through Dowling and other recruiters and employees) have persisted in their improper solicitation of GRI employees, including as recently as September 15, 2022.

12.     The full extent of Defendants' unlawful conduct is presently unknown because Rorvig and Nations have taken significant efforts to conceal their wrongdoing from GRI, including holding meetings in person, texting on personal devices, and having oral conversations on the telephone. On information and belief, Defendants are also communicating—or having people communicate on their behalf—with GRI employees on personal devices, personal email addresses,

through social media platforms (e.g., LinkedIn) and other channels hidden from GRI in order to covertly poach current GRI employees. Defendants' internal communications on Nations' systems are also currently inaccessible to GRI. Nevertheless, GRI has already uncovered substantial evidence of ongoing misconduct by these Defendants that has harmed GRI, and that will continue to cause irreparable harm unless Defendants are enjoined.

## PARTIES

13.     GRI is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 3940 North Ravenswood Avenue in Chicago, Illinois. GRI is a citizen of the State of Illinois. GRI is in the business of originating, closing, and selling mortgage loans and related products, and is one of the leading mortgage lenders in the United States.

14.     Rorvig is an individual who resides in Madison, Wisconsin. Rorvig is a citizen of the State of Wisconsin. Rorvig and GRI executed the Producing Branch Manager Compensation Plan and Agreement on December 27, 2019. ("Rorvig Agreement," attached hereto as **Exhibit A**.)

15.     Nations Lending Corporation is an Ohio corporation with its headquarters and principal place of business located at 4 Summit Park Drive, Suite 200, in Independence, Ohio.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction, pursuant to 28 U.S.C. §1331, because this action involves a claim arising under the laws of the United States, the Defend Trade Secrets Act of 2016, 18 U.S.C. §1832, et seq.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

21877245 v3

17.    This Court also has original jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1), as this is a civil action between parties of diverse citizenship and the amount in controversy exceeds $75,000.

18.    Venue is proper under 28 U.S. Code § 1391 because much of the wrongdoing and the harms associated with that wrongdoing occurred in this judicial district. In addition, both Rorvig and Nations conduct business in this District.

19.    For example, from March 8, 2021 through March 31, 2022, Nations generated tens of millions of dollars in loans, and several hundred thousands of dollars in fees, as the result of doing business in Illinois.

20.    Nations also sent several hundred thousand marketing and advertising communications to Illinois customers from March 2021 through March 31, 2022.

21.    In addition, Nations has:

- three office locations in the Chicagoland area (Evanston, Niles and Schaumburg);

- a Vice-President/Regional Manager (former GRI employee Timothy Dowling) who lives in Illinois and whose job duties include—and whose compensation is based on—ensuring the success and profitability of Nations' "Midwest Region," which includes Illinois; and

- hired multiple GRI employees who live in and/or work out of Illinois.

22.    Furthermore, in a three-month window, January 1, 2022 through March 31, 2022, Nations sent **545** solicitation communications to GRI employees, approximately **100** of whom are located in Illinois.  Hence, Nations' improper targeting and solicitation of GRI employees occurred (and is occurring) in Illinois, and Nations has directly interfered with contracts between GRI and its Illinois employees.

21877245 v3

23.    Finally, Rorvig, in addition to being licensed to do business in Illinois, consented to the exclusive jurisdiction of and venue in the federal court located in Cook County, Illinois, for the purpose of actions arising out of his employment with GRI and/or the Rorvig Agreement. (Ex. A, p. 16.)

24.    Nations was aware of Rorvig's license to do business in Illinois, as well as the requirement that Rorvig consent to the exclusive jurisdiction of and venue in the federal court located in Cook County, Illinois, when it hired Rorvig, instructed Rorvig to create a "wish list" of GRI employees to solicit to Nations, and had Rorvig assist in the illegal solicitation of GRI employees.

## BACKGROUND FACTS

### GRI

25.    GRI is a residential mortgage lender and is licensed to do business in every state. GRI employs loan officers across the country to offer residential mortgage loans to consumers. GRI is one of the top five retail mortgage lenders in the United States, and GRI and its affiliated companies funded more than $73 billion in loans in 2020.

26.    GRI has found success in the mortgage industry through its operations model and organizational structure, which includes a corporate office located in Chicago, Illinois and branch offices strategically located in key areas around the country, including a significant presence in the Midwest.

27.    The branch offices service the surrounding areas and mainly contain local sales teams made up of loan officers and operations support staff.

28.    These branch offices are run by branch managers, whose duties include overseeing and building the branch operations, recruiting top loan originators, and oftentimes managing loan

6

processers and operational staff.

29.     Loan officers are licensed salespeople who source potential borrowers, take loan applications, and quote mortgage rates.

30.     GRI's operations staff help loan officers source business, collect loan documents, and otherwise process loans by completing assorted tasks. GRI's operations staff have various titles depending on their specific job duties, including Loan Coordinator and Licensed Sales Assistant.

31.     Each position plays a pivotal role in GRI's success. As a result, GRI invests substantial time and money training and developing its employee base. Moreover, GRI expends substantial time and money building up its various branches in regions across the country to ensure success in cultivating and building local contacts, goodwill, and market share.

32.     GRI equips its employees with the tools they need to provide excellent client service and close mortgage loans for customers and prospective customers. GRI provides employees access to a trove of GRI confidential and proprietary information, cutting-edge technology and other resources. GRI also equips its loan officers with a variety of marketing resources that enable them to grow GRI's customer base and referral networks, building up from the local branch levels to benefit the regions and the company as a whole.

33.     GRI protects the confidential and proprietary information described in paragraph 32 by, among other things: limiting the disclosure and use of this information to only the GRI employees who need this information to perform their duties on behalf of GRI; developing and implementing policies and procedures regarding the use and protection of confidential information; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access its networks; and requiring employees to execute written

7

agreements that protect against the misuse and improper disclosure of this information.

34.     GRI receives a financial and economic benefit as a result of the above information being kept confidential and not publicly available.  Indeed, and as this Complaint describes in more detail below, a GRI competitor would receive a significant economic benefit and other industry advantages if the information was stolen and then used by a competitor.

35.     Similarly, a GRI competitor could not easily replicate or reengineer the confidential information described above without incurring significant economic, technological, and labor costs.

**RORVIG'S EMPLOYMENT AND AGREEMENT WITH GRI**

36.     As a condition of his employment, Rorvig signed the Rorvig Agreement on December 27, 2019. (Ex. A, pp. 8, 17.)

37.     As a Producing Branch Manager in Wisconsin, Rorvig's duties included procuring customers for the sale of mortgage loans to be secured by residential real estate through direct customer contact. He also assisted in recruiting top originators, strengthening his branch operations, and managing the operations and employees of his branch.

38.     As a Producing Branch Manager, Rorvig was entrusted with GRI's confidential information to assist him with these duties. The confidential information, as defined in the Rorvig Agreement ("Confidential Information"), included but was not limited to information about GRI's local sales, operations, business, personnel matters, the identity of GRI's top-performing employees, hiring criteria, pricing and cost structure of GRI's products and services, client or potential client identities, client relationship histories, and training techniques. (Ex. A, p. 13.)

39.     As a Producing Branch Manager, Rorvig used GRI's Confidential Information on a daily basis in order to perform the duties and obligations he owed GRI.

40.     As a Producing Branch Manager located in Wisconsin, Rorvig reported up to Dowling, GRI's Midwest Regional Manager until May 14, 2021, when Dowling resigned from GRI to join Nations as a Midwest Regional Manager.

41.     The Rorvig Agreement contains a Non-Solicitation Provision, which includes specific and unambiguous restrictions on the solicitation of GRI employees during a Restricted Period ("Non-Solicitation Obligation"). (Ex. A, pp. 14-15.) The Restricted Period for Rorvig is defined as "the period beginning with the first date of your employment with the Company and ending 24 months after the last day of your employment." (*Id.* at 14.)

42.     The Non-Solicitation Provision states:

> During the Restricted Period, you may not, directly or indirectly, solicit or attempt to solicit, entice, recruit influence, persuade, induce, promote, facilitate, encourage or assist in the solicitation of any Person employed/engaged by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment/engagement with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship with which you become employed or affiliated….During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

> You may ask the Company to provide you with written consent to engage in any of the foregoing activities.  The Company may approve or deny any such request in the Company's sole discretion.

> **If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.**  Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement.  You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

9

(Ex. A, pp. 14-15.) (emphasis in original.)

43.     The Rorvig Agreement also contains a Non-Disclosure of Confidential Information Provision, which includes specific and unambiguous restrictions on using and disclosing GRI Confidential Information, as defined therein, for GRI-business purposes only ("Confidentiality Obligation"). The Non-Disclosure of Confidential Information Provision states:

> (a) Confidential Information
>
> During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations; (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.
>
> (b) Use of Company's Confidential Information
>
> As consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

> Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for you actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions,(iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

(Ex. A, pp. 13-14.)

44.     By signing the Rorvig Agreement, Rorvig acknowledged that the Non-Solicitation and Non-Disclosure of Confidential Information Provisions in the Rorvig Agreement "are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of [GRI]." (Ex. A, p. 15.)

45.     Because the Non-Solicitation and Confidentiality Obligations are intended to survive after an employee leaves GRI, the Rorvig Agreement also contains a provision whereby Rorvig is obligated to notify prospective employers of his ongoing obligations to GRI ("Notification Obligation"). The Notification Obligation states:

> You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

(Ex. A, p. 13.)

46.     Rorvig notified Nations of the Non-Solicitation and Non-Disclosure of Confidential Information Provisions in the Rorvig Agreement, and the duties and obligations he owes GRI under those provisions.

47.     Unfortunately, and as more fully explained below, Nations told Rorvig to ignore and violate the duties and obligations he owes GRI and Rorvig chose to do so.

11

21877245 v3

48.     Also, and as more fully explained below, Nations encouraged, incentivized, and/or turned a blind eye to Rorvig and other former GRI employees ignoring and violating the duties and obligations they owe GRI.

## RORVIG VIOLATES THE AGREEMENT AND THE DUTIES AND OBLIGATIONS HE OWES GRI

49.     The Non-Solicitation Obligation, Confidentiality Obligation, and Notification Obligation (together, the "Post-Employment Obligations") apply both during and after an employee's employment with GRI.

50.     Occasionally, former employees run afoul of their Post-Employment Obligations. When GRI suspects an employee has or will violate their Post-Employment Obligations, GRI's legal team sends letters both to the former employee and to the new employer, putting all parties on notice of these Post-Employment Obligations.

51.     Rorvig resigned from GRI effective December 23, 2021. Shortly thereafter, in January 2022, Rorvig began working at Nations as a producing branch manager, the same title he held at GRI.

52.     Before resigning from GRI, Rorvig actively solicited GRI employees to leave GRI and join him at Nations.

53.     For example, prior to November 24, 2021, Rorvig met with GRI employees who were members of his GRI team at his home to discuss the GRI employees leaving GRI and joining Nations.

54.     Rorvig also had other meetings with GRI employees, outside of his home and before he resigned from GRI, where Rorvig spoke with the GRI employees about leaving GRI and joining Nations.

55.     During these meeting(s) with GRI employees that occurred before Rorvig resigned

21877245 v3

from GRI, Rorvig actively solicited GRI employees to leave GRI and join Nations.

56.     Based upon information and belief, Rorvig used and relied on GRI Confidential Information, including confidential GRI compensation information, to solicit GRI employees to leave GRI and join Nations.

57.     Rorvig also had meetings and conversations with Dowling, now a Nations employee and business leader, before he resigned from GRI about soliciting and moving other GRI employees to Nations.

58.     Before resigning from GRI, Rorvig also met and spoke with others at Nations, and received "positive feedback" from Nations, about meeting with and soliciting GRI employees to leave GRI and join Nations.

59.     In fact, Nations instructed Rorvig to create a "wish list" of employees that Nations could solicit to leave GRI and join Nations.

60.     Rorvig, however, knew that, under the Rorvig Agreement, he could "not, **directly or indirectly**, solicit or … **assist in the solicitation**" of GRI employees.

61.     Thus, Rorvig told Nations that creating the "wish list" violated the Rorvig Agreement.

62.     Nations knew that Rorvig providing the "wish list" was a violation of the Rorvig Agreement.

63.     Nevertheless, Nations told Rorvig that it was okay to create the wish list because Rorvig would not be the individual who directly called the GRI employees listed on the "wish list."

64.     Put another way. Nations knew that instructing Rorvig to create and turnover the "wish list" to Nations caused Rorvig to violate the Rorvig Agreement but Nations thought it could

hide the violation by having someone other than Rorvig solicit the GRI employees to join Nations.

65.     As a result of Rorvig's and Nation's solicitations, several GRI employees Rorvig managed or worked with at GRI—including 1) Meredith Richardson; 2) Kyle McManners; 3) Randy Barwick; 4) Chris Rollins; and 5) Paul Gagne—left GRI and joined Nations in quick succession.

66.     Based upon information and belief, the five former employees mentioned in Paragraph 65 are now working directly with or for Rorvig at Nations.

67.     Based upon information and belief, Nations knew that Rorvig contacted and/or spoke with Richardson, McManners, Barwick, Rollins, and Gagne about leaving GRI and joining Nations before Rorvig resigned from GRI.

68.     Nations encouraged Rorvig to directly or indirectly solicit GRI employees Richardson, McManners, Barwick, Rollins, and Gagne to leave GRI and join Nations.

69.     Nations knew that Rorvig soliciting GRI employees Richardson, McManners, Barwick, Rollins, and Gagne to leave GRI and join Nations violated the Rorvig Agreement.

70.      GRI sent Rorvig a cease and desist letter on January 5, 2022 because Rorvig was violating the Non-Solicitation and Confidentiality Obligations he owed GRI. (January 5, 2022 Cease and Desist Letter ("First Rorvig Letter"), attached hereto as **Exhibit B**.) In the First Rorvig Letter, GRI noted that:

> Recently, the following Guaranteed Rate employees whom you managed or worked with resigned in a manner that appears staggered and deliberately coordinated: 1) Meredith Richardson (December 10, 2021); 2) Kyle McManners (December 23, 2021); 3) Randy Barwick (December 29, 2021); 4) Chris Rollins (December 30, 2021); and 5) Paul Gagne (January 4, 2022). We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations, and that you are doing so in conjunction with former Guaranteed Rate employee Timothy Dowling (current Nations Midwest Regional Manager).

(Ex. B, p. 1-2.)

71.     In the First Rorvig Letter, GRI demanded that Rorvig immediately cease and desist all actions that constitute violations of his Non-Solicitation and Confidentiality Obligations to GRI.

72.     GRI reminded Rorvig that, under the Rorvig Agreement, he would be liable for $50,000 in damages for each violation of the Non-Solicitation Obligation. (Ex. B, p. 2.) GRI also informed Rorvig that, to the extent any violations of the Non-Solicitation and Confidentiality Obligations occurred while he still worked for GRI, such violations would also constitute a breach of the fiduciary duties Rorvig owed GRI. (*Id.*)

73.     GRI copied Nations on the First Rorvig Letter "to make it aware of [Rorvig's] continuing obligations to Guaranteed Rate and of these issues." (Ex. B, p. 2.) GRI also demanded that Nations and Rorvig take steps to maintain and preserve documents related to these issues. (*Id.*)

74.     Unfortunately, Rorvig's solicitation of GRI employees did not cease after GRI issued the First Rorvig Letter to Rorvig and Nations.

75.     Instead, Rorvig continued soliciting GRI employees that he managed or worked with, including GRI employees Richard Cohen, Lee Kampa, and Dawn Kaczmark, to leave GRI and join Nations.

76.     Based upon information and belief, Rorvig used and relied on GRI Confidential Information, including confidential GRI compensation information, to solicit Cohen, Kampa, and Kaczmark to leave GRI and join Nations.

77.     Based upon information and belief, Nations knew that Rorvig contacted and/or spoke with Cohen, Kampa, and Kaczmark about leaving GRI and joining Nations.

78.     Based upon information and belief, Nations was aware of Rorvig soliciting GRI employees Cohen, Kampa, and Kaczmark to leave GRI and join Nations.

15

79.     Based upon information and belief, Nations encouraged Rorvig to solicit GRI employees Cohen, Kampa, and Kaczmark to leave GRI and join Nations.

80.     Based upon information and belief, Nations knew that Rorvig soliciting GRI employees Cohen, Kampa, and Kaczmark to leave GRI and join Nations violated the Rorvig Agreement.

81.     As a result of Rorvig's and Nations' continued illegal activity, on January 18, 2022, GRI sent Rorvig a second cease and desist letter. (January 18, 2022 Cease and Desist Letter ("Second Rorvig Letter"), attached hereto as **Exhibit C**.) In the Second Rorvig Letter, GRI noted that since it had sent the First Rorvig Letter, three (3) additional GRI employees whom Rorvig managed or worked with had resigned in quick succession to join Nations:

> Since I sent the January 5th Letter, and indeed since your response on January 7th, we have learned that three other Guaranteed Rate employees whom you managed or with whom you worked resigned, and we have reason to believe they will be joining you and Tim Dowling at Nations Lending ("Nations"), your new employer. Specifically, we learned that Richard Cohen resigned on January 10, 2022, Lee Kampa resigned on January 14, 2022, and Dawn Kaczmark resigned on January 17, 2022. Their resignations appear to be a continuation of the coordinated campaign waged by you and Mr. Dowling to solicit Guaranteed Rate employees to Nations: 1) Meredith Richardson (December 10, 2021); 2) Kyle McManners (December 23, 2021); 3) Randy Barwick (December 29, 2021); 4) Chris Rollins (December 30, 2021); and 5) Paul Gagne (January 4, 2022). We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations.

(Ex. C, p. 1.)

82.     At Nations, Rorvig manages and/or directly works with several of these former GRI employees, including Gagne, McManners, Rollins, Kampa, Kaczmark, and Cohen.

83.     In the Second Rorvig Letter, GRI informed Rorvig that its investigation into his violations had unearthed evidence that Rorvig was working in conjunction with Dowling to solicit

16

GRI employees to Nations, in violation of both of their Post-Employment Obligations to GRI:

> Specifically, we have found emails from Joe Noonan to you and Mr. Cohen detailing his conversations with you both regarding the circumstances of your moves from Guaranteed Rate to Nations. In one email, dated November 24, 2021 and with the subject 'Factors to Decision → New Mortgage Company,' Mr. Noonan provides notes from his conversation with you, detailing the following: 1) you met with your team at your home the previous day to discuss moving to a new mortgage company and that it was a 'productive' conversation; and 2) you had '[g]reat conversations with Tim Dowling @ Nations Bank.' In another email, dated December 14, 2021, Mr. Noonan writes to Mr. Cohen recapping their conversation, noting that Mr. Cohen is '[e]xcited to move to Nations Bank in January with Eirik's team' and that Mr. Cohen had '[s]poke[n] to team members at Nations and feedback is positive.'

(Ex. C, p. 1-2.)

84. GRI copied Nations on the Second Rorvig Letter to again "make it aware of [Rorvig's] continuing obligations to Guaranteed Rate and of these issues." (Ex. C, p. 2.) GRI also reiterated its demand that Rorvig and Nations maintain and preserve all documents related to this dispute. (*Id.*)

85. On February 1, 2022, GRI sent Rorvig a third and final cease and desist letter in an effort to get his violations to stop. (February 1, 2022 Letter ("Third Rorvig Letter"), attached hereto as **Exhibit D**.) In the Third Rorvig Letter, GRI again outlined Rorvig's many violations of his Non-Solicitation and Confidentiality Obligations to GRI and demanded written assurances from Rorvig that he would stop misusing GRI Confidential Information and soliciting GRI employees in violation of his Non-Solicitation and Confidentiality Obligations to GRI. (*Id.* at 2-3.)

86. In the Third Rorvig Letter, GRI also sought to resolve this dispute but its overtures were rebuffed. (Ex. D, p. 2-3.)

87. As of the date of this filing, Rorvig continues to violate his Non-Solicitation and Confidentiality Obligations to GRI. Since GRI sent the Third Rorvig Letter, GRI has learned that

21877245 v3

Rorvig has contacted and/or spoken with at least four GRI branch managers about leaving GRI and joining Nations.

88.     Based on Rorvig's flagrant violations of his Non-Solicitation and Confidentiality Obligations—many of which occurred even after he received cease and desist letters from GRI—there is little doubt that Rorvig will continue his campaign to misuse GRI Confidential Information and improperly solicit GRI employees unless enjoined.

### ADDITIONAL ILLEGAL ACTIVITY BY NATIONS

89.     Dowling resigned from his position as GRI's Midwest Regional Manager on May 14, 2021. Shortly thereafter, Dowling began working for Nations as its Midwest Vice-President/Regional Manager.

90.     In this capacity, Dowling is responsible for, among other things, recruiting Illinois employees for Nations and growing Nations' business in Illinois.

91.     Not surprisingly then, after leaving GRI, Dowling sent email and text messages to GRI employees soliciting the GRI employees to leave GRI and join Nations.

92.     More specifically, Dowling sent email and text messages to GRI employees stating that he is "checking in to say hello and see if [the GRI employee] would be open to a conversation with [Dowling]?"

93.     Dowling also tells the GRI employee in his email and text messages that he "is looking for leadership in IL and WI and was hoping we could talk."

94.     As part of his employment with GRI, Dowling executed an employment agreement with GRI that contains the same Non-Solicitation and Confidentiality Obligations as the Rorvig Agreement ("Dowling Agreement").

21877245 v3

95.     Thus, Dowling knew (and knows) that sending text and email messages like the messages identified in paragraphs 92 and 93 violate the duties and obligations he owes GRI under the Dowling Agreement.

96.     Despite this knowledge, Dowling knowingly solicited GRI employees in violation of the duties and obligations he owes GRI under the Dowling Agreements.

97.     Nations knew that Dowling sending the text and email messages identified in paragraphs 92 and 93 violated the Dowling Agreement but, nevertheless, instructed and/or encouraged Dowling to send the text and email messages in order to solicit GRI employees to Nations.

98.     In doing so, Nations instructed and/or encouraged Dowling to violate the Dowling Agreement.

99.     On May 25, 2021, GRI sent a letter to Dowling reminding him of his Post-Employment Obligations to GRI. (May 25, 2021 Letter ("Reminder Letter"), attached hereto as **Exhibit E**.) In the Reminder Letter, GRI advised Dowling of his ongoing Non-Solicitation and Confidentiality Obligations to GRI. (*Id.*)

100.    GRI copied Nations on the Reminder Letter in order to make Nations aware of Dowling's Post-Employment Obligations to GRI. (Ex. E.)

101.    On January 5, 2022, GRI sent Dowling a cease and desist letter because it had strong reason to believe Dowling had violated his Non-Solicitation and Confidentiality Obligations to GRI. (January 5, 2022 Cease and Desist Letter ("First Dowling Letter"), attached hereto as **Exhibit F**.) In the First Dowling Letter, GRI noted the basis for its belief in Dowling's misconduct:

> Recently, the following Guaranteed Rate employees resigned in a manner
> that appears staggered and deliberately coordinated: 1) Meredith

> Richardson (December 10, 2021); 2) Barbara Miller (December 20, 2021); 3) Eirik Rorvig (December 23, 2021); 4) Kyle McManners (December 23, 2021); 5) Randy Barwick (December 29, 2021); 6) Chris Rollins (December 30, 2021); and 7) Paul Gagne (January 4, 2022). These are individuals whom you managed at Guaranteed Rate or who worked directly with individuals you managed at Guaranteed Rate. We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations.

(Ex. F, p. 1-2.)

102.     GRI copied Nations on the First Dowling Letter in order "to make it aware of [Dowling's] continuing obligations to Guaranteed Rate and of these issues." (Ex. F, p. 2.) GRI also demanded that Nations and Dowling take steps to maintain and preserve documents related to these issues. (*Id.*)

103.     Subsequently, on January 18, 2022, GRI sent Dowling a second cease and desist letter. (January 18, 2022 Cease and Desist Letter ("Second Dowling Letter"), attached hereto as **Exhibit G**.) In the Second Dowling Letter, GRI noted that since it had sent the First Dowling Letter, three (3) additional GRI employees whom Dowling managed or worked with had resigned in quick succession to join Nations:

> Since I sent the January 5th Letter, and indeed since your response on January 7th, we have learned that three other Guaranteed Rate employees resigned, and we have reason to believe they will be joining you and Eirik Rorvig at Nations Lending ("Nations"), your employer. Specifically, we learned that Richard Cohen resigned on January 10, 2022, Lee Kampa resigned on January 14, 2022, and Dawn Kaczmark resigned on January 17, 2022. Their resignations appear to be a continuation of the coordinated campaign waged by you and Mr. Rorvig to solicit Guaranteed Rate employees to Nations: 1) Meredith Richardson (December 10, 2021); 2) Barbara Miller (December 20, 2021); 3) Mr. Rorvig himself (December 23, 2021); 4) Kyle McManners (December 23, 2021); 5) Randy Barwick (December 29, 2021); 6) Chris Rollins (December 30, 2021); and 7) Paul Gagne (January 4, 2022). The above are individuals whom you managed at Guaranteed Rate or who worked directly with individuals you managed at Guaranteed Rate. We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of

20

these individuals to recruit them to work at Nations.

(Ex. G, p. 1.)

104.    In the Second Dowling Letter, GRI informed Dowling that its investigation into his

violations had unearthed evidence that Dowling was working in conjunction with Rorvig to solicit

GRI employees to Nations, in violation of both of their Post-Employment Obligations to GRI:

> Specifically, we have found emails from Joe Noonan to Mr. Rorvig and Mr.
> Cohen detailing his conversations with them regarding the circumstances of
> their moves from Guaranteed Rate to Nations. In one email, dated
> November 24, 2021 and with the subject 'Factors to Decision → New
> Mortgage Company,' Mr. Noonan provides Mr. Rorvig with notes from
> their conversation, detailing the following: 1) Mr. Rorvig met with his team
> at his home the previous day to discuss moving to a new mortgage company
> and that it was a 'productive' conversation; and 2) Mr. Rorvig had '[g]reat
> conversations with Tim Dowling @ Nations Bank.' In another email, dated
> December 14, 2021, Mr. Noonan writes to Mr. Cohen recapping their
> conversation, noting that Mr. Cohen is '[e]xcited to move to Nations Bank
> in January with Eirik's team' and that Mr. Cohen had '[s]poke[n] to team
> members at Nations and feedback is positive.'

(Ex. G, p. 1-2.)

105.    GRI copied Nations on the Second Dowling Letter in order to, again, "make it

aware of [Dowling's] continuing obligations to Guaranteed Rate and of these issues." (Ex. G, p.

2.) GRI also reiterated its demand that Dowling and Nations maintain and preserve all documents

related to this dispute. (*Id.*)

106.    On February 1, 2022, GRI sent Dowling a third and final cease and desist letter in

an effort to get his violations to stop. (February 1, 2022 Letter ("Third Dowling Letter"), attached

hereto as **Exhibit H**.) In the Third Dowling Letter, GRI again outlined Dowling's many violations

of his Non-Solicitation and Confidentiality Obligations to GRI and demanded written assurances

from Rorvig that he would stop misusing GRI Confidential Information and soliciting GRI

employees in violation of his Non-Solicitation and Confidentiality Obligations to GRI. (*Id.* at 2-

3.)

107.     In the Third Dowling Letter, GRI also sought to resolve this dispute, but its overtures were rebuffed. (Ex. H, p. 2-3.)

108.     On February 3, 2022, GRI sent Nations a letter regarding the ongoing violations of Dowling, its Midwest Regional Manager, and Rorvig, its Producing Branch Manager. (February 3, 2022 Letter ("Nations Letter"), attached hereto as **Exhibit I**.)

109.     In the Nations Letter, GRI demanded, among other things, that Nations instruct Dowling and Rorvig to stop misusing GRI Confidential Information and soliciting GRI employees in violation of their Non-Solicitation and Confidentiality Obligations to GRI. (Ex. I, p. 2.)

110.     In the Nations Letter, GRI informed Nations that it would take necessary steps to enforce its contractual rights and legitimate business interests, and that it may seek damages and injunctive relief against Dowling, Rorvig and Nations if the violations of Dowling's and Rorvig's Non-Solicitation and Confidentiality Obligations to GRI continued. (Ex. I, p. 2.)

111.     Unfortunately, and based upon the continued actions of Rorvig and Dowling, Nations did not instruct Dowling and Rorvig to stop misusing GRI Confidential Information.

112.     Nor did Nations instruct Rorvig and Dowling to stop soliciting GRI employees. To the contrary, on information and belief, Nations continues to encourage, induce and/or incentivize former GRI employees to solicit current GRI employees directly and/or indirectly through Nations' recruiters.

113.     For example, on February 16, 2022, Katie Dorece, a Vice President for Market Growth in the Wisconsin/Illinois Region of GRI's Midwest Division, resigned from GRI to join Nations as a Senior Recruiter.

21877245 v3

114.    As part of her employment with GRI, Dorece executed an employment agreement with GRI that contains the same Non-Solicitation and Confidentiality Obligations as the Rorvig Agreement and Dowling Agreement.

115.    Despite having the same Non-Solicitation and Confidentiality Obligations, Dorece actively solicited GRI employees to leave GRI and join Nations.

116.    In fact, in one email communication sent a little over a month after joining Nations, Dorece wrote to approximately **100** GRI employees:

> I would love to learn what you are doing to stay competitive and tell you about the tools we have available.  What works for a quick call this week?

117.    Not surprisingly then, even after the Nations Letter was sent, Nations continues to pilfer GRI employees from the Midwest Region, sometimes an entire branch at a time.

118.    On information and belief, this poaching of GRI employees is happening through Rorvig and Dowling (and potentially other former and current GRI employees such as Dorece) and with the assistance and misuse of GRI Confidential Information.

119.    More specifically, on March 15, 2022, Nick Wurzer, a branch manager from GRI's Wisconsin/Illinois Region, resigned from GRI to join Nations.

120.    When resigning, Wurzer preemptively went out of his way to declare that Dowling never contacted him and confirmed that Rorvig had contacted him regarding the compensation model at Nations.

121.    On March 15, 2022, Adam Cook, a GRI loan officer who reported to Wurzer resigned to go to Nations. Dorece sent Cook messages on LinkedIn on or around the time Cook resigned from GRI.

122.    On March 21, 2022, Matt Hoekstra, a GRI loan officer who reported to Wurzer resigned to go to Nations.

123.     On May 16, 2022, Richard Demonica, a Senior Vice President of Strategic Growth in Illinois who worked with Dowling at GRI, resigned to go to Nations. Three GRI employees whom Demonica directly worked with and/or managed also resigned to go to Nations shortly thereafter. Brian Augustine, a loan officer based in Illinois, resigned on June 29, 2022. Caise Hassan, a producing branch manager based in Illinois, resigned on July 5, 2022. Amy Pinkerton, a loan officer based in Indiana, resigned on August 1, 2022.

124.     On information and belief, Demonica also recruited members of a GRI branch in Illinois managed by Michael Curtin. Between September 1, 2022 and September 13, 2022, 19 GRI employees (including Curtin) affiliated with the same branch resigned to go to Nations.

125.     On June 29, 2022, Greg Griffin, a Senior Vice President of Strategic Growth in Illinois, resigned to go to Nations. Subsequently, Griffin solicited GRI employees to join him at Nations, primarily through John Owens ("Owens").  Owens is the Vice President of Strategic Growth at Nations.

126.     Griffin solicited Cara Srogus, a producing branch manager based in Illinois, to join Nations through Owens. Griffin was Srogus' regional manager at GRI. (Declaration of Cara Srogus, attached hereto as **Exhibit J**, ¶ 4.)

127.     On or shortly after resigning from GRI, Griffin called Srogus and asked her if she would be open to receiving a call from Owens. (Declaration of Cara Srogus, ¶ 5.) Griffin told Srogus that he could not solicit her directly because of the Non-Solicitation obligations in his employment agreement with GRI, but that he could recruit her through Owens. (*Id.*)

128.     Griffin told other GRI employees to expect similar recruiting calls from Owens on his behalf. (*Id.* ¶ 11.) For example, Griffin contacted Jason Chandler, Chris Broadhurst and Mark Larsen to discuss employment at Nations. (*Id.*) Broadhurst resigned from GRI to work at Nations

on September 15, 2022.

129.     Owens called and texted Srogus' personal cell phone several times to discuss employment at Nations in the months after Griffin's resignation from GRI. (*Id.* ¶¶ 7, 10.) Griffin also contacted Srogus directly to encourage her to speak to Owens about employment at Nations and tried to persuade her of the many ways in which he thought Nations was a better place to work than GRI. (*Id.* ¶¶ 5, 8-9.)

130.     On information and belief, Owens has texted several GRI employees whom Griffin managed or directly worked with, including Britney Stiles.

131.     On August 31, 2022, Christian White, a Vice President of Growth in Illinois, resigned to go to Nations.

132.     As of this filing and since Dowling joined Nations in May 2021 as its Midwest Regional Manager, the following GRI employees have been improperly solicited and poached from GRI's Midwest Division by Rorvig (directly and/or indirectly through Nations' recruiters based on information Rorvig provided) before and after Rorvig resigned from GRI, and/or Nations (through Dowling as Nations' Midwest Manager and/or through recruiters soliciting on behalf of former GRI employees like Demonica and Griffin):

| Name | GRI Resignation Date | GRI Position |
|---|---|---|
| Meredith Richardson | December 10, 2021 | Loan Coordinator who worked with Barbara Miller |
| Barbara Miller | December 20, 2021 | Branch Manager in the Wisconsin/Illinois Region who reported to Dowling |
| Eirik Rorvig | December 23, 2021 | Branch Manager in the Wisconsin/Illinois Region who reported to Dowling |
| Kyle McManners | December 23, 2021 | Loan officer who reported to |

| | | Rorvig |
|---|---|---|
| Randy Barwick | December 29, 2021 | Area Manager who reported to Dowling |
| Chris Rollins | December 30, 2021 | Loan officer who reported to Rorvig |
| Paul Gagne | January 4, 2022 | Sales assistant who reported to Rorvig |
| Richard Cohen | January 10, 2022 | Loan officer who reported to Rorvig |
| Lee Kampa | January 14, 2022 | Loan officer who reported to Rorvig |
| Dawn Kaczmark | January 17, 2022 | Loan officer who reported to Rorvig |
| Katie Dorece | February 16, 2022 | Vice president for market growth in the Wisconsin/Illinois Region |
| Nick Wurzer | March 15, 2022 | Branch manager in the Wisconsin/Illinois Region |
| Adam Cook | March 15, 2022 | Loan officer who reported to Wurzer |
| Matt Hoekstra | March 21, 2022 | Loan officer who reported to Wurzer |
| Richard Demonica | May 16, 2022 | Senior vice president of strategic growth in Illinois who used to work with Dowling |
| Brady Griffin | June 28, 2022 | Loan coordinator in Illinois who worked under Griffin |
| Gregory Griffin | June 29, 2022 | Senior vice president of strategic growth in Illinois |
| Brian Augustine | June 29, 2022 | Senior loan officer who worked with Demonica |

| | | |
|---|---|---|
| Caise Hassan | July 5, 2022 | Producing branch manager in Illinois who worked with Demonica |
| Dave Oller | July 25, 2022 | Loan officer in Illinois who worked under Griffin |
| Amy Pinkerton | August 1, 2022 | Loan officer in Indiana who worked under Demonica |
| Christian White | August 31, 2022 | Vice president of market growth in Illinois who worked under Griffin |
| Matt Medinger | September 1, 2022 | Loan Officer in Illinois who worked with Curtin |
| Fabian Herrera | September 6, 2022 | Closing Coordinator in Illinois who worked with Curtin |
| Rafal Nawara | September 6, 2022 | Assistant Loan Officer in Illinois who worked with Curtin |
| Jose Razo | September 6, 2022 | Loan Officer in Illinois who worked with Curtin |
| Hasan Abutaleb | September 7, 2022 | Loan Officer in Illinois who worked with Curtin |
| Jash Chavero | September 7, 2022 | Loan Officer in Texas who worked with Curtin |
| Andrew Creagh | September 7, 2022 | Assistant Loan Officer in Illinois who worked with Curtin |
| Oscar Padilla | September 7, 2022 | Business Development Coordinator in Illinois who worked with Curtin |
| John Pearson | September 7, 2022 | Business Development Coordinator in Illinois who worked with Curtin |
| Isabel Perez | September 7, 2022 | Business Development Coordinator in Illinois who |

27

| | | worked with Curtin |
|---|---|---|
| Kyle Perks | September 7, 2022 | Senior Loan Officer in Illinois who worked with Curtin |
| Kevin Scott | September 7, 2022 | Loan Officer in Illinois who worked with Curtin |
| Angie Wozniak | September 7, 2022 | Loan Officer in Illinois who worked with Curtin |
| Ashley Arroyo | September 8, 2022 | Loan Coordinator in Illinois who worked with Curtin |
| Alysse McHale | September 8, 2022 | Licensed Production Manager in Illinois who worked with Curtin |
| Dayanara Medina | September 8, 2022 | Mortgage Consultant in Illinois who worked with Curtin |
| David Pinelli | September 8, 2022 | Mortgage Consultant in Illinois who worked with Curtin |
| Christopher Tylka | September 8, 2022 | Loan Officer in Illinois who worked with Curtin |
| Michael Curtin | September 13, 2022 | Producing Branch Manager in Illinois who worked with Demonica |

133.    These resignations have caused severe business and operations disruption to GRI, as they include key figures from all levels of GRI's loan origination process in its Wisconsin/Illinois Region specifically, and its Midwest Division more generally. The losses to GRI include six (6) branch and area managers, twenty (20) loan officers, and 15 various operations and sales staff such as production managers, recruiters, loan coordinators and sales assistants.

134.    Moreover, GRI is aware that Nations, through Rorvig, Dowling, Dorece, Griffin and other former GRI employees continues to solicit GRI employees.

135.    In fact, three additional branch managers were contacted by Rorvig in March 2022 to leave GRI and join Nations.

136.    Rorvig's contacting of the three additional branch managers was a solicitation by Rorvig of the three branch managers and, based upon information and belief, approved and/or encouraged by Nations.

137.    In addition, Wurzer has almost certainly been in contact with, and solicited by, Dowling given his preemptive denial of the same.

138.    Nations has been aware of the Non-Solicitation and Confidentiality Obligations that GRI's former employees owe GRI since at least May 25, 2021, when GRI sent the Reminder Letter to Dowling and copied Nations. (Ex. E.)

139.    Moreover, Nations has been on notice of its employees' violations of the Non-Solicitation and Confidentiality Obligations since it was copied on the First and Second Rorvig and Dowling Letters on January 5, 2022 and January 18, 2022, respectively, and since Nations received a separate letter from GRI regarding these issues on February 3, 2022. (Exs. B, C, F, G, I.)

140.    Furthermore, Nations was copied on letters that GRI sent to Demonica (July 7, 2022), Augustine (July 7, 2022), Griffin (July 7, 2022), and White (September 15, 2022), reminding them of their Post-Employment Obligations to GRI and demanding that they cease and desist any actions that breach those obligations. (The letters are attached hereto as **Exhibit K**.) In the letter sent to Demonica, GRI specifically noted that it was currently involved in litigation against Rorvig and Nations, and that as such:

21877245 v3

Guaranteed Rate's concerns about your employment with Nations and/or solicitation by you of Guaranteed Rate employees to follow you to Nations not only cover whether your employment with Nations violates any duty or obligation <u>you</u> owe to Guaranteed Rate, but also whether Nation in any way induced, encouraged and/or incentivized Timothy Dowling or any other former Guaranteed Rate employees to violate <u>their</u> obligations to Guaranteed Rate by recruiting and/or hiring you.

(Exhibit K, p. 2) (emphasis in original.)

141. Nevertheless, Nations continues its encouragement, inducement, and/or condoning of its employees' violations of the Non-Solicitation and Confidentiality Obligations they owe GRI, even after the filing of the instant matter.

142. Specifically, and as mentioned above, Nations encouraged, induced and/or incentivized Rorvig (and potentially other former GRI employees) to provide "wish lists" of GRI employees they wanted to solicit to leave GRI and join Nations.

143. Nations then provided these "wish lists" to its recruiters so the recruiters could solicit GRI employees on behalf of the former GRI employees and to have the current GRI employees leave GRI and join Nations.

144. Nations' actions in having former GRI employees create solicitation "wish lists" is a blatant effort to circumvent the Non-Solicitation and Confidentiality Obligations of former GRI employees.

145. Even more egregious, Nations knew (and knows) that asking a former GRI employee to create the "wish list" is a blatant violation of the Non-Solicitation and Confidentiality Obligations the former GRI employees owe GRI,

146. Nations nonetheless represents (and represented) to the former GRI employees that this type of indirect solicitation is okay and does not violate the duties and obligations the former GRI employees owe GRI.

21877245 v3

147.    Given Nations utter disregard for the Non-Solicitation and Confidentiality Obligations the former GRI employees owe GRI, GRI has reason to believe that Nations will continue this campaign to improperly poach and attempt to poach GRI employees—and enjoy the ill-gotten benefits thereof—unless enjoined.

## GRI'S RIGHT TO INJUNCTIVE RELIEF

148.    Rorvig has materially breached his Agreement and fiduciary duties to GRI, committed other violations of law, and is likely to continue to do so—and in fact has continued to do so—unless enjoined as requested herein.

149.    Nations has induced and encouraged Dowling, Rorvig, Demonica, Dorece, Griffin, and potentially others to breach their contractual and fiduciary obligations to GRI. Moreover, Nations has tortiously interfered and unfairly competed with GRI by reaping the benefits of wrongfully poaching key figures from GRI's Midwest Region within short order and through ill-gotten means and information. Nations is likely to continue this misconduct—and in fact has continued this misconduct—unless enjoined as requested herein.

150.    Defendants' breaches and other violations of law have caused and will continue to result in substantial, irreparable, and foreseeable harm to GRI for which there is no adequate remedy at law.

151.    Thus, without the preliminary and permanent injunctive relief requested herein, GRI will continue to suffer substantial and irreparable harm for which there is no adequate remedy at law.

152.    GRI has a substantial likelihood of success on the merits of its claims.

153.    The threat of harm to GRI in the absence of injunctive relief as requested herein far outweighs the threat of any harm to Defendants if injunctive relief is granted. As noted above, GRI

21877245 v3

faces substantial and irreparable harm if Defendants' breaches and violations of law are permitted to continue unabated.

154.     In contrast, there is no hardship imposed on Defendants. Rorvig and Nations remain free to conduct business, but without the unfair competitive aid of stolen and misused GRI Confidential Information and improper solicitation of GRI employees and inducement to breach contractual and fiduciary obligations. Defendants' only burden is to comply with the law and for Rorvig to comply with the Rorvig Agreement, compete fairly and lawfully in the market, and refrain from reaping any illicit gain or benefit from the breach of his contractual and fiduciary obligations to GRI.

155.     The public interest favors preventing Defendants from reaping illicit gains by breaching or inducing the breach of contractual and fiduciary obligations to GRI and committing other violations of law, including, among other things, misusing GRI's Confidential Information for their own benefit and to improperly solicit GRI employees.

## CLAIMS

### COUNT I – BREACH OF CONTRACT (CONFIDENTIAL INFORMATION)
### (Against Rorvig)

156.     GRI incorporates and re-alleges Paragraphs 1 through 155 as if fully set forth herein.

157.     The Rorvig Agreement is a valid and enforceable contract that imposes upon Rorvig certain contractual obligations and restrictive covenants, including the Confidentiality Obligation.

158.     GRI has performed all of its obligations under the Rorvig Agreement or those obligations are excused under the circumstances.

32

159.    Pursuant to the Non-Disclosure of Confidential Information Provision in the Rorvig Agreement, Rorvig was and is prohibited from seeking, accepting, providing, disclosing, or using for his own benefit or the benefit competitor like Nations or other third party GRI Confidential Information. Confidential Information includes, but is not limited to, information about GRI's sales, operations, business, personnel matters, the identity of GRI's top-performing employees, hiring criteria, pricing, and cost structure of GRI's products and services, client or potential client identities, client relationship histories, and training techniques.

160.    Rorvig misappropriated and/or misused GRI Confidential Information about GRI's top-performing employees in the Wisconsin/Illinois Region—employees whom he managed or who directly worked with him—to solicit them to Nations with competitive, lucrative offers. This Confidential Information included data about their compensation, training, and the business goodwill and contacts developed in the region through GRI's resources, promotional strategies and operations.

161.    Rorvig's misappropriation and/or misuse of GRI Confidential Information is a breach of the explicit terms of the Rorvig Agreement, and GRI has suffered—and continues to suffer—damages as a result of this breach.

**WHEREFORE**, GRI respectfully requests that this Court enter judgment in its favor and against Rorvig, award GRI compensatory damages in an amount in accord with the proofs, but in any event, no less than $100,000 for Rorvig's misappropriation and/or misuse of GRI's Confidential Information, enter an injunction enjoining Rorvig from using, possessing or accessing GRI Confidential Information, award GRI its reasonable attorney's fees and costs associated with bringing this action, and award GRI any other and further relief this Court deems just and equitable.

## COUNT II – BREACH OF CONTRACT (NON-SOLICITATION OF EMPLOYEES)
### (Against Rorvig)

162.    GRI incorporates and realleges Paragraphs 1 through 162 as if fully set forth herein.

163.    The Rorvig Agreement is a valid and enforceable contract that imposes upon Rorvig certain contractual obligations and restrictive covenants, including the Non-Solicitation Obligation.

164.    GRI has performed all of its obligations under the Rorvig Agreement or those obligations are excused under the circumstances.

165.    Pursuant to the terms of the Rorvig Agreement, during the course of Rorvig's employment and for 24 months thereafter ("Restricted Period"), Rorvig could not and cannot, directly or indirectly, solicit or attempt to solicit, entice, recruit influence, persuade, induce, promote, facilitate, encourage or assist in the solicitation of any Person employed/engaged by GRI to end their employment with GRI and/or to join him in any new business venture or business relationship with which he becomes employed or affiliated.

166.    Pursuant to the terms of the Rorvig Agreement, Rorvig may not supervise, manage, or oversee the work of any former GRI employee during the Restricted Period.

167.    Pursuant to the explicit terms of the Agreement, in the event Rorvig breaches the Non-Solicitation Provision of the Rorvig Agreement, he shall be liable to GRI for each employee solicited in the amount of Fifty Thousand Dollars ($50,000) as liquidated damages.

168.    As alleged above, Rorvig breached the Non-Solicitation Provision of the Rorvig Agreement, in part or wholly *while he was still employed by GRI*, by soliciting or helping to solicit at least 14 GRI employees from the Wisconsin/Illinois Region of GRI's Midwest Division to leave GRI and join Nations with him. As noted above, each of these individuals resigned from GRI around the same time or shortly after Rorvig did, with contemporaneous correspondence showing

34

that Rorvig's team members secretly met at Rorvig's house to discuss moving to Nations to work with Rorvig and Dowling. Rorvig managed or worked with these former GRI employees in the Wisconsin/Illinois Region, and on information and belief, he manages or works directly with many of them at Nations in its Midwest Region. Given the number of employees supervised by Rorvig and the timing of their resignations, Rorvig improperly solicited his team members and others he worked with in the Wisconsin/Illinois Region to depart GRI and join Nations.

169.    Furthermore, since joining Nations, Rorvig has continued to breach the Non-Solicitation Provision of the Rorvig Agreement by personally soliciting more current GRI employees, including at least three branch managers in the Wisconsin/Illinois Region.

170.    Moreover, Rorvig provided Nations with a "wish list" of GRI employees he wants Nations to recruit on his behalf, at the behest of Nations. Nations has, through its recruiters like Owens, actively and aggressively solicited those current GRI employees on wish lists provided by Rorvig and potentially other former GRI employees working at Nations. As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law.  Such irreparable harm will continue unless Rorvig is enjoined as requested in the Prayer for Relief below.

**WHEREFORE**, GRI respectfully requests this Court enter judgment in its favor and against Rorvig, award GRI compensatory damages in an amount in accord with the proofs, but in any event, no less than $100,000 for Rorvig's unlawful solicitations, award GRI liquidated damages in the amount of $50,000 for each of Rorvig's unlawful solicitations, enter an injunction enjoining Rorvig from soliciting GRI employees until after December 23, 2023, award GRI its reasonable attorney's fees and costs associated with bringing this action, and award GRI any other and further relief this Court deems just and equitable.

21877245 v3

## COUNT III – BREACH OF FIDUCIARY DUTY
### (Against Rorvig)

171.    GRI incorporates and realleges Paragraphs 1 through 170 as if fully set forth herein.

172.    At all relevant times prior to his resignation from GRI, Rorvig was an employee of GRI.

173.    At all relevant times prior to his resignation from GRI, Rorvig owed GRI fiduciary duties of trust, loyalty, full disclosure, and good faith with respect to all matters within the scope of his agency.

174.    Rorvig, while still employed by GRI, solicited his team members and other GRI employees to terminate their employment with GRI and to join Nations. Rorvig's breach of his fiduciary duties by improperly soliciting GRI's employees *while still employed by GRI* was willful and intentional, as evidenced by contemporaneous emails showing that Rorvig's team members met secretly at his house to discuss joining Rorvig and Dowling at Nations. This particular meeting occurred on November 23, 2021; Rorvig resigned from GRI on December 23, 2021.

175.    Moreover, another email from before Rorvig's resignation, dated December 14, 2021, showed that another member of Rorvig's team, Richard Cohen, was "excited to move to Nations Bank in January with Eirik [Rorvig]'s team."

176.    Rorvig's wrongful conduct has caused immediate, substantial, and ongoing injury to GRI, including economic harm in the form of the disruption and damage to GRI's relationships with its valued employees, the continuing loss of its competitive position, loss of market share, and lost profits.

**WHEREFORE**, GRI requests this Court enter judgment in its favor and against Rorvig, award GRI compensatory damages in an amount in accord with the proofs, award GRI its reasonable attorney's fees and costs incurred in bringing this action, order Rorvig to disgorge his

36

21877245 v3

wrongful gains in an amount to be determined at trial, award GRI an additional amount constituting forfeiture of any and all compensation in any form that Rorvig received or earned during, or that was otherwise related to, all periods in which he was breaching his fiduciary duties to GRI, award GRI punitive damages, award GRI prejudgment interest, and any other and further relief this Court deems just and equitable.

## COUNT IV – TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against Nations)

177.    GRI incorporates and realleges Paragraphs 1 through 176 as if fully set forth herein.

178.    The Rorvig Agreement is a valid and enforceable agreement between GRI and Rorvig.

179.    GRI has similar valid and enforceable employment agreements with the other former GRI employees mentioned herein, including Dowling.

180.    At all times, Nations was aware that the Rorvig Agreement was a valid and enforceable contract.

181.    At all times, Nations was aware that GRI had valid and enforceable contracts with its other former employees, including Dowling.

182.    At a minimum, Nations was on notice of these contracts upon receiving the Reminder Letter GRI sent to Dowling on May 25, 2021.

183.    Nations induced Dowling, Rorvig and other former and current GRI employees to breach their employment agreements with GRI by soliciting GRI employees and/or misusing GRI Confidential Information to solicit GRI employees.

184.    Specifically, Nations induced Dowling to breach his employment agreement with GRI to solicit Rorvig and others to come to Nations.

185.     Specifically, Nations induced Rorvig to breach the Rorvig Agreement and/or his fiduciary duties to GRI by soliciting GRI employees to resign from GRI and join him at Nations.

186.     Specifically, Nations continues to induce Dowling, Rorvig and other former and current GRI employees to solicit GRI employees to resign from GRI and join Nations, in violation of their contractual obligations to GRI.

187.     Specifically, GRI is aware that Dowling, Rorvig, Dorece, Demonica, and Griffin, as agents and employees of Nations and due to Nations' inducement, encouragement and/or incentivization, continue to solicit and/or solicited GRI employees in violation of the Non-Solicitation and Confidentiality Obligations they owe GRI.

188.     Nations has induced and benefited from Rorvig's breach of the Rorvig Agreement.

189.     Nations has induced and benefited from the other former GRI employees' breach of their Non-Solicitation and Confidentiality Obligations to GRI.

190.     Nations' wrongful conduct has caused immediate, substantial, and ongoing injury to GRI, including economic harm in the form of the disruption and damage to GRI's relationships with its valued employees, the continuing loss of its competitive position, loss of market share, and lost profits.

191.     As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law. Such irreparable harm will continue unless Nations is enjoined as requested in the Prayer for Relief below.

**WHEREFORE**, GRI respectfully requests this Court enter judgment in its favor and against Nations, award GRI compensatory damages in an amount in accord with the proofs, but in any event, no less than $100,000 for Nations' tortious interference, award punitive damages, award

GRI its reasonable attorney's fees and costs associated with bringing this action, and award GRI any other and further relief this Court deems just and equitable.

### COUNT V – TORTIOUS INDUCEMENT OF BREACH OF FIDUCIARY DUTY
### (Against Nations)

192.    GRI incorporates and realleges Paragraphs 1 through 191 as if fully set forth herein.

193.    Nations colluded with Rorvig, while Rorvig was still employed by GRI, to solicit employees to resign from GRI and join Nations.

194.    Specifically, Dowling, as Nations' Midwest Regional Manager, colluded with Rorvig, while Rorvig was still employed by GRI, to divulge GRI Confidential Information about GRI's top-performing employees in the Wisconsin/Illinois Region and/or Midwest Division, including but not limited to their compensation and other personnel related information, to solicit GRI employees to resign and join Nation through competitive job offers.

195.    Contemporaneous records of meetings and conversations between Dowling and Rorvig show that this collusion occurred before Rorvig resigned from GRI on December 23, 2021. For example, one email dated November 24, 2021 with the subject "Factors to Decision → New Mortgage Company" details how Rorvig had "[g]reat conversations with Tim Dowling @ Nations Banks" and that Rorvig met with his team at his home the previous day to solicit them all to join him at Nations. (Ex. G.)

196.    Nations, through Dowling, induced and/or participated in Rorvig's breach of fiduciary duty in divulging and misusing GRI Confidential Information and soliciting GRI employees to resign while he was still employed by GRI.

197.    Nations obtained the benefit resulting from Rorvig's breach of fiduciary duty in that 11 key employees from GRI's Midwest Region have all resigned in short succession and joined Nations.

198.    The addition of these GRI employees to Nations unfairly and improperly transfers a substantial section of GRI's Midwest operations, local goodwill and contacts to Nations.

199.    Nations' wrongful conduct has caused immediate, substantial, and ongoing injury to GRI, including economic harm in the form of the disruption and damage to GRI's relationships with its valued employees, the continuing loss of its competitive position, loss of market share, and lost profits.

200.    As a result of this conduct, GRI has suffered irreparable harm for which there is no adequate remedy at law. Such irreparable harm will continue unless Nations is enjoined as requested in the Prayer for Relief below.

**WHEREFORE**, GRI respectfully requests this Court enter judgment in its favor and against Nations, award GRI compensatory damages in an amount in accord with the proofs, but in any event, no less than $100,000 for Nations' tortious inducement, award punitive damages, award GRI its reasonable attorney's fees and costs associated with bringing this action, and award GRI any other and further relief this Court deems just and equitable

### COUNT VI - VIOLATION OF DTSA
### (Against Rorvig and Nations)

201.    GRI realleges and incorporate Paragraphs 1 through 200 as if fully set forth herein.

202.    During the course of his relationship with GRI, Rorvig was provided access to substantial amounts of GRI Confidential Information, including the Confidential Information identified in Paragraphs 32, 38, 43, 76 and 160.

203.    This information is not available to the general public and is closely guarded by GRI. GRI keeps such information strictly confidential in order to protect and maintain its competitive advantage. The economic value of this information is over $1,000,000.

21877245 v3

204.    GRI Confidential Information, including the Confidential Information identified in Paragraphs 32, 38, 43, 76 and 160 is a trade secret under the Defend Trade Secrets Act, 18 U.S.C. § 1832, *et seq*. ("DTSA"), because the information is not generally known outside of GRI; the information is not generally known by employees and others involved in GRI's business except for those who need the information to perform their job function; GRI has taken reasonable measures to guard the secrecy of the information; the information is of great value to GRI; GRI invested significant amounts of time and money in developing the information; the information cannot easily be acquired or duplicated by others; and because GRI uses the information in its business.

205.    Rorvig was legally and contractually obligated to return GRI Confidential Information to GRI when he resigned from GRI on December 23, 2021.

206.    Rorvig knew that he was legally and contractually obligated to not use GRI Confidential Information after he resigned from GRI on December 23, 2021.

207.    Unfortunately, Rorvig ignored (and continues to ignore) his obligations to GRI and misappropriated GRI's Confidential Information after he resigned from GRI on December 23, 2021.

208.    In addition, and based upon information and belief, Rorvig engaged in other acts of misappropriation that will be revealed through discovery.

209.    Rorvig and other former GRI employees also provided GRI Confidential Information to Nations.

210.    Specifically, Rorvig and former GRI employees provided GRI Confidential Information to Nations so that Nations could use the Confidential Information to solicit GRI employees.

211.    Nations encouraged and instructed Rorvig and former GRI employees to provide GRI Confidential Information to Nations and Nations used the GRI Confidential Information to solicit GRI employees.

212.    Thus, Nations has also misappropriated GRI Confidential Information.

213.    Unless restrained, and based upon the activity described above, Rorvig and Nations will continue to use, divulge, and/or disclose GRI Confidential Information.

214.    It is axiomatic that if Rorvig and Nations continue to possess GRI Confidential Information, then Rorvig and Nations have no intention of complying with the DTSA.

215.    Consequently, Rorvig's and Nations' actions constitute the actual or threatened misuse of GRI Confidential Information.  Injunctive relief against Rorvig and Nations is therefore appropriate.

216.    Naturally then, GRI requests an order enjoining Rorvig and Nations from accessing, using, or possessing GRI Confidential Information.

217.    GRI also requests an order requiring Rorvig and Nations to return any and all GRI Confidential Information in their possession, custody or control to GRI as provided by 18 U.S.C. § 1836(3)(A)(ii).

218.    In addition, GRI has incurred significant damages as a result of Rorvig's and Nations' misappropriation of GRI Confidential Information.

219.    Rorvig's and Nations' actions have also damaged GRI's goodwill, reputation, and legitimate business interests.  GRI's damages, described above, are well in excess of 100,000.00, and GRI seeks monetary and economic damages provided by 18 U.S.C. § 1832 *et seq*.

220.    Finally, Rorvig's and Nations' misappropriation of GRI Confidential Information has been willful and malicious.

21877245 v3

221.    As a result, GRI is entitled to recover its attorneys' fees and punitive from Rorvig.

**WHEREFORE**, GRI respectfully requests this Court enter judgment in its favor and against Rorvig and Nations, enter an injunction enjoining Rorvig and Nations from using, possessing, or accessing GRI Confidential Information, enter an order requiring Rorvig and Nations to return all GRI Confidential Information in Rorvig's and/or Nations' possession, custody or control to GRI, award GRI compensatory damages in an amount no less than $100,000, award GRI punitive damages, award GRI its reasonable attorney's fees and costs associated with bringing this action, and award GRI any other and further relief this Court deems just and equitable.

### COUNT VII - VIOLATION OF WTSA
### (Against Rorvig and Nations)

222.    GRI realleges and incorporates paragraphs 1 through 221 as if fully set forth herein.

223.    During the course of his relationship with GRI, Rorvig was exposed to substantial amounts of GRI Confidential Information, including the Confidential Information identified in Paragraphs 32, 38, 43, 76 and 160.

224.    This information is not available to the general public and is closely guarded by GRI.  GRI keeps this information strictly confidential in order to maintain a competitive advantage over its competitors.

225.    This information is considered a trade secret under the Wisconsin Trade Secrets Act ("WTSA"), Chp. 134.90/et al., because GRI derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

226.    The economic value of the GRI trade secrets/Confidential Information that Rorvig had access to and misappropriated is over $1,000,000.

21877245 v3

227.    Rorvig misappropriated GRI trade secrets.

228.    Based upon information and belief, Rorvig also engaged in other acts of misappropriation that will be revealed through discovery.

229.    Rorvig and other former GRI employees also provided GRI Confidential Information to Nations.

230.    Specifically, Rorvig and former GRI employees provided GRI Confidential Information to Nations so that Nations could use the Confidential Information to solicit GRI employees.

231.    Nations encouraged and instructed Rorvig and former GRI employees to provide GRI Confidential Information to Nations and Nations used the GRI Confidential Information to solicit GRI employees.

232.    Thus, Nations has also misappropriated GRI Confidential Information.

233.    Injunctive relief is therefore appropriate, and GRI requests that this Court enter an order enjoining Rorvig and Nations from using, possessing, or accessing any GRI Confidential Information and from disclosing GRI Confidential Information to anyone not authorized to receive the Confidential Information.

234.    GRI also requests that this Court enter an order requiring Rorvig and Nations to return any and all GRI Confidential Information.

235.    GRI has incurred significant damages as a result of Rorvig's and Nations' misappropriation of GRI Confidential Information.

236.    Rorvig's and Nations' actions have also damaged GRI's goodwill, reputation, and legitimate business interests.  GRI's damages, described above, are well in excess of 100,000.00, and GRI seeks monetary and economic damages provide by the WTSA.

237.     Finally, Rorvig's and Nations' misappropriation of GRI Confidential Information has been willful and malicious.  As a result, GRI is entitled to recover its attorneys' fees and punitive damages from Rorvig and Nations.

**WHEREFORE**, GRI respectfully requests this Court enter judgment in its favor and against Rorvig and Nations, enter an injunction enjoining Rorvig and Nations from using, possessing, or accessing GRI Confidential Information, enter an order requiring Rorvig and Nations to return all GRI Confidential Information in Rorvig's and/or Nations' possession, custody or control to GRI, award GRI compensatory damages in an amount no less than $100,000, award GRI punitive damages, award GRI its reasonable attorney's fees and costs associated with bringing this action, and award GRI any other and further relief this Court deems just and equitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Guaranteed Rate, Inc. respectfully requests that the Court grant the following relief in favor of GRI and against Defendants (without waiving or limiting any other relief that may be available to GRI):

(a) Enter a judgment in favor of GRI and against Defendants on all Counts;

(b) Enter an Order preliminarily and permanently enjoining Defendants from directly or indirectly using, transferring, copying, or disclosing to any individual or entity, any GRI Confidential Information (including, but not limited to, any and all information relating to, evidencing or derived in whole or in part from information about GRI's employees' compensation, training, operations, business, sales, the identity of GRI's top-performing employees, hiring criteria, or the pricing and cost structure of GRI's products and services) or from otherwise violating the

45

Confidential Information Provisions of the Rorvig Agreement or any other GRI employee Agreement;

(c) Enter an order requiring Defendants to return any and all Confidential Information in Defendants' possession, custody, or control; to immediately turn over and deliver to GRI, and permanently uninstall and delete from each of their respective computers and other information storage media and devices, all GRI Confidential Information and all other property of GRI, however stored or maintained, and all paper and electronic copies thereof, including without limitation any and all information related to, evidencing, or derived in whole or in part from information about GRI's customers;

(d) Enter an order requiring that Defendants immediately cease and desist from directly or indirectly soliciting any GRI employees to leave their employment with GRI;

(e) Enter an order requiring Defendants to disgorge any profits they have a received as a result of their wrongful acts, including all compensation Defendants received during the period in which Rorvig breached fiduciary duties while employed by GRI and Nations induced his breach of fiduciary duties while employed by GRI;

(f) Award monetary damages to GRI for those claims for which monetary damages are available in this proceeding in an amount to be proven at trial;

(g) Award GRI its attorneys' fees and all costs and expenses related to this action;

(h) Award GRI punitive damages; and

(i) Such other and further relief as the Court deems just and appropriate.

21877245 v3

## JURY DEMAND

GRI demands a jury trial on all issues so triable.

Dated: March 14, 2023

Respectfully submitted,

_____/s/ J. Scott Humphrey_____

J. Scott Humphrey
Katie Burnett
**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**
71 South Wacker Drive
Suite 1600
Chicago, IL 60606-4637
Telephone: 312-212-4940
shumphrey@beneschlaw.com
kburnett@beneschlaw.com

*Counsel for Guaranteed Rate, Inc.*

47

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 14, 2023, he served a copy of the foregoing on

all counsel of record via electronic case filing procedures.

<div align="right">

_____/s/ J. Scott Humphrey_____
*One of the Attorneys for Plaintiff*

</div>

# EXHIBIT A



**EIRIK RORVIG – PRODUCING BRANCH MANAGER – PORTAGE, WI (1047)**

All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings as defined in Exhibit A attached hereto and incorporated herein by reference in the Agreement.

## I.   SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1)  You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2)  You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

(3)  You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

(4)  You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(5)  You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(6)  You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(7)  You may offer only the loan products and programs approved by and made available through an origination channel of the Company.

(8)  You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans. The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

(9)  You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must regularly and frequently visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc. These meetings will normally and customarily occur outside of the office. The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II. CORPORATE OBJECTIVE AND LOAN PRICING

### (a) How We Calculate the Corporate Objective

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission. In the event that the deductions above are determined to be deductions from your Commission, you hereby expressly authorize the Company to deduct these costs, which are incurred directly for your benefit.

### (b) Corporate Objective Surplus

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses. If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may _not_ receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise. For example, you may _not_ offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

### (c) Corporate Objective Shortfall

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you. You may _not_ price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

DocuSign Envelope ID: A16E631C-EDA9-48DD-ADAE-2E2U82UF7H54

**(d) Loan Pricing**

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III. COMPENSATION

**(a) Your Draw**

### (1) In General

Please refer to the Schedule to determine whether you have a Draw.

### (2) The Amount of Your Draw

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

### (1) Fully Recoverable Draw.

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

### (2) Non-Recoverable Draw

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

**(c) Your Commissions**

### (1) How We Calculate Your Commissions

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

### (2) Commission for Loans that you assist the Company to Close

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

### (3) Timing of Your Commission; Advances

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate, and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

### (4) Recapture Event

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (5) Monthly Commission Statement Must Be Accurate

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are an Employee "At Will"

DocuSign Envelope ID: A166631C-EDA8-46DD-AU4E-2E2U62UF79P4

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

**(b) Termination for Cause**

The Company may also terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company and/or exhibit poor performance, (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry, (vii) you violate a federal or state law or regulation applicable to the business of the Company, (viii) you engage in fraudulent acts, (ix) you misappropriate property belonging to the Company; or (x) you breach in any material respect of the terms of any confidentiality or proprietary information agreement with the Company.

**(c) Commissions Paid After Your Employment Ends**

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

**(d) Bonus not Paid After Your Employment Ends**

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V.   YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

**(a) Confidential Information**

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents,

materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce promote facilitate, encourage or assist in the solicitation of any Person employed/engaged by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment/engagement with the Company and/or join you as

a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship with which you become employed or affiliated, and/or  During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities.  The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.**  Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement.  You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty.  You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company.  This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law.  Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision.  This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI.  LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company.  You must inform each vendor and potential vendor that

you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration in** accordance with the rules of the American Arbitration Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend

DocuSign Envelope ID: A166631C-EDA8-409D-AD4E-2E2D62DF7954

and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X. MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Eirik Rorvig
_____
(Print your name here)

_Eirik Rorvig_
62E788E60CB747A...
_____
(Place your signature here)

12/27/2019
_____
(Date)

Guaranteed Rate, Inc.

_____

By: Nikolaos Athanasiou, Chief Operating Officer

12/27/2019
_____
(Date)

## EXHIBIT A

"**Agreement**" means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

"**Authority**" means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

"**Basis Point**" means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

"**Borrower Expenses**" mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

"**Cause**" has the meaning set forth in Section IV(b).

"**Commission**" means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

"**Company**" means Guaranteed Rate, Inc.

"**Confidential Information**" has the meaning set forth in Section V(a).

"**Corporate Objective**" means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

"**Corporate Objective Shortfall**" means the amount of Net Loan Revenue that falls short of your Corporate Objective with respect to a loan originated by you.

"**Corporate Objective Surplus**" means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

"**Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"**Draw**" means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"**Early Payment Default**" means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Early Payoff**" means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Earned Commission**" has the meaning set forth in Section III (c) (2).

"**Eligible Loan**" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

"**Net Loan Revenue**" means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

"**Outside Sales Employee**" means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

"**Person**" means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Recapture Event**" has the meaning set forth in Section III(c)(3) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage**" has the meaning set forth in Section III(b)(2) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Mortgage Lending.

## <u>Out of State Referral Acknowledgement</u>

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a VP to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **MAY NOT** (ONLY the licensed VP may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in unlicensed activity, it revokes your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when unlicensed activity is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes licensable activity.

Signed: Eirik Rønnig

Date: 12/27/2019

# EXHIBIT B



January 5, 2022

**Yesha Hoeppner**
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: 773-328-6431
yesha.hoeppner@rate.com

<u>**Via Email and UPS**</u>

Eirik Rorvig
415 Galileo Drive
Madison, WI 53718
erorvigmortgage@gmail.com

  Re: Cease and Desist

Mr. Rorvig:

  Effective December 23, 2021, you resigned your position as Producing Bank Manager at Guaranteed Rate, Inc. ("Guaranteed Rate"). As you may recall, on December 27, 2019, you executed certain Terms and Conditions of Employment that both governed your time at Guaranteed Rate and also created certain post-employment obligations on your part (the "Agreement"). A copy of your Agreement is enclosed for your reference.

  Pursuant to the Agreement, you acknowledged you would have access to certain Confidential Information as part of your employment with Guaranteed Rate. This Confidential Agreement included, but was not limited to, information about Guaranteed Rate's operations, the identity of its top-performing employees, hiring criteria, and other personnel matters. (Agreement, p. 13.) You acknowledged and expressly agreed that "[a]s consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer or any other Person or entity." (*Id.* at 14.) The obligation to safeguard this Confidential Information survives the termination of your employment, and remains in full force and effect indefinitely.

  Additionally, under the Agreement, you acknowledged and agreed that during your employment and for a period of 24 months following any termination of employment with Guaranteed Rate (the "Restricted Period"), you would not directly or indirectly hire, solicit, or encourage employees to end their employment with Guaranteed Rate and/or join you in another business venture or relationship. (Agreement, p. 14-15.) The Agreement also provides that during the Restricted Period, you may not "supervise, manage or oversee the work of any former employee of [Guaranteed Rate], the identity of which you learned during your employment with [Guaranteed Rate]." (*Id.* at 15.)

  We are aware that you are now employed as a Producing Branch Manager for Nations Lending ("Nations"), a competitor of Guaranteed Rate. Recently, the following Guaranteed Rate employees whom you managed or worked with resigned in a manner that appears staggered and deliberately coordinated: 1) Meredith Richardson (December 10, 2021); 2) Kyle McManners (December 23, 2021); 3) Randy Barwick (December 29, 2021); 4) Chris Rollins (December 30,



2021); and 5) Paul Gagne (January 4, 2022). We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations, and that you are doing so in conjunction with former Guaranteed Rate employee Timothy Dowling (current Nations Midwest Regional Manager).

Accordingly, we have strong reason to believe that you are in violation of your non-solicitation and confidentiality obligations to Guaranteed Rate and demand that you immediately cease and desist from all such actions. Moreover, to the extent any of these improper activities occurred while you still worked for Guaranteed Rate, they would constitute violations of your fiduciary duties of good faith, loyalty and honesty to Guaranteed Rate. We intend to investigate the above occurrences and any others and will take all appropriate legal actions. As a reminder, under the terms of your Agreement, you are liable for $50,000 for *each* solicitation that violates your Agreement, plus attorneys' fees and costs incurred in enforcing the Agreement. (Agreement, p. 15.)

In the meantime, we demand that you confirm in writing, by **January 12, 2022**, your intention to abide by your contractual obligations. If we do not hear from you by that date, we will assume you have no interest in complying with your duties and obligations, and will take necessary steps to enforce and protect Guaranteed Rate's rights. We are copying Nations on this correspondence to make it aware of your continuing obligations to Guaranteed Rate and of these issues.

Finally, we demand that you and Nations take the necessary steps to maintain and preserve all documents of any kind related to these issues. The term "documents" is intended in its broadest sense to include, without limitation, emails (personal or work), voicemails/recordings, text messages, social media (including, without limitation, LinkedIn), and any other types of hard copy or electronic communications.

The foregoing is without prejudice to Guaranteed Rate's rights and remedies, all of which are expressly reserved.

Sincerely,

/s/ Yesha Hoeppner
Vice President and Senior Counsel
Guaranteed Rate, Inc.

CC:     Nations Lending
        Attn: General Counsel
        4 Summit Park Drive, Suite 200
        Independence, OH 44131

DocuSign Envelope ID: A166691C-EDA9-490D-AD15-2E2D63DF7954



## EIRIK RORVIG – PRODUCING BRANCH MANAGER – PORTAGE, WI (1047)

All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings as defined in Exhibit A attached hereto and incorporated herein by reference in the Agreement.

### I.    SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1)    You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2)    You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

(3)    You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

(4)    You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(5)    You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(6)    You must devote your full time and efforts to your employment with the Company.  During your employment with the Company, you may not be employed by any other Person.  You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(7)    You may offer only the loan products and programs approved by and made available through an origination channel of the Company.

(8)    You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans.  The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

(9)    You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must regularly and frequently visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc.  These meetings will normally and customarily occur outside of the office.  The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II. CORPORATE OBJECTIVE AND LOAN PRICING

**(a) How We Calculate the Corporate Objective**

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission. In the event that the deductions above are determined to be deductions from your Commission, you hereby expressly authorize the Company to deduct these costs, which are incurred directly for your benefit.

**(b) Corporate Objective Surplus**

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses. If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may **not** receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise. For example, you may **not** offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

**(c) Corporate Objective Shortfall**

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you. You may **not** price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

**(d) Loan Pricing**

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective.  For example, assume that your Corporate Objective is 150 basis points.  When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III.  COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company.  The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month.  We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive.  We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

**(1) Fully Recoverable Draw.**

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other compensation earned by you.  By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full.  If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

**(2) Non-Recoverable Draw**

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company.  This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount."  The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

**(c) Your Commissions**

**(1) How We Calculate Your Commissions**

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

### (2) Commission for Loans that you assist the Company to Close

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

### (3) Timing of Your Commission; Advances

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate, and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

### (4) Recapture Event

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (5) Monthly Commission Statement Must Be Accurate

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

## IV.   ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are an Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

**(b) Termination for Cause**

The Company may also terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company and/or exhibit poor performance, (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry, (vii) you violate a federal or state law or regulation applicable to the business of the Company, (viii) you engage in fraudulent acts, (ix) you misappropriate property belonging to the Company; or (x) you breach in any material respect of the terms of any confidentiality or proprietary information agreement with the Company.

**(c) Commissions Paid After Your Employment Ends**

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

**(d) Bonus not Paid After Your Employment Ends**

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V.   YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

**(a) Confidential Information**

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents,

materials and information belonging or relating to the Company (collectively "Confidential Information").  The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity.  You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company.  However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has:  (1)  taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce promote facilitate, encourage or assist in the solicitation of any Person employed/engaged by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment/engagement with the Company and/or join you as

DocuSign Envelope ID: A166691C-EDA8-400D-AD15-2E2D63DF7954

a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship with which you become employed or affiliated, and/or   During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities.  The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance**.  Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement.  You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty.  You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company.  This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law.  Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

    (i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

    (ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision.  This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI.   LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company.  You must inform each vendor and potential vendor that

you are not authorized to bind the Company.

## VII.  MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

**(a) Arbitration**

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American Arbitration Association then in existence.  Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

**(b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action**

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

**(c) Exclusions**

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII.  APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX.  ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend

and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X.   MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Eirik Rorvig

_____
(Print your name here)

*Eirik Rorvig*
62E788E60CB747B...

(Place your signature here)

12/27/2019
_____
(Date)

Guaranteed Rate, Inc.

_____

E000CD25871A478...

By: Nikolaos Athanasiou, Chief Operating Officer

12/27/2019
_____
(Date)

## EXHIBIT A

"**Agreement**" means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

"**Authority**" means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

"**Basis Point**" means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

"**Borrower Expenses**" mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

"**Cause**" has the meaning set forth in Section IV(b).

"**Commission**" means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

"**Company**" means Guaranteed Rate, Inc.

"**Confidential Information**" has the meaning set forth in Section V(a).

"**Corporate Objective**" means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

"**Corporate Objective Shortfall**" means the amount of Net Loan Revenue that falls short of your Corporate Objective with respect to a loan originated by you.

"**Corporate Objective Surplus**" means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

"**Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"**Draw**" means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"**Early Payment Default**" means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Early Payoff**" means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Earned Commission**" has the meaning set forth in Section III (c) (2).

"**Eligible Loan**" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

DocuSign Envelope ID: A166691C-EDA8-490D-AD15-2E2D62DF7954

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

"**Net Loan Revenue**" means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

"**Outside Sales Employee**" means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

"**Person**" means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Recapture Event**" has the meaning set forth in Section III(c)(3) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage**" has the meaning set forth in Section III(b)(2) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Mortgage Lending.

DocuSign Envelope ID: A166691C-EDA9-490D-AD15-2E2D63DF7954

**<u>Out of State Referral Acknowledgement</u>**

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a VP to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **<u>MAY NOT</u>** (ONLY the licensed VP may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in unlicensed activity, it revokes your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when unlicensed activity is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes licensable activity.

Signed: _Eirik Romwig_

Date: _12/27/2019_

# EXHIBIT C



**January 18, 2022**

**Yesha Hoeppner**
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: 773-328-6431
yesha.hoeppner@rate.com

<u>**Via Email**</u>

Eirik Rorvig
415 Galileo Drive
Madison, WI 53718
erorvigmortgage@gmail.com

      Re:     Cease and Desist

Mr. Rorvig:

      I write to follow up on the letter I sent you, dated January 5, 2022 ("January 5th Letter"). In the January 5th Letter, I demanded that you cease and desist from actions that violate your contractual non-solicitation and confidentiality obligations to Guaranteed Rate Inc. ("Guaranteed Rate"), as provided in the Terms and Conditions of Employment you executed in conjunction with your employment with Guaranteed Rate (the "Agreement"). I also outlined the apparently synchronized departures of members of your team from Guaranteed Rate, and informed you that we intended to investigate those occurrences and any other unlawful actions. On January 7, 2022, I received an email response from you claiming that you "have not undertaken any actions in violation of lawful prior agreements, nor do [you] intend any such actions."

      Since I sent the January 5th Letter, and indeed since your response on January 7th, we have learned that three other Guaranteed Rate employees whom you managed or with whom you worked resigned, and we have reason to believe they will be joining you and Tim Dowling at Nations Lending ("Nations"), your new employer. Specifically, we learned that Richard Cohen resigned on January 10, 2022, Lee Kampa resigned on January 14, 2022, and Dawn Kaczmark resigned on January 17, 2022. Their resignations appear to be a continuation of the coordinated campaign waged by you and Mr. Dowling to solicit Guaranteed Rate employees to Nations: 1) Meredith Richardson (December 10, 2021); 2) Kyle McManners (December 23, 2021); 3) Randy Barwick (December 29, 2021); 4) Chris Rollins (December 30, 2021); and 5) Paul Gagne (January 4, 2022). We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations.

      Moreover, since the January 5th Letter, Guaranteed Rate has discovered evidence that you have worked in conjunction with Tim Dowling to solicit Guaranteed Rate employees to Nations, in violation of both of your contractual non-solicitation and confidentiality obligations to Guaranteed Rate. Specifically, we have found emails from Joe Noonan to you and Mr. Cohen detailing his conversations with you both regarding the circumstances of your moves from Guaranteed Rate to Nations. In one email, dated November 24, 2021 and with the subject "Factors to Decision → New Mortgage Company," Mr. Noonan provides notes from his conversation with you, detailing the following: 1) you met with your team at your home the previous day to discuss



moving to a new mortgage company and that it was a "productive" conversation; and 2) you had "[g]reat conversations with Tim Dowling @ Nations Bank." In another email, dated December 14, 2021, Mr. Noonan writes to Mr. Cohen recapping their conversation, noting that Mr. Cohen is "[e]xcited to move to Nations Bank in January with Eirik's team" and that Mr. Cohen had "[s]poke[n] to team members at Nations and feedback is positive."

As you may recall, pursuant to your Agreement, you acknowledged that Guaranteed Rate Confidential Agreement included, but was not limited to, information about Guaranteed Rate's operations, the identity of its top-performing employees, hiring criteria, and other personnel matters, and that you would not use or divulge this Confidential Agreement for the benefit of any competitor. (Agreement, p. 13-14.) Additionally, you acknowledged and agreed that during your employment and for a period of 24 months following any termination of employment with Guaranteed Rate (the "Restricted Period"), you would not directly or indirectly hire, solicit, or encourage employees to end their employment with Guaranteed Rate and/or join you in another business venture or relationship. (*Id.* at 14-15.)

Given what we have learned so far, we have strong reason to believe that you are in violation of your non-solicitation and confidentiality obligations to Guaranteed Rate. Once again, we demand that you immediately cease and desist from all such actions. Our investigation into your contractual and other legal violations is ongoing. We expressly reserve all our rights and remedies, including without limitation filing a lawsuit against you for breach of contract, breach of fiduciary duties and other potential claims. We intend to seek—pursuant to the terms of your Agreement—liquidated damages in the amount of $50,000 for *each* solicitation that violates your Agreement, in addition to seeking any other applicable damages, remedies, attorneys' fees and costs incurred in enforcing the Agreement. (Agreement, p. 15.)

We are copying Nations on this correspondence to make it aware of your continuing obligations to Guaranteed Rate and of these issues. We also reiterate our demand that you and Nations take the necessary steps to maintain and preserve all documents of any kind related to these issues. The term "documents" is intended in its broadest sense to include, without limitation, emails (personal or work), voicemails/recordings, text messages, social media (including, without limitation, LinkedIn), and any other types of hard copy or electronic communications.

Sincerely,

/s/ Yesha Hoeppner
Vice President and Senior Counsel
Guaranteed Rate, Inc.

CC:    George Chamberlain (george.chamberlain@nationslending.com)
       Christopher Baker (chris.baker@nationslending.com)

# EXHIBIT D



J. Scott Humphrey
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Direct Dial: 312.624.6420
Fax: 312.767.9192
shumphrey@beneschlaw.com

February 1, 2022

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**

Eirik Rorvig
415 Galileo Drive
Madison, WI 53718
erorvigmortgage@gmail.com

      Re:    Violations of Post-Employment Obligations owed to Guaranteed Rate

Dear Mr. Rorvig:

      We are litigation counsel for Guaranteed Rate, Inc. ("Guaranteed Rate"). We write to you regarding your multiple violations of the duties and obligations you owe Guaranteed Rate pursuant to the Terms and Conditions of Employment ("Agreement") you executed with Guaranteed Rate on December 27, 2019. A copy of your executed Agreement is enclosed with this letter so that there is no confusion over the duties and obligations you still owe Guaranteed Rate. Please know that your continuing violations of the Agreement will not be tolerated.

      As a Producing Bank Manager at Guaranteed Rate, you had access to Guaranteed Rate's confidential information. As stated in the Agreement, Guaranteed Rate's confidential information includes, but is not limited to, information about Guaranteed Rate's:

> sales, **operations**, financial condition, financial projections, profit margins, personnel matters, **the identity of [Guaranteed Rate]'s top-performing employees, hiring criteria, and training techniques,** business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of [Guaranteed Rate] and its business and operations. (emphasis added)

      The above confidential information has been developed and created over time and as a result of Guaranteed Rate expending significant resources. The above confidential information gives Guaranteed Rate a significant economic advantage over its competitors because the information is not generally known or publicly available. Accordingly, Guaranteed Rate's confidential information is a trade secret under both the Illinois Uniform Trade Secrets Act, 750 ILCS 1065, and the Federal Defend Trade Secrets Act, 18 U.S.C.A. § 1836. Not surprisingly, you agreed to not use any Guaranteed Rate confidential information for your own benefit. And you

Eirik Rorvig
February 1, 2022
Page 2

promised under the Agreement to not "divulge to or use [Guaranteed Rate] confidential information for the benefit of any competitor, customer, or any other person or entity."

As a result of your access to Guaranteed Rate's confidential information and in exchange for receiving compensation from Guaranteed Rate, you agreed under Section V(d) of the Agreement that, for two years following the termination of your Guaranteed Rate employment, you will not "directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce, promote, facilitate, encourage or assist in the solicitation of any person employed/engaged by [Guaranteed Rate] ... to end their employment/engagement with [Guaranteed Rate]." Similarly, and for two years following the termination of your Guaranteed Rate employment, you agreed to not a) have another Guaranteed Rate employee join you "in a business venture or other business" and/or b) "supervise, manage, or oversee the work of any former employee of [Guaranteed Rate]." Since you voluntarily resigned from Guaranteed Rate on December 23, 2021, these restrictions are in place through December 23, 2023.

Unfortunately, you have not complied with the above duties and obligations you still owe Guaranteed Rate. Specifically, Guaranteed Rate is aware of you soliciting at least eight Guaranteed Rate employees to leave Guaranteed Rate for Nations Lending ("Nations"), your current employer and a Guaranteed Rate competitor. In fact, Guaranteed Rate has uncovered emails from you to Guaranteed Rate employees that document your solicitation efforts and violations of the duties and obligations you still owe Guaranteed Rate under the Agreement. Moreover, it appears from these emails and Guaranteed Rate's investigation that you are using Guaranteed Rate's confidential information in your efforts to solicit and induce Guaranteed Rate employees to leave Guaranteed Rate and join Nations. Your actions not only violate the specific terms of the Agreement, but also statutory and common law that prohibit the improper interference with employee relationships, breaches of restrictive covenant agreements and the misappropriation of trade secrets.

Accordingly, the purpose of this letter is to alert you to the fact that Guaranteed Rate is continuing its investigation of you and, unless your violations of the Agreement stop immediately, Guaranteed Rate will take the necessary steps to enforce its rights under the Agreement and the law against you and anyone acting in concert with you. Such actions may include seeking injunctive relief against you, and anyone acting in concert with you, as a result of you breaching the Agreement and misappropriating Guaranteed Rate's confidential information. Please note that, under Section V(d)(i) of the Agreement, Guaranteed Rate will be entitled to recover "all of [Guaranteed Rate]'s reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any" violation of the restrictive covenants or confidentiality obligations found in the Agreement.

In addition, you agreed to pay Guaranteed Rate $50,000 for each violation of Section V(d). Since you violated Section V(d) by soliciting at least eight Guaranteed Rate employees to leave Guaranteed Rate for Nations, you currently owe Guaranteed Rate $400,000. However, and in order to bring this matter to a quick and amicable resolution, Guaranteed Rate hereby demands payment from you in the amount of $250,000 as a result of your violations of Section V(d). Guaranteed Rate also demands that you provide written assurances that a) you will not solicit Guaranteed Rate employees until after December 23, 2023, b) do not possess or have access to

Eirik Rorvig
February 1, 2022
Page 3

Guaranteed Rate confidential information, and c) will not use or access Guaranteed Rate confidential information.

Please contact me within the next seven days to confirm your compliance with Guaranteed Rate's demands. If we do not hear from you on or before February 8, 2022, we will assume that you have no interest in complying with the duties and obligations you owe Guaranteed Rate, and will take the necessary steps to protect Guaranteed Rate's legitimate business interests. Since Guaranteed Rate has a dispute with you that may result in litigation, you are directed to preserve all documents, records, evidence, electronic data and metadata related to these issues. You are also directed to preserve and not alter, destroy or compromise in any way, whether in hard copy or in electronic format, any information, document or data that relates to these issues. This instruction also applies to anyone acting in concert with you.

If you would like to discuss this matter further, you or your attorney may contact me at (312) 624-6420.

Very truly yours,

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP

J. Scott Humphrey

JSH
Encl.



**EIRIK RORVIG – PRODUCING BRANCH MANAGER – PORTAGE, WI (1047)**

All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings as defined in Exhibit A attached hereto and incorporated herein by reference in the Agreement.

## I. SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1) You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2) You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

(3) You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

(4) You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(5) You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(6) You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(7) You may offer only the loan products and programs approved by and made available through an origination channel of the Company.

(8) You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans. The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

(9) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must regularly and frequently visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc. These meetings will normally and customarily occur outside of the office. The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II. CORPORATE OBJECTIVE AND LOAN PRICING

### (a) How We Calculate the Corporate Objective

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission. In the event that the deductions above are determined to be deductions from your Commission, you hereby expressly authorize the Company to deduct these costs, which are incurred directly for your benefit.

### (b) Corporate Objective Surplus

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses. If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may *not* receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise. For example, you may *not* offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

### (c) Corporate Objective Shortfall

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you. You may *not* price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

### (d) Loan Pricing

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III. COMPENSATION

### (a) Your Draw

#### (1) In General

Please refer to the Schedule to determine whether you have a Draw.

#### (2) The Amount of Your Draw

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

### (b) Fully Recoverable Draw and Non-Recoverable Draw

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

#### (1) Fully Recoverable Draw.

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

#### (2) Non-Recoverable Draw

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

### (c) Your Commissions

#### (1) How We Calculate Your Commissions

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

### (2) Commission for Loans that you assist the Company to Close

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

### (3) Timing of Your Commission; Advances

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate, and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

### (4) Recapture Event

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (5) Monthly Commission Statement Must Be Accurate

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are an Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

**(b) Termination for Cause**

The Company may also terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company and/or exhibit poor performance, (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry, (vii) you violate a federal or state law or regulation applicable to the business of the Company, (viii) you engage in fraudulent acts, (ix) you misappropriate property belonging to the Company; or (x) you breach in any material respect of the terms of any confidentiality or proprietary information agreement with the Company.

**(c) Commissions Paid After Your Employment Ends**

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

**(d) Bonus not Paid After Your Employment Ends**

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V.   YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

**(a) Confidential Information**

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents,

materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce promote facilitate, encourage or assist in the solicitation of any Person employed/engaged by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment/engagement with the Company and/or join you as

a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship with which you become employed or affiliated, and/or   During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

### (ii) Vendors

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

### (e) Enforcement; Remedies

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

### (f) Construction

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI. LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company. You must inform each vendor and potential vendor that

you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American Arbitration Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend

and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X. MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Eirik Rorvig

_____
(Print your name here)

—DocuSigned by:

*Eirik Rorvig*

—02E788E60CB7476—
(Place your signature here)

12/27/2019

_____
(Date)

Guaranteed Rate, Inc.

—DocuSigned by:

—EB068D590F1A479—
By: Nikolaos Athanasiou, Chief Operating Officer

12/27/2019

_____
(Date)

## EXHIBIT A

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

**"Cause"** has the meaning set forth in Section IV(b).

**"Commission"** means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a).

**"Corporate Objective"** means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Corporate Objective Shortfall"** means the amount of Net Loan Revenue that falls short of your Corporate Objective with respect to a loan originated by you.

**"Corporate Objective Surplus"** means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

**"Deductible Expenses"** include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

**"Early Payment Default"** means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Early Payoff"** means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Earned Commission"** has the meaning set forth in Section III (c) (2).

 **"Eligible Loan"** means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

"**Net Loan Revenue**" means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

"**Outside Sales Employee**" means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

"**Person**" means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Recapture Event**" has the meaning set forth in Section III(c)(3) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage**" has the meaning set forth in Section III(b)(2) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Mortgage Lending.

DocuSign Envelope ID: A166631C-EDA9-460D-AD4E-2E2D62DF7954

## Out of State Referral Acknowledgement

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a VP to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **MAY NOT** (ONLY the licensed VP may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in unlicensed activity, it revokes your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when unlicensed activity is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes licensable activity.

Signed: _Eirik Rorvig_

Date: 12/27/2019

# EXHIBIT E



**May 25, 2021**

**Yesha Hoeppner**
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: 773-516-6939
yesha.hoeppner@rate.com

**Via Email and UPS**

Mr. Timothy Dowling
1804 Black Oak Drive
McHenry, IL 60050
Tdowlin1@gmail.com

      **Re:     Reminder of Your Post-Employment Obligations**

Dear Mr. Dowling:

As you know, effective May 14, 2021, your employment with Guaranteed Rate, Inc. ("GRI") ended. As part of your employment with GRI, you executed certain Terms and Conditions of Employment that both governed your time at GRI and also created certain post-employment obligations on your part (the "Agreement"). A copy of your Agreement is enclosed for your reference.

Specifically, you agreed that for a period of time following any termination of employment with GRI, you would not directly or indirectly hire, solicit, or encourage employees to end their employment with GRI.

Additionally, you agreed not to divulge any "Confidential Information" you gained access to through your employment with GRI. The Confidential Information included, but was not limited to, information about client or potential client identities and other aspects of GRI and its business and operations. Under the terms of your Agreement, you are prohibited from utilizing this Confidential Information for the benefit of any other party, including any competitor of GRI. Please be advised that the obligation to safeguard this Confidential Information survives the termination of your employment, and remains in full force and effect indefinitely.

Please review your Agreement so you are cognizant of and can abide by the specific post-employment obligations contained therein. If you have any questions in this regard, please let me know.

In the event you have not done so, and consistent with the requirements in your Agreement, we are copying Nations Lending officials to make them aware of your continuing obligations to GRI.

We wish you the best going forward.



Sincerely,

/s/ Yesha Hoeppner

Yesha Hoeppner
Vice President and Senior Counsel, Litigation

Encl.

CC:    Nations Lending
        Attn: General Counsel
        4 Summit Park Drive, Suite 200
        Independence, OH 44131

guaranteed**Rate** ®

---

# COMPENSATION SCHEDULE FOR TIM DOWLING SVP OF STRATEGIC GROWTH (NON-PRODUCING)

---

This Compensation Schedule ("Schedule") to the Compensation Plan and Agreement (the "Agreement") is dated as of **January 1, 2020** (the "Effective Date").

The purpose of this Schedule is to identify and confirm your Bonuses and other compensation on and after the Effective Date.

Compensation under this Agreement shall at all times comply with applicable law, including the Loan Originator Compensation Rule, 12 CFR § 1026.36(d)-(e). Nothing in this Agreement shall be construed to conflict with applicable law.

All capitalized terms that are not defined in this Schedule shall have the meaning set forth in the Agreement.

You and the Company agree as follows:

## I. YOUR SALARY– EFFECTIVE FOR THE MARCH 13, 2020 PAYROLL DATE AND LATER

You will be paid a monthly salary of ($6,250). The salary will be paid pursuant to the Company's applicable payroll practices.

## II. COMPONENTS TO YOUR COMPENSATION

Your total compensation amount will be based on your Regional Leadership Bonus ("RLB"), Recruiting Bonus- Strategic Growth Activity ("RB"), and the Performance Management Modifier ("PMM") to the RB bonus, collectively referred to as your Performance Opportunity Bonus or "POB." You will receive your POB compensation, about forty-five (45) days in arrears on the fifteenth day of each month.

## III. YOUR ROLE AS A NON-PRODUCING MANAGER

While you are employed as a Non-Producing Manager of the Company you may not conduct any licensed loan activity. This includes but is not limited to the following:
- Quoting rates or offering mortgage terms to prospective borrowers
- Discussing eligibility or suitability of particular loan programs
- Discussing credit qualification scenarios
- Issuing pre-approval letters
- Taking loan applications or otherwise completing 1003s
- Pulling credit or locking a loan
- Marketing or holding yourself out as a licensed individual who can do any of the above
- Directing or referring any individual consumer to a specific loan originator

## IV. YOUR RECRUITMENT GOALS PER YOUR GPOD [DOWLING GPOD] – Tier 2

| Time Period | Number of New Loan Originators | Estimated Annual Volume |
|---|---|---|
| **Monthly** | 2 | $20,000,000 |
| **Annually** | 24 | $240,000,000 |

## V. YOUR REGIONAL LEADERSHIP BONUS EFFECTIVE DECEMBER, 2021 - Standard

You will be eligible to receive an RLB bonus based upon the production of Existing Members within your region. Your RLB is calculated by multiplying the amount of each Eligible Existing Member Loan originated during the period by the number of basis

points earned for that loan type as described in the table below. An Existing Member is defined as a loan originator within your region who was hired by the Company before January 1, 2019.  Please note your RLB will not be affected by your Performance Management Modifier described below in Section VII.  This RLB will take effect as of December 2021, after all RLB enhancements have ended.

The amount of Basis Points for the type of loan originated is described in the table below.

| Loan Type | Basis Points |
|---|---|
| FHA | 5.0 Basis Points |
| VA/Other Govt | 4.0 Basis Points |
| Conforming | 3.0 Basis Points |
| Jumbo/High Bal | 1.0 Basis Points |
| Broker/Bond | 0.5 Basis Points |

## VI. YOUR REGIONAL LEADERSHIP BONUS FOR MONTHS THIRTEEN THROUGH TWENTY-FOUR OF YOUR EMPLOYMENT WITH THE COMPANY

For months thirteen (13) through twenty-four (24) of your employment with the Company, you will be eligible to receive an additional RLB bonus based upon the production of the new hires within your region, for the first twelve months (12) of the new hire's employment with the Company. You are eligible to receive three percent (3%) of new hire's Corporate Objective multiplied by the Eligible Loan Volume of the new hires within your region. You are only eligible to receive this RLB for new hires hired during months thirteen (13) through twenty-four (24) of your employment with the Company. You will receive this RLB for the first twelve months of the new hire's employment with the Company.  Beginning December, 2021 your RLB will revert back to the Standard RLB.

## VII. YOUR REGIONAL LEADERSHIP BONUS ON EXISTING BRANCHES FOR YOUR FIRST SIX MONTHS OF EMPLOYMENT WITH THE COMPANY

For your first six months of employment with the Company, you will be eligible to receive a five Basis Point (5) RLB bonus based upon the production of the existing Byrer, Algonquin, Green Bay, Brookfield, Lake Geneva, and Marshfield-Wausa branches. Your RLB is calculated by multiplying the amount of each Eligible Loan originated during the period by five Basis Points (5). If the Company assigns an additional existing Cost Center to your region, you will be eligible to receive this five Basis Point (5) bonus on any additional existing Cost Center under your management.

## VIII. YOUR REGIONAL LEADERSHIP BONUS ON EXISTING BRANCHES FOR MONTHS SEVEN THROUGH TWELVE OF YOUR EMPLOYMENT WITH THE COMPANY

**Eligibility: If you actively recruit and the Company hires nine (9) Vice Presidents of Mortgage Lending to work in your region by day one hundred eighty (180) of your employment with the Company, you are eligible to receive the below described RLB. If you do not actively recruit and the Company does not hire nine (9) Vice Presidents of Mortgage Lending to work in your region by day one hundred eighty (180) of your employment with the Company, you are not eligible to receive the below described RLB.**

Months seven through twelve of your employment with the Company, you will be eligible to receive a five Basis Point (5) RLB bonus based upon the production of the existing Byrer, Algonquin, Green Bay, Brookfield, Lake Geneva, and Marshfield-Wausa branches. Your RLB is calculated by multiplying the amount of each Eligible Loan originated during the period by five Basis Points (5). If the Company assigns an additional existing Cost Center to your region, you will be eligible to receive this five Basis Point (5) bonus on any additional existing Cost Center under your management.

## IX. YOUR REGIONAL LEADERSHIP BONUS ON EXISTING BRANCHES AFTER YOUR FIRST TWELVE MONTHS OF EMPLOYMENT WITH THE COMPANY

After your first twelve months of employment with the Company, you will be eligible to receive a two Basis Point (2) RLB bonus based upon the production of the existing Byrer, Algonquin, Green Bay, Brookfield, Lake Geneva, and Marshfield-Wausa branches. Your RLB is calculated by multiplying the amount of each Eligible Loan originated during the period by two Basis Points (2). If the Company assigns an additional existing Cost Center to your region, you will be eligible to receive this two Basis Point (2) bonus on any additional existing Cost Center under your management.  Beginning December, 2020 your RLB will revert back to the Standard RLB.

## X. RECRUITING BONUS-SVP OF STRATEGIC GROWTH ACTIVITY

You will be eligible to receive a Recruiting Bonus (RB) based upon your recruiting efforts, Your RB bonus is calculated by multiplying the amount of each Eligible New Member Loan originated and funded by the company during the period by the number of basis points as described in the table below. A New Member is defined as a loan originator that you have recruited, and who was hired by the company on or after October 1, 2019. Any recruit hired between January 1, 2019 and September 30, 2019, will be grandfathered into the Months 13-30 tier of the table below. You are eligible to receive the RB for the first thirty (30) months of each New Member's employment with Company, after which time the loan originator will be deemed an "Existing Member." Tim Dowling will receive the recruiting override on Barb Miller and Anthony Burns per the tables below and effective with their start dates.

The amount of Basis Points for the type of loan originated and the length of time you are eligible to receive a bonus on a New Member is described in the table below. These calculations shall be done on a monthly basis and shall be paid about forty-five (45) days in arrears. For example, your first RB bonus under this plan shall be for your New Members' production from January 2020, and you shall be paid this RB bonus on March 15, 2020.

| Loan Type | Basis Points on a New Member's Loan Origination in Months 1-12 | Basis Points on a New Member's Loan Origination in Months 13-30 |
|---|---|---|
| FHA | 18.0 Basis Points | 9.0 Basis Points |
| VA/Other Govt | 15.0 Basis Points | 7.50 Basis Points |
| Conforming | 9.0 Basis Points | 4.5 Basis Points |
| Jumbo/High Bal | 6.0 Basis Points | 3.0 Basis Points |
| Broker/Bond | 1.2 Basis Points | .6 Basis Points |

## XI. PERFORMANCE MANAGEMENT MODIFIER

Your RB will be multiplied by your Performance Management Modifier ("PMM") to calculate your total earned bonus for the period. The PMM is made up of a combination of 50% of the Tier Matrix and 50% of your P&L Modifier, as described below.

### (a) DOWLING GPOD TIER 2 MATRIX

Fifty percent (50%) of your RB will be determined by your Tier Matrix, which is determined by the number of Qualified Hires that your team recruited, and the Company hired. The table below will determine your Tier Matrix percentage for the DOWLING GPOD. Your monthly Recruiting Bonus shall be modified based upon your prior three months average recruiting production and shall be paid forty-five (45) days in arrears. For example, if you have 3 Qualified Hires in October, 4 Qualified Hires in November, and 5 Qualified Hires in December, the three month average of 4 Qualified Hires determines your January modifier and your January Recruiting Bonus would be paid on March 15. The percentage that your monthly Recruiting Bonus will be modified is described in the table below.

| Number of Qualified Hires per Month OR Total Verified Production Volume | Percentage of Bonus |
|---|---|
| 4 | 125% |
| 3 | 110% |
| 2 OR $20,000,000 verified production volume | 100% |
| 1 OR $10M in verified production volume | 75% |

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

| | |
|---|---|
| 0 | 50% |

#### (b) P&L MODIFIER EFFECTIVE DECEMBER, 2021 - Standard

The other fifty percent (50%) of your PMM calculation will be based on a profitability component. There will be a P&L Modifier, which is based on the grid below. For example, if your Region is profitable by 35 bps in the month of January, you will receive 125% of your bonus on this 50% of the PMM calculation for the January POB bonus paid forty-five (45) days in arrears. Alternatively, if your region is only 9 bps profitable, this portion of the 50% PMM calculation will be only paid out at 75% of the total. This P&L Modifier will take effect as of December 2021, after all P&L Modifier enhancements have ended.

| PMM Basis Points | Bonus Modifier |
|---|---|
| 70.00 or More | 150% |
| 69.99 to 50.00 | 125% |
| 49.99 to 20.00 | 100% |
| 19.99 to 00.00 | 75% |
| Less than 0.00 | 50% |

#### (c) P&L MODIFIER FOR FIRST TWENTY-FOUR (24) MONTHS OF EMPLOYMENT

The other fifty percent (50%) of your PMM calculation will be based on a profitability component. There will be a P&L Modifier, which is based on the grid below. For example, if your Region is profitable by 35 bps in the month of January, you will receive 110% of your bonus on this 50% of the PMM calculation for the January POB bonus paid forty-five (45) days in arrears. Alternatively, if your region is only 9 bps profitable, this portion of the 50% PMM calculation will be only paid out at 70% of the total. Beginning December, 2021 your P&L Modifier will revert back to the Standard P&L.

| PMM Basis Points | Bonus Modifier |
|---|---|
| 45.00 or More | 120% |
| 44.99 to 35.00 | 110% |
| 34.99 to 20.00 | 100% |
| 19.99 to 15.00 | 90% |
| 14.99 to 10.00 | 80% |
| 9.99 to 5.00 | 70% |
| 4.99 to 0.00 | 60% |
| Less than 0.00 | 50% |

### XII. YOUR GUARANTEED COMPENSATION FOR YOUR FIRST FIVE MONTHS OF EMPLOYMENT WITH THE COMPANY

Your compensation will never be less than twenty thousand dollars ($20,000) per month for five months (5). Your guaranteed compensation will begin for the December 2019 Profit and Loss Statement which will be paid on the February 14, 2020, payroll date. The guaranteed compensation is based upon your Recruiting Bonus—SVP of Strategic Growth Activity. You will be eligible to receive the "better of" your compensation listed in the Schedule or this guaranteed compensation, not both. The last pay period you are eligible to receive this guaranteed compensation is the June 15, 2020, payroll date for the April 2020 Profit and Loss Statement.

### XIII. YOUR GUARANTEED COMPENSATION FOR MONTHS SIX THROUGH ELEVEN OF YOUR EMPLOYMENT WITH THE COMPANY

**Eligibility: If you actively recruit and the Company hires nine (9) Vice Presidents of Mortgage Lending to work in your region by day one hundred eighty (180) of your employment with the Company, you are eligible to receive the below described guaranteed compensation. If you do not actively recruit and the Company does not hire nine (9) Vice Presidents of Mortgage Lending to work in your region by day one hundred eighty (180) of your employment with the Company, you are not eligible to receive the below described guaranteed compensation.**

Your compensation will never be less than twenty thousand dollars ($20,000) per month for six months (6). Your guaranteed compensation will begin for the May 2020 Profit and Loss Statement which will be paid on the July 15, 2020, payroll date. The guaranteed compensation is based upon your Recruiting Bonus—SVP of Strategic Growth Activity. You will be eligible to receive the "better of" your compensation listed in the Schedule or this guaranteed compensation, not both. The last pay period you are eligible to receive this guaranteed compensation is the December 15, 2020, payroll date for the October 2020 Profit and Loss Statement.

**I agree that this Schedule accurately reflects my understanding of the terms of my Bonuses and other compensation.**

Tim Dowling
_____
(Print your name here)

Guaranteed Rate, Inc.

DocuSigned by:
Tim Dowling
_____
9261BCE806C34F2... (Place your signature here)

DocuSigned by:
_____
By: Nik Athanasiou, Chief Operating Officer

03/18/2020
_____
(Date)

03/19/2020
_____
(Date)

DocuSign Envelope ID: 4576108E-4BC1-4588-805B-208C36E85733



**TIM DOWLING– NON-PRODUCING REGIONAL MANAGER – MORAN MIDWEST 2 (REGIONAL) ILLINOIS (COST CENTER 1737)**

All capitalized terms used in this Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

## I. SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1) You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2) You must manage the Branches and your employees in a manner consistent with applicable Requirements.

(3) You must recruit and hire employees who have the ethics and skills necessary to provide services to the Company in a manner consistent with applicable Requirements.

(4) You must cause each of your employees to enter into a Compensation Plans and Agreement that is reviewed and approved by the Company's legal department.

(5) You may not open any operating accounts of the Company during the term of this Agreement.

(6) You must train or cause to be trained all of your employees to ensure that they originate Eligible Loans and perform other services for the Company in a manner that complies with applicable Requirements.

(7) You must cause your employees to ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(8) You must cause your employees to ensure and confirm that each Eligible Loan document and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(9) You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(10) You must cause your employees to ensure that applicants are offered only Eligible Loan products and programs approved by and made available through an origination channel of the Company.

(11) Obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which a Branch originates and/or intends to originate Eligible Loans.

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

(12) You must develop new business and business sources in the manner directed by the Company and consistent with applicable Requirements.

(13) You must direct, manage and supervise the overall operations of the Branches in your region in a manner consistent with applicable Requirements.

(14) You must prepare and execute budgets, forecasts and business plans in the manner directed by the Company and consistent with applicable Requirements.

(15) You must post and continuously display of all regulatory notices in the Branches that are required by HUD, ECOA, the Department of Labor or any other Authority under applicable Requirements.

(16) You must maintain a professional and secure working environment for the benefit of your Branch employees, consumers, business partners and clients.

(17) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Non-Producing Manager**

As a Non-Producing Manager, you may not:

(1) originate an Eligible Loan,

(2) take an application for an Eligible Loan,

(3) offer, arrange, or assist a consumer in obtaining or applying to obtain an Eligible Loan,

(4) negotiate or otherwise obtain or make an Eligible Loan for another person,

(5) represent to the public that you can or will perform any of the activities described above, or

(6) otherwise engage in any activity that would cause you to be considered a Loan Officer.

## II.  EMPLOYEE CORPORATE OBJECTIVES AND LOAN PRICING

The amount of your employees' Corporate Objectives must be set forth in the Schedules to their respective Compensation Plans and Agreements. You should ensure that employees in your region are pricing Eligible Loans in amounts that meet or exceed their respective Corporate Objectives.

You must ensure that each employee receives approval from a designated officer or employee of the Company prior to pricing an Eligible Loan that would result in a Corporate Objective Shortfall.

## III.  COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

DocuSign Envelope ID: 4576108F-4BC1-4588-80FB-208C36E85733

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

**(1) Fully Recoverable Draw**

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Bonus and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Bonuses and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

**(2) Non-Recoverable Draw**

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Bonuses or other future compensation.

**(c) Your Salary**

**(1) In General**

Please refer to the Schedule to determine whether you have a Salary.

**(2) Payment of your Salary**

Your salary will be paid according to the Company's applicable payroll practices which may change without notice to you.

**(d) Your Bonuses**

**(1) How We Calculate Your Bonuses**

Your Bonuses are calculated in the manner described in the Schedule.

**(2) Timing of Your Bonuses; Advances**

Your Bonuses will be calculated and advanced each month during the payroll period following the month for which we determine the aggregate profitability of your Branches and the aggregate principal balance of Eligible Loans originated and funded through your Branches, in accordance with the Company's payroll practices. However, your Bonuses are not fully calculable or earned until the Company has determined that there is no Recapture Event.

**(3) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Bonus or other compensation is greater than the correct amount owed under this Agreement, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs before the Company has paid you the related Bonus, the Company will not pay you part or all of the Bonus, as the case may be.

If the Company has paid you a Bonus prior to the occurrence of a Recapture Event, you must repay all or part of the Bonus to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Bonuses or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (4) Monthly Bonus Statement Must Be Accurate

You must ensure that each of your monthly Bonus statements are accurate by reviewing all of these statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the SVP of Finance before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your statement is issued.

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination for Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Bonus Not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V. YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans,

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for you actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions,(iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential or trade secret documents, data, or information acquired from any former employer or otherwise; (as used in this Section V (c), the "Confidential Information") (2) transmitted, communicated or divulged any Confidential Information from any former employer or otherwise to the Company or its employees; (3) used any former employer's Confidential Information in connection with your employment with the Company, including but not limited to any loan origination activity; or (4) violated any post-employment restrictive covenants or obligations you owe any former employer. Confidential Information as used in this Section V(c) shall include documents, data or information which your former employer(s) may consider to be confidential or a trade secret. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. You agree that you will also pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. In addition to all other remedies at law and equity, the Company reserves the right to claw back any and all commissions, bonuses, and other compensation paid to you in connection with or arising out of any breach or alleged breach of the foregoing representations and warranties. The obligations, rights and remedies hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.**  Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement.  You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d) and is not a penalty.  You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company.  This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law.  Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision.  This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI.   LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company, or (d) open any operating account on behalf of the Company.   You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII.   MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American **Arbitration** Association then in existence.  Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII.   APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein.  You irrevocably consent to the exclusive jurisdiction of the

state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX.   ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement.  You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain.  Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X.   MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement.  The Company reserves the right to terminate or modify this Agreement at any time.  Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer.  This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee.  Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

## XI.   DEFINITIONS

**"Agreement**" means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent.  One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Branches"** means the branch offices of the Company that you have recruited to join the Company and that you manage within your region.

**"Cause"** has the meaning set forth in Section IV(b) below.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a) below.

**"Corporate Objective"** means the amount of net revenue that each of your Branch employees agree the Company will receive from the sale of each Eligible Loan that such employee originates, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E857A3

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"Eligible Existing Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for thirty-one months or longer.

**"Eligible Loan"** means each mortgage loan that (a) is originated by Branch employee, (b) is closed and funded by the Company, (c) is not the subject of a Recapture Event, and (d) otherwise complies with all applicable Requirements.

"Eligible New Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for less than thirty-one months.

 "**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Bonus during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Bonus during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

 "**Loan Originator**" means a person who is considered to be a loan originator under the Consumer Financial Protection Bureau's loan originator compensation rule, 12 CFR §1026.36.  This rule considers a person to be a Loan Originator if that person, in expectation of direct or indirect compensation or other monetary gain or for direct or indirect compensation or other monetary gain, performs any of the following activities: (a) takes an application, (b) offers, arranges, assists a consumer in obtaining or applying to obtain, (c) negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or (d) through advertising or other means of communication represents to the public that such person can or will perform any of these activities.

"**Manager**" means your direct supervisor.

**"Non-Recoverable Draw"** means a Draw which, when it exceeds the amount of your Bonus during any month, may not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Non-Recoverable Draw Amount"** is the amount by which your Draw exceeds the amount of your Bonus during any month, which amount will not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Person"** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**"Profitability"** means, with respect to the Branches, the Net Income of the Branches, expressed in Basis Points, all as reflected in the Company's financial statements.

**"Recapture Event"** has the meaning set forth in Section III(c)(3) of this Agreement.

 "**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

**"Schedule"** means the Compensation Schedule to this Agreement.

**"You"** or **"your"** means you, the employee, in your capacity as a Non-Producing Senior Vice President of Strategic Growth.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Tim Dowling

_____
(Print your name here)

Guaranteed Rate, Inc.

DocuSigned by:

*Tim Dowling*
_____
9261BCE806C34F2...(Place your signature here)

DocuSigned by:

By: Nikolaos Athanasiou, Chief Operating Officer

03/18/2020
_____
(Date)

03/19/2020
_____
(Date)

# EXHIBIT F



**January 5, 2022**

**Yesha Hoeppner**
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: 773-328-6431
yesha.hoeppner@rate.com

<u>**Via Email and UPS**</u>

Timothy Dowling
1804 Black Oak Drive
McHenry, IL 60050
Tdowlin1@gmail.com

      Re:    Cease and Desist

Mr. Dowling:

      Effective May 14, 2021, you resigned your position as Senior Vice President of Strategic Growth at Guaranteed Rate, Inc. ("Guaranteed Rate"). As you may recall, on May 25, 2021, I sent you a letter reminding you of your post-employment obligations to Guaranteed Rate pursuant to the Terms and Conditions of Employment you executed with Guaranteed Rate on March 18, 2020 (the "Agreement"). A copy of your Agreement is enclosed again for your reference.

      Pursuant to the Agreement, you acknowledged you would have access to certain Confidential Information as part of your employment with Guaranteed Rate. This Confidential Agreement included, but was not limited to, information about Guaranteed Rate's operations, the identity of its top-performing employees, hiring criteria, and other personnel matters. (Agreement, p. 9.) You acknowledged and expressly agreed that "[a]s consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer or any other Person or entity." (*Id.* at 10.) The obligation to safeguard this Confidential Information survives the termination of your employment, and remains in full force and effect indefinitely.

      Additionally, under the Agreement, you acknowledged and agreed that during your employment and for a period of 24 months following any termination of employment with Guaranteed Rate (the "Restricted Period"), you would not directly or indirectly hire, solicit, or encourage employees to end their employment with Guaranteed Rate and/or join you in another business venture or relationship. (Agreement, p. 10-11.) The Agreement also provides that during the Restricted Period, you may not "supervise, manage or oversee the work of any former employee of [Guaranteed Rate], the identity of which you learned during your employment with [Guaranteed Rate]." (*Id.* at 11.)

      We are aware that you are now employed as the Midwest Regional Manager for Nations Lending ("Nations"), a competitor of Guaranteed Rate. Recently, the following Guaranteed Rate employees resigned in a manner that appears staggered and deliberately coordinated: 1) Meredith Richardson (December 10, 2021); 2) Barbara Miller (December 20, 2021); 3) Eirik Rorvig (December 23, 2021); 4) Kyle McManners (December 23, 2021); 5) Randy Barwick (December



29, 2021); 6) Chris Rollins (December 30, 2021); and 7) Paul Gagne (January 4, 2022). These are individuals whom you managed at Guaranteed Rate or who worked directly with individuals you managed at Guaranteed Rate. We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations.

Accordingly, we have strong reason to believe that you are in violation of your non-solicitation and confidentiality obligations to Guaranteed Rate and demand that you immediately cease and desist from all such actions. We intend to investigate the above occurrences and any others and will take all appropriate legal actions. As a reminder, under the terms of your Agreement, you are liable for $50,000 for *each* solicitation that violates your Agreement, plus attorneys' fees and costs incurred in enforcing the Agreement. (Agreement, p. 11.)

In the meantime, we demand that you confirm in writing, by **January 12, 2022**, your intention to abide by your contractual obligations to Guaranteed Rate. If we do not hear from you by that date, we will assume you have no interest in complying with your duties and obligations, and will take necessary steps to enforce and protect Guaranteed Rate's rights. We are copying Nations on this correspondence to make it aware of your continuing obligations to Guaranteed Rate and of these issues.

Finally, we demand that you and Nations take the necessary steps to maintain and preserve all documents of any kind related to these issues. The term "documents" is intended in its broadest sense to include, without limitation, emails (personal or work), voicemails/recordings, text messages, social media (including, without limitation, LinkedIn), and any other types of hard copy or electronic communications.

The foregoing is without prejudice to Guaranteed Rate's rights and remedies, all of which are expressly reserved.

Sincerely,

/s/ Yesha Hoeppner
Vice President and Senior Counsel
Guaranteed Rate, Inc.

CC:     Nations Lending
        Attn: General Counsel
        4 Summit Park Drive, Suite 200
        Independence, OH 44131

DocuSign Envelope ID: 4576108E-4BC1-4588-805B-208C36E85733



<div style="background:#c0392b; color:white">

**TIM DOWLING– NON-PRODUCING REGIONAL MANAGER – MORAN MIDWEST 2 (REGIONAL) ILLINOIS (COST CENTER 1737)**

</div>

All capitalized terms used in this Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

## I.   SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1) You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2) You must manage the Branches and your employees in a manner consistent with applicable Requirements.

(3) You must recruit and hire employees who have the ethics and skills necessary to provide services to the Company in a manner consistent with applicable Requirements.

(4) You must cause each of your employees to enter into a Compensation Plans and Agreement that is reviewed and approved by the Company's legal department.

(5) You may not open any operating accounts of the Company during the term of this Agreement.

(6) You must train or cause to be trained all of your employees to ensure that they originate Eligible Loans and perform other services for the Company in a manner that complies with applicable Requirements.

(7) You must cause your employees to ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(8) You must cause your employees to ensure and confirm that each Eligible Loan document and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(9) You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(10) You must cause your employees to ensure that applicants are offered only Eligible Loan products and programs approved by and made available through an origination channel of the Company.

(11) Obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which a Branch originates and/or intends to originate Eligible Loans.

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

(12) You must develop new business and business sources in the manner directed by the Company and consistent with applicable Requirements.

(13) You must direct, manage and supervise the overall operations of the Branches in your region in a manner consistent with applicable Requirements.

(14) You must prepare and execute budgets, forecasts and business plans in the manner directed by the Company and consistent with applicable Requirements.

(15) You must post and continuously display of all regulatory notices in the Branches that are required by HUD, ECOA, the Department of Labor or any other Authority under applicable Requirements.

(16) You must maintain a professional and secure working environment for the benefit of your Branch employees, consumers, business partners and clients.

(17) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Non-Producing Manager**

As a Non-Producing Manager, you may not:

(1) originate an Eligible Loan,

(2) take an application for an Eligible Loan,

(3) offer, arrange, or assist a consumer in obtaining or applying to obtain an Eligible Loan,

(4) negotiate or otherwise obtain or make an Eligible Loan for another person,

(5) represent to the public that you can or will perform any of the activities described above, or

(6) otherwise engage in any activity that would cause you to be considered a Loan Officer.

## II. EMPLOYEE CORPORATE OBJECTIVES AND LOAN PRICING

The amount of your employees' Corporate Objectives must be set forth in the Schedules to their respective Compensation Plans and Agreements. You should ensure that employees in your region are pricing Eligible Loans in amounts that meet or exceed their respective Corporate Objectives.

You must ensure that each employee receives approval from a designated officer or employee of the Company prior to pricing an Eligible Loan that would result in a Corporate Objective Shortfall.

## III. COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

**(1) Fully Recoverable Draw**

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Bonus and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Bonuses and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

**(2) Non-Recoverable Draw**

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Bonuses or other future compensation.

**(c) Your Salary**

**(1) In General**

Please refer to the Schedule to determine whether you have a Salary.

**(2) Payment of your Salary**

Your salary will be paid according to the Company's applicable payroll practices which may change without notice to you.

**(d) Your Bonuses**

**(1) How We Calculate Your Bonuses**

Your Bonuses are calculated in the manner described in the Schedule.

**(2) Timing of Your Bonuses; Advances**

Your Bonuses will be calculated and advanced each month during the payroll period following the month for which we determine the aggregate profitability of your Branches and the aggregate principal balance of Eligible Loans originated and funded through your Branches, in accordance with the Company's payroll practices. However, your Bonuses are not fully calculable or earned until the Company has determined that there is no Recapture Event.

**(3) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Bonus or other compensation is greater than the correct amount owed under this Agreement, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs before the Company has paid you the related Bonus, the Company will not pay you part or all of the Bonus, as the case may be.

If the Company has paid you a Bonus prior to the occurrence of a Recapture Event, you must repay all or part of the Bonus to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Bonuses or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (4) Monthly Bonus Statement Must Be Accurate

You must ensure that each of your monthly Bonus statements are accurate by reviewing all of these statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the SVP of Finance before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your statement is issued.

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination for Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Bonus Not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V. YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans,

DocuSign Envelope ID: 4576108F-4BC1-4588-805B-208C36E85733

promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations; (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for you actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions,(iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential or trade secret documents, data, or information acquired from any former employer or otherwise; (as used in this Section V (c), the "Confidential Information") (2) transmitted, communicated or divulged any Confidential Information from any former employer or otherwise to the Company or its employees; (3) used any former employer's Confidential Information in connection with your employment with the Company, including but not limited to any loan origination activity; or (4) violated any post-employment restrictive covenants or obligations you owe any former employer. Confidential Information as used in this Section V(c) shall include documents, data or information which your former employer(s) may consider to be confidential or a trade secret. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. You agree that you will also pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. In addition to all other remedies at law and equity, the Company reserves the right to claw back any and all commissions, bonuses, and other compensation paid to you in connection with or arising out of any breach or alleged breach of the foregoing representations and warranties. The obligations, rights and remedies hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d) and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI. LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company, or (d) open any operating account on behalf of the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American **Arbitration** Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the

state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X. MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

## XI. DEFINITIONS

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Branches"** means the branch offices of the Company that you have recruited to join the Company and that you manage within your region.

**"Cause"** has the meaning set forth in Section IV(b) below.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a) below.

**"Corporate Objective"** means the amount of net revenue that each of your Branch employees agree the Company will receive from the sale of each Eligible Loan that such employee originates, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"Eligible Existing Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for thirty-one months or longer.

**"Eligible Loan"** means each mortgage loan that (a) is originated by Branch employee, (b) is closed and funded by the Company, (c) is not the subject of a Recapture Event, and (d) otherwise complies with all applicable Requirements.

"Eligible New Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for less than thirty-one months.

 **"Fully Recoverable Draw"** means a Draw which, when it exceeds the amount of your Bonus during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount"** means the dollar amount by which your monthly Draw exceeds your Bonus during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

 **"Loan Originator"** means a person who is considered to be a loan originator under the Consumer Financial Protection Bureau's loan originator compensation rule, 12 CFR §1026.36. This rule considers a person to be a Loan Originator if that person, in expectation of direct or indirect compensation or other monetary gain or for direct or indirect compensation or other monetary gain, performs any of the following activities: (a) takes an application, (b) offers, arranges, assists a consumer in obtaining or applying to obtain, (c) negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or (d) through advertising or other means of communication represents to the public that such person can or will perform any of these activities.

"**Manager**" means your direct supervisor.

**"Non-Recoverable Draw"** means a Draw which, when it exceeds the amount of your Bonus during any month, may not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Non-Recoverable Draw Amount"** is the amount by which your Draw exceeds the amount of your Bonus during any month, which amount will not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Person"** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**"Profitability"** means, with respect to the Branches, the Net Income of the Branches, expressed in Basis Points, all as reflected in the Company's financial statements.

**"Recapture Event"** has the meaning set forth in Section III(c)(3) of this Agreement.

 **"Requirements"** means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

**"Schedule"** means the Compensation Schedule to this Agreement.

**"You"** or **"your"** means you, the employee, in your capacity as a Non-Producing Senior Vice President of Strategic Growth.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Tim Dowling

_____
(Print your name here)

Guaranteed Rate, Inc.

DocuSigned by:

*Tim Dowling*

_____
9261BCE806C34F2...(Place your signature here)

DocuSigned by:

By: Nikolaos Athanasiou, Chief Operating Officer
E86C0909F1A8...

03/18/2020
_____
(Date)

03/19/2020
_____
(Date)

# EXHIBIT G



**January 18, 2022**

**Yesha Hoeppner**
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: 773-328-6431
yesha.hoeppner@rate.com

**<u>Via Email</u>**

Timothy Dowling
1804 Black Oak Drive
McHenry, IL 60050
Tdowlin1@gmail.com

      Re:     Cease and Desist

Mr. Dowling:

      I write to follow up on the letter I sent you, dated January 5, 2022 ("January 5th Letter"). In the January 5th Letter, I demanded that you cease and desist from actions that violate your contractual non-solicitation and confidentiality obligations to Guaranteed Rate Inc. ("Guaranteed Rate"), as provided in the Terms and Conditions of Employment you executed in conjunction with your employment with Guaranteed Rate (the "Agreement"). I also outlined the apparently synchronized departures of members of your team from Guaranteed Rate, and informed you that we intended to investigate those occurrences and any other unlawful actions. On January 7, 2022, I received an email response from you claiming that you "have not undertaken any actions in violation of lawful prior agreements, nor do [you] intend any such actions."

      Since I sent the January 5th Letter, and indeed since your response on January 7th, we have learned that three other Guaranteed Rate employees resigned, and we have reason to believe they will be joining you and Eirik Rorvig at Nations Lending ("Nations"), your employer. Specifically, we learned that Richard Cohen resigned on January 10, 2022, Lee Kampa resigned on January 14, 2022, and Dawn Kaczmark resigned on January 17, 2022. Their resignations appear to be a continuation of the coordinated campaign waged by you and Mr. Rorvig to solicit Guaranteed Rate employees to Nations: 1) Meredith Richardson (December 10, 2021); 2) Barbara Miller (December 20, 2021); 3) Mr. Rorvig himself (December 23, 2021); 4) Kyle McManners (December 23, 2021); 5) Randy Barwick (December 29, 2021); 6) Chris Rollins (December 30, 2021); and 7) Paul Gagne (January 4, 2022). The above are individuals whom you managed at Guaranteed Rate or who worked directly with individuals you managed at Guaranteed Rate. We suspect you used Guaranteed Rate Confidential Information regarding the identities, performance and compensation of these individuals to recruit them to work at Nations.

      Moreover, since the January 5th Letter, Guaranteed Rate has discovered evidence that you have worked in conjunction with Eirik Rorvig to solicit Guaranteed Rate employees to Nations, in violation of both of your contractual non-solicitation and confidentiality obligations to Guaranteed Rate. Specifically, we have found emails from Joe Noonan to Mr. Rorvig and Mr. Cohen detailing his conversations with them regarding the circumstances of their moves from Guaranteed Rate to Nations. In one email, dated November 24, 2021 and with the subject "Factors to Decision → New



Mortgage Company," Mr. Noonan provides Mr. Rorvig with notes from their conversation, detailing the following: 1) Mr. Rorvig met with his team at his home the previous day to discuss moving to a new mortgage company and that it was a "productive" conversation; and 2) Mr. Rorvig had "[g]reat conversations with Tim Dowling @ Nations Bank." In another email, dated December 14, 2021, Mr. Noonan writes to Mr. Cohen recapping their conversation, noting that Mr. Cohen is "[e]xcited to move to Nations Bank in January with Eirik's team" and that Mr. Cohen had "[s]poke[n] to team members at Nations and feedback is positive."

As you may recall, pursuant to your Agreement, you acknowledged that Guaranteed Rate Confidential Agreement included, but was not limited to, information about Guaranteed Rate's operations, the identity of its top-performing employees, hiring criteria, and other personnel matters, and that you would not use or divulge this Confidential Agreement for the benefit of any competitor. (Agreement, p. 9-10.) Additionally, you acknowledged and agreed that during your employment and for a period of 24 months following any termination of employment with Guaranteed Rate (the "Restricted Period"), you would not directly or indirectly hire, solicit, or encourage employees to end their employment with Guaranteed Rate and/or join you in another business venture or relationship. (*Id.* at 10-11.)

Given what we have learned so far, we have strong reason to believe that you are in violation of your non-solicitation and confidentiality obligations to Guaranteed Rate. Once again, we demand that you immediately cease and desist from all such actions. Our investigation into your contractual and other legal violations is ongoing. We expressly reserve all our rights and remedies, including without limitation filing a lawsuit against you for breach of contract and other potential claims. We intend to seek—pursuant to the terms of your Agreement—liquidated damages in the amount of $50,000 for *each* non-solicitation that violates your Agreement, in addition to seeking any other applicable damages, remedies, attorneys' fees and costs incurred in enforcing the Agreement. (Agreement, p. 11.)

We are copying Nations on this correspondence to make it aware of your continuing obligations to Guaranteed Rate and of these issues. We also reiterate our demand that you and Nations take the necessary steps to maintain and preserve all documents of any kind related to these issues. The term "documents" is intended in its broadest sense to include, without limitation, emails (personal or work), voicemails/recordings, text messages, social media (including, without limitation, LinkedIn), and any other types of hard copy or electronic communications.

Sincerely,

/s/ Yesha Hoeppner
Vice President and Senior Counsel
Guaranteed Rate, Inc.

CC:    George Chamberlain (george.chamberlain@nationslending.com)
        Christopher Baker (chris.baker@nationslending.com)

# EXHIBIT H



J. Scott Humphrey
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Direct Dial: 312.624.6420
Fax: 312.767.9192
shumphrey@beneschlaw.com

February 1, 2022

**VIA FEDERAL EXPRESS AND ELECTRONIC MAIL**
Timothy Dowling
1804 Black Oak Drive
McHenry, IL 60050
Tdowlin1@gmail.com
     Re:    Violations of Post-Employment Obligations owed to Guaranteed Rate

Dear Mr. Dowling:

We are litigation counsel for Guaranteed Rate, Inc. ("Guaranteed Rate"). We write to you regarding your multiple violations of the duties and obligations you owe Guaranteed Rate pursuant to the Terms and Conditions of Employment ("Agreement") you executed with Guaranteed Rate on March 18, 2020. A copy of your executed Agreement is enclosed with this letter so that there is no confusion over the duties and obligations you still owe Guaranteed Rate. Please know that your continuing violations of the Agreement will not be tolerated.

As Senior Vice President of Strategic Growth, you had access to Guaranteed Rate's confidential information. As stated in the Agreement, Guaranteed Rate's confidential information includes, but is not limited to, information about Guaranteed Rate's:

> sales, **operations**, financial condition, financial projections, profit margins, personnel matters, **the identity of [Guaranteed Rate]'s top-performing employees, hiring criteria, and training techniques**, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of [Guaranteed Rate] and its business and operations. (emphasis added)

The above confidential information has been developed and created over time and as a result of Guaranteed Rate expending significant resources. The above confidential information gives Guaranteed Rate a significant economic advantage over its competitors because the information is not generally known or publicly available. Accordingly, Guaranteed Rate's confidential information is a trade secret under both the Illinois Uniform Trade Secrets Act, 750 ILCS 1065, and the Federal Defend Trade Secrets Act, 18 U.S.C.A. § 1836. Not surprisingly, you agreed to not use any Guaranteed Rate confidential information for your own benefit. And you promised under the Agreement to not "divulge to or use [Guaranteed Rate] confidential information for the benefit of any competitor, customer, or any other person or entity."

Timothy Dowling
February 1, 2022
Page 2

As a result of your access to Guaranteed Rate's confidential information and in exchange for receiving compensation from Guaranteed Rate, you agreed under Section V(d) of the Agreement that, for two years following the termination of your Guaranteed Rate employment, you will not "directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce, promote, facilitate, encourage or assist in the solicitation of any person employed/engaged by [Guaranteed Rate] … to end their employment/engagement with [Guaranteed Rate]." Similarly, and for two years following the termination of your Guaranteed Rate employment, you agreed to not a) have another Guaranteed Rate employee join you "in a business venture or other business" and/or b) "supervise, manage, or oversee the work of any former employee of [Guaranteed Rate]." Since you voluntarily resigned from Guaranteed Rate on May 14, 2021, these restrictions are in place through May 14, 2023.

Unfortunately, you have not complied with the above duties and obligations you still owe Guaranteed Rate. Specifically, Guaranteed Rate is aware of you soliciting at least ten Guaranteed Rate employees to leave Guaranteed Rate for Nations Lending ("Nations"), your current employer and a Guaranteed Rate competitor. In fact, Guaranteed Rate has uncovered emails from Guaranteed Rate employees that document your solicitation efforts and violations of the duties and obligations you still owe Guaranteed Rate under the Agreement. Moreover, it appears from these emails and Guaranteed Rate's investigation that you are using Guaranteed Rate's confidential information in your efforts to solicit and induce Guaranteed Rate employees to leave Guaranteed Rate and join Nations. Your actions not only violate the specific terms of the Agreement, but also statutory and common law that prohibit the improper interference with employee relationships, breaches of restrictive covenant agreements and the misappropriation of trade secrets.

Accordingly, the purpose of this letter is to alert you to the fact that Guaranteed Rate is continuing its investigation of you and, unless your violations of the Agreement stop immediately, Guaranteed Rate will take the necessary steps to enforce its rights under the Agreement and the law against you and anyone acting in concert with you. Such actions may include seeking injunctive relief against you, and anyone acting in concert with you, as a result of you breaching the Agreement and misappropriating Guaranteed Rate's confidential information. Please note that, under Section V(d)(i) of the Agreement, Guaranteed Rate will be entitled to recover "all of [Guaranteed Rate]'s reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any" violation of the restrictive covenants or confidentiality obligations found in the Agreement.

In addition, you agreed to pay Guaranteed Rate $50,000 for each violation of Section V(d). Since you violated Section V(d) by soliciting at least ten Guaranteed Rate employees to leave Guaranteed Rate for Nations, you currently owe Guaranteed Rate $500,000. However, and in order to bring this matter to a quick and amicable resolution, Guaranteed Rate hereby demands payment from you in the amount of $250,000 as a result of your violations of Section V(d). Guaranteed Rate also demands that you provide written assurances that a) you will not solicit Guaranteed Rate employees until after May 14, 2023, b) do not possess or have access to Guaranteed Rate confidential information, and c) will not use or access Guaranteed Rate confidential information.

Timothy Dowling
February 1, 2022
Page 3

Please contact me within the next seven days to confirm your compliance with Guaranteed Rate's demands. If we do not hear from you on or before February 8, 2022, we will assume that you have no interest in complying with the duties and obligations you owe Guaranteed Rate, and will take the necessary steps to protect Guaranteed Rate's legitimate business interests. Since Guaranteed Rate has a dispute with you that may result in litigation, you are directed to preserve all documents, records, evidence, electronic data and metadata related to these issues. You are also directed to preserve and not alter, destroy or compromise in any way, whether in hard copy or in electronic format, any information, document or data that relates to these issues. This instruction also applies to anyone acting in concert with you.

If you would like to discuss this matter further, you or your attorney may contact me at (312) 624-6420.

Very truly yours,

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP

J. Scott Humphrey

JSH
Encl.

15391082 v1



All capitalized terms used in this Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

## I.  SCOPE OF EMPLOYMENT

You and the Company agree as follows:

### (a) Your Employment Obligations

As an employee of the Company, you must comply with all of the following requirements.

(1)  You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2)  You must manage the Branches and your employees in a manner consistent with applicable Requirements.

(3)  You must recruit and hire employees who have the ethics and skills necessary to provide services to the Company in a manner consistent with applicable Requirements.

(4)  You must cause each of your employees to enter into a Compensation Plans and Agreement that is reviewed and approved by the Company's legal department.

(5)  You may not open any operating accounts of the Company during the term of this Agreement.

(6)  You must train or cause to be trained all of your employees to ensure that they originate Eligible Loans and perform other services for the Company in a manner that complies with applicable Requirements.

(7)  You must cause your employees to ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(8)  You must cause your employees to ensure and confirm that each Eligible Loan document and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(9)  You must devote your full time and efforts to your employment with the Company.  During your employment with the Company, you may not be employed by any other Person.  You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(10) You must cause your employees to ensure that applicants are offered only Eligible Loan products and programs approved by and made available through an origination channel of the Company.

(11) Obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which a Branch originates and/or intends to originate Eligible Loans.

DocuSign Envelope ID: 45761D8F-4BC1-4F83-89FB-208C36E85733

(12) You must develop new business and business sources in the manner directed by the Company and consistent with applicable Requirements.

(13) You must direct, manage and supervise the overall operations of the Branches in your region in a manner consistent with applicable Requirements.

(14) You must prepare and execute budgets, forecasts and business plans in the manner directed by the Company and consistent with applicable Requirements.

(15) You must post and continuously display of all regulatory notices in the Branches that are required by HUD, ECOA, the Department of Labor or any other Authority under applicable Requirements.

(16) You must maintain a professional and secure working environment for the benefit of your Branch employees, consumers, business partners and clients.

(17) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Non-Producing Manager**

As a Non-Producing Manager, you may not:

(1) originate an Eligible Loan,

(2) take an application for an Eligible Loan,

(3) offer, arrange, or assist a consumer in obtaining or applying to obtain an Eligible Loan,

(4) negotiate or otherwise obtain or make an Eligible Loan for another person,

(5) represent to the public that you can or will perform any of the activities described above, or

(6) otherwise engage in any activity that would cause you to be considered a Loan Officer.

## II. EMPLOYEE CORPORATE OBJECTIVES AND LOAN PRICING

The amount of your employees' Corporate Objectives must be set forth in the Schedules to their respective Compensation Plans and Agreements. You should ensure that employees in your region are pricing Eligible Loans in amounts that meet or exceed their respective Corporate Objectives.

You must ensure that each employee receives approval from a designated officer or employee of the Company prior to pricing an Eligible Loan that would result in a Corporate Objective Shortfall.

## III. COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

**(1) Fully Recoverable Draw**

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Bonus and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Bonuses and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

**(2) Non-Recoverable Draw**

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Bonuses or other future compensation.

**(c) Your Salary**

**(1) In General**

Please refer to the Schedule to determine whether you have a Salary.

**(2) Payment of your Salary**

Your salary will be paid according to the Company's applicable payroll practices which may change without notice to you.

**(d) Your Bonuses**

**(1) How We Calculate Your Bonuses**

Your Bonuses are calculated in the manner described in the Schedule.

**(2) Timing of Your Bonuses; Advances**

Your Bonuses will be calculated and advanced each month during the payroll period following the month for which we determine the aggregate profitability of your Branches and the aggregate principal balance of Eligible Loans originated and funded through your Branches, in accordance with the Company's payroll practices. However, your Bonuses are not fully calculable or earned until the Company has determined that there is no Recapture Event.

**(3) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Bonus or other compensation is greater than the correct amount owed under this Agreement, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed

by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs before the Company has paid you the related Bonus, the Company will not pay you part or all of the Bonus, as the case may be.

If the Company has paid you a Bonus prior to the occurrence of a Recapture Event, you must repay all or part of the Bonus to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Bonuses or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (4) Monthly Bonus Statement Must Be Accurate

You must ensure that each of your monthly Bonus statements are accurate by reviewing all of these statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the SVP of Finance before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your statement is issued.

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination for Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action of fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Bonus Not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V. YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans,

promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for you actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions,(iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential or trade secret documents, data, or information acquired from any former employer or otherwise; (as used in this Section V (c), the "Confidential Information") (2) transmitted, communicated or divulged any Confidential Information from any former employer or otherwise to the Company or its employees; (3) used any former employer's Confidential Information in connection with your employment with the Company, including but not limited to any loan origination activity; or (4) violated any post-employment restrictive covenants or obligations you owe any former employer. Confidential Information as used in this Section V(c) shall include documents, data or information which your former employer(s) may consider to be confidential or a trade secret. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. You agree that you will also pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. In addition to all other remedies at law and equity, the Company reserves the right to claw back any and all commissions, bonuses, and other compensation paid to you in connection with or arising out of any breach or alleged breach of the foregoing representations and warranties. The obligations, rights and remedies hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d) and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI. LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company, or (d) open any operating account on behalf of the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American **Arbitration** Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the

state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX.  ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement.  You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain.  Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X.  MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement.  The Company reserves the right to terminate or modify this Agreement at any time.  Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer.  This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee.  Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

## XI.  DEFINITIONS

"**Agreement**" means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

"**Authority**" means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

"**Basis Point**" means a unit of measure equal to one hundredth of one percent.  One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

"**Branches**" means the branch offices of the Company that you have recruited to join the Company and that you manage within your region.

"**Cause**" has the meaning set forth in Section IV(b) below.

"**Company**" means Guaranteed Rate, Inc.

"**Confidential Information**" has the meaning set forth in Section V(a) below.

"**Corporate Objective**" means the amount of net revenue that each of your Branch employees agree the Company will receive from the sale of each Eligible Loan that such employee originates, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

DocuSign Envelope ID: 4576408F-4BC1-4583-80FB-208C36E85733

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"Eligible Existing Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for thirty-one months or longer.

**"Eligible Loan"** means each mortgage loan that (a) is originated by Branch employee, (b) is closed and funded by the Company, (c) is not the subject of a Recapture Event, and (d) otherwise complies with all applicable Requirements.

"Eligible New Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for less than thirty-one months.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Bonus during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

**"Fully Recoverable Draw Amount"** means the dollar amount by which your monthly Draw exceeds your Bonus during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

**"Loan Originator"** means a person who is considered to be a loan originator under the Consumer Financial Protection Bureau's loan originator compensation rule, 12 CFR §1026.36. This rule considers a person to be a Loan Originator if that person, in expectation of direct or indirect compensation or other monetary gain or for direct or indirect compensation or other monetary gain, performs any of the following activities: (a) takes an application, (b) offers, arranges, assists a consumer in obtaining or applying to obtain, (c) negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or (d) through advertising or other means of communication represents to the public that such person can or will perform any of these activities.

"**Manager**" means your direct supervisor.

**"Non-Recoverable Draw"** means a Draw which, when it exceeds the amount of your Bonus during any month, may not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Non-Recoverable Draw Amount"** is the amount by which your Draw exceeds the amount of your Bonus during any month, which amount will not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Person"** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**"Profitability"** means, with respect to the Branches, the Net Income of the Branches, expressed in Basis Points, all as reflected in the Company's financial statements.

**"Recapture Event"** has the meaning set forth in Section III(c)(3) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

**"Schedule"** means the Compensation Schedule to this Agreement.

**"You"** or **"your"** means you, the employee, in your capacity as a Non-Producing Senior Vice President of Strategic Growth.

DocuSign Envelope ID: 4576408F-4BC1-4F83-80EB-208C36E85733

*I hereby acknowledge that I have reviewed the Guaranteed Rate Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Tim Dowling

_____
(Print your name here)

Guaranteed Rate, Inc.

DocuSigned by:

Tim Dowling
_____
9261BCE806C34F...(Place your signature here)

DocuSigned by:

By: Nikolaos Athanasiou, Chief Operating Officer

03/18/2020
_____
(Date)

03/19/2020
_____
(Date)

# EXHIBIT I



J. Scott Humphrey
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Direct Dial: 312.624.6420
Fax: 312.767.9192
shumphrey@beneschlaw.com

February 3, 2022

**VIA ELECTRONIC AND FEDERAL EXPRESS**
R. Christopher Baker
General Counsel
Nations Lending Corporation
4 Summit Park Drive
Suite 200
Independence, OH 44131

   Re: Timothy Dowling and Erik Rorvig

Dear Mr. Baker:

   We are litigation counsel for Guaranteed Rate Inc. ("Guaranteed Rate") and are writing to you regarding Timothy Dowling ("Dowling") and Erik Rorvig ("Rorvig"). Dowling was a Senior Vice President of Strategic Growth at Guaranteed Rate before resigning on May 14, 2021, to become the Midwest Regional Manager for Nations Lending Corporation ("Nations"). Rorvig was a Producing Bank Manager at Guaranteed Rate until he resigned on December 23, 2021, to become a Producing Bank Manager for Nations.

   Both Rorvig and Dowling executed Terms and Conditions of Employment Agreements (the "Agreements") with Guaranteed Rate. A copy of the Agreements is enclosed with this letter so that there is no confusion over the duties and obligations Dowling and Rorvig still owe Guaranteed Rate. As you can tell from reading the Agreements, both Dowling and Rorvig agreed, for a period of two years after their employment ended, to not "directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce, promote, facilitate, encourage or assist in the solicitation of any person employed/engaged by [Guaranteed Rate] … to end their employment/engagement with [Guaranteed Rate]." Similarly, Dowling and Rorvig agreed that, for two years following the termination of their Guaranteed Rate employment, they would not (a) have another Guaranteed Rate employee join them "in a business venture or other business" and/or (b) supervise, manage or oversee the work of any former employee of [Guaranteed Rate]." These two-year restrictions are in place through May 14, 2023, with respect to Dowling and through December 23, 2023, with respect to Rorvig.

   Rorvig and Dowling have been reminded on two separate occasions of the duties and obligations they owe Guaranteed Rate, and their required compliance with these duties and obligations. Nations has been copied on both letters. Unfortunately, Guaranteed Rate has uncovered emails from Guaranteed Rate employees that demonstrate Dowling and Rorvig soliciting Guaranteed Rate employees to leave Guaranteed Rate for Nations. Such solicitations

15394864 v1

R. Christopher Baker
February 3, 2022
Page 2

are a clear violation of the Agreements and Dowling's and Rorvig's illegal activity has resulted in ten Guaranteed Rate employees leaving Guaranteed Rate and joining Nations. Just as disturbing, it appears from these emails and Guaranteed Rate's investigation that Dowling and Rorvig are using Guaranteed Rate's confidential information in their solicitation efforts. Thus, in addition to violating the Agreements, Dowling and Rorvig also appear to be violating statutory and common law that prohibit the improper interference with employee relationships, breaches of restrictive covenant agreements, and the misappropriation of trade secrets.[1] Dowling's and Rorvig's actions will not be tolerated. Nor will Guaranteed Rate tolerate any person or corporation who encourages, incentives (through recruiting bonuses or other forms of compensation) or turns a blind eye to Dowling's and Rorvig's illegal activity.

Accordingly, Guaranteed Rate hereby demands that Nations instruct Dowling and Rorvig to immediately come into compliance with the post-employment obligations they owe Guaranteed Rate by a) stopping the solicitation of Guaranteed Rate employees, b) immediately returning all Guaranteed Rate confidential information in their possession, custody or control to Guaranteed Rate and c) instructing Dowling and Rorvig that they are not to use or access any Guaranteed Rate confidential information on behalf of themselves or Nations. We also demand that Nations not place Dowling and Rorvig in a position where they will/would be encouraged to violate the post-termination obligations they owe Guaranteed Rate. Please confirm to us, in writing, that Nations has taken the above actions within the next seven days. If such action is not taken and Dowling and Rorvig continue to violate their Agreements and the law, then Guaranteed Rate will take the necessary steps to enforce its contractual rights and legitimate business interests. Such action may include seeking injunctive relief against Dowling and Rorvig, and anyone acting in concert with them, as a result of Dowling and Rorvig breaching their Guaranteed Rate Agreements and/or misappropriating and using Guaranteed Rate's confidential information.

Lastly, since Guaranteed Rate has a dispute with Nations that may result in litigation, Nations is hereby directed to preserve all documents, records, evidence, electronic data and metadata related to these issues. Nations is also directed to preserve and not alter, destroy or compromise in any way, whether in hard copy or in electronic format, any information, document or data that relates to these issues.

---

[1] Dowling and Rorvig are also required under the Agreements to pay Guaranteed Rate $50,000 for each violation of their non-solicitation obligations and, as such, currently owe Guaranteed Rate $900,000.

R. Christopher Baker
February 3, 2022
Page 3


If you would like to discuss this matter further, you may contact me at (312) 624-6420.


Very truly yours,

BENESCH, FRIEDLANDER,
  COPLAN & ARONOFF LLP


J. Scott Humphrey


JSH:ss
Enclosures



**TIM DOWLING– NON-PRODUCING REGIONAL MANAGER – MORAN MIDWEST 2 (REGIONAL) ILLINOIS (COST CENTER 1737)**

All capitalized terms used in this Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

## I.    SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1)  You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2)  You must manage the Branches and your employees in a manner consistent with applicable Requirements.

(3)  You must recruit and hire employees who have the ethics and skills necessary to provide services to the Company in a manner consistent with applicable Requirements.

(4)  You must cause each of your employees to enter into a Compensation Plans and Agreement that is reviewed and approved by the Company's legal department.

(5)  You may not open any operating accounts of the Company during the term of this Agreement.

(6)  You must train or cause to be trained all of your employees to ensure that they originate Eligible Loans and perform other services for the Company in a manner that complies with applicable Requirements.

(7)  You must cause your employees to ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(8)  You must cause your employees to ensure and confirm that each Eligible Loan document and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(9)  You must devote your full time and efforts to your employment with the Company.  During your employment with the Company, you may not be employed by any other Person.  You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(10) You must cause your employees to ensure that applicants are offered only Eligible Loan products and programs approved by and made available through an origination channel of the Company.

(11) Obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which a Branch originates and/or intends to originate Eligible Loans.

DocuSign Envelope ID: 45761D8F-4BC1-4F83-89FB-208C36E85733

(12) You must develop new business and business sources in the manner directed by the Company and consistent with applicable Requirements.

(13) You must direct, manage and supervise the overall operations of the Branches in your region in a manner consistent with applicable Requirements.

(14) You must prepare and execute budgets, forecasts and business plans in the manner directed by the Company and consistent with applicable Requirements.

(15) You must post and continuously display of all regulatory notices in the Branches that are required by HUD, ECOA, the Department of Labor or any other Authority under applicable Requirements.

(16) You must maintain a professional and secure working environment for the benefit of your Branch employees, consumers, business partners and clients.

(17) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Non-Producing Manager**

As a Non-Producing Manager, you may not:

(1) originate an Eligible Loan,

(2) take an application for an Eligible Loan,

(3) offer, arrange, or assist a consumer in obtaining or applying to obtain an Eligible Loan,

(4) negotiate or otherwise obtain or make an Eligible Loan for another person,

(5) represent to the public that you can or will perform any of the activities described above, or

(6) otherwise engage in any activity that would cause you to be considered a Loan Officer.

## II. EMPLOYEE CORPORATE OBJECTIVES AND LOAN PRICING

The amount of your employees' Corporate Objectives must be set forth in the Schedules to their respective Compensation Plans and Agreements. You should ensure that employees in your region are pricing Eligible Loans in amounts that meet or exceed their respective Corporate Objectives.

You must ensure that each employee receives approval from a designated officer or employee of the Company prior to pricing an Eligible Loan that would result in a Corporate Objective Shortfall.

## III. COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

**(1) Fully Recoverable Draw**

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Bonus and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Bonuses and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

**(2) Non-Recoverable Draw**

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Bonus during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Bonuses or other future compensation.

**(c) Your Salary**

**(1) In General**

Please refer to the Schedule to determine whether you have a Salary.

**(2) Payment of your Salary**

Your salary will be paid according to the Company's applicable payroll practices which may change without notice to you.

**(d) Your Bonuses**

**(1) How We Calculate Your Bonuses**

Your Bonuses are calculated in the manner described in the Schedule.

**(2) Timing of Your Bonuses; Advances**

Your Bonuses will be calculated and advanced each month during the payroll period following the month for which we determine the aggregate profitability of your Branches and the aggregate principal balance of Eligible Loans originated and funded through your Branches, in accordance with the Company's payroll practices. However, your Bonuses are not fully calculable or earned until the Company has determined that there is no Recapture Event.

**(3) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Bonus or other compensation is greater than the correct amount owed under this Agreement, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed

by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs before the Company has paid you the related Bonus, the Company will not pay you part or all of the Bonus, as the case may be.

If the Company has paid you a Bonus prior to the occurrence of a Recapture Event, you must repay all or part of the Bonus to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Bonuses or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (4) Monthly Bonus Statement **Must Be Accurate**

You must ensure that each of your monthly Bonus statements are accurate by reviewing all of these statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the SVP of Finance before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your statement is issued.

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination for Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Bonus Not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V. YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans,

promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations; (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for you actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions,(iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential or trade secret documents, data, or information acquired from any former employer or otherwise; (as used in this Section V (c), the "Confidential Information") (2) transmitted, communicated or divulged any Confidential Information from any former employer or otherwise to the Company or its employees; (3) used any former employer's Confidential Information in connection with your employment with the Company, including but not limited to any loan origination activity; or (4) violated any post-employment restrictive covenants or obligations you owe any former employer. Confidential Information as used in this Section V(c) shall include documents, data or information which your former employer(s) may consider to be confidential or a trade secret. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. You agree that you will also pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. In addition to all other remedies at law and equity, the Company reserves the right to claw back any and all commissions, bonuses, and other compensation paid to you in connection with or arising out of any breach or alleged breach of the foregoing representations and warranties. The obligations, rights and remedies hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d) and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI.  LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company, or (d) open any operating account on behalf of the Company.  You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII.  MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American **Arbitration** Association then in existence.  Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII.  APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein.  You irrevocably consent to the exclusive jurisdiction of the

state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX.   ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement.  You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain.  Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X.   MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement.  The Company reserves the right to terminate or modify this Agreement at any time.  Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer.  This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee.  Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

## XI.   DEFINITIONS

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent.  One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Branches"** means the branch offices of the Company that you have recruited to join the Company and that you manage within your region.

**"Cause"** has the meaning set forth in Section IV(b) below.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a) below.

**"Corporate Objective"** means the amount of net revenue that each of your Branch employees agree the Company will receive from the sale of each Eligible Loan that such employee originates, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"Eligible Existing Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for thirty-one months or longer.

**"Eligible Loan"** means each mortgage loan that (a) is originated by Branch employee, (b) is closed and funded by the Company, (c) is not the subject of a Recapture Event, and (d) otherwise complies with all applicable Requirements.

"Eligible New Member Loan" means an Eligible Loan originated by an employee of the Company that you recruited, and the Company hired that has been employed with the Company for less than thirty-one months.

**"Fully Recoverable Draw"** means a Draw which, when it exceeds the amount of your Bonus during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

**"Fully Recoverable Draw Amount"** means the dollar amount by which your monthly Draw exceeds your Bonus during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

**"Loan Originator"** means a person who is considered to be a loan originator under the Consumer Financial Protection Bureau's loan originator compensation rule, 12 CFR §1026.36. This rule considers a person to be a Loan Originator if that person, in expectation of direct or indirect compensation or other monetary gain or for direct or indirect compensation or other monetary gain, performs any of the following activities: (a) takes an application, (b) offers, arranges, assists a consumer in obtaining or applying to obtain, (c) negotiates, or otherwise obtains or makes an extension of consumer credit for another person; or (d) through advertising or other means of communication represents to the public that such person can or will perform any of these activities.

**"Manager"** means your direct supervisor.

**"Non-Recoverable Draw"** means a Draw which, when it exceeds the amount of your Bonus during any month, may not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Non-Recoverable Draw Amount"** is the amount by which your Draw exceeds the amount of your Bonus during any month, which amount will not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Person"** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**"Profitability"** means, with respect to the Branches, the Net Income of the Branches, expressed in Basis Points, all as reflected in the Company's financial statements.

**"Recapture Event"** has the meaning set forth in Section III(c)(3) of this Agreement.

**"Requirements"** means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

**"Schedule"** means the Compensation Schedule to this Agreement.

**"You"** or **"your"** means you, the employee, in your capacity as a Non-Producing Senior Vice President of Strategic Growth.

DocuSign Envelope ID: 4576409F-4BC1-4F83-80EB-208C36E85733

*I hereby acknowledge that I have reviewed the Guaranteed Rate Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Tim Dowling

_____
(Print your name here)

Guaranteed Rate, Inc.

DocuSigned by:

*Tim Dowling*
_____
9261BCE806C34F(Place your signature here)

DocuSigned by:

_____
By: Nikolaos Athanasiou, Chief Operating Officer

03/18/2020
_____
(Date)

03/19/2020
_____
(Date)



All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings as defined in Exhibit A attached hereto and incorporated herein by reference in the Agreement.

## I. SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1) You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2) You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

(3) You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

(4) You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(5) You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(6) You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(7) You may offer only the loan products and programs approved by and made available through an origination channel of the Company.

(8) You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans. The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

(9) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must regularly and frequently visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc. These meetings will normally and customarily occur outside of the office. The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II.  CORPORATE OBJECTIVE AND LOAN PRICING

### (a) How We Calculate the Corporate Objective

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission.  In the event that the deductions above are determined to be deductions from your Commission, you hereby expressly authorize the Company to deduct these costs, which are incurred directly for your benefit.

### (b) Corporate Objective Surplus

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses.  If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may _not_ receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise.  For example, you may _not_ offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

### (c) Corporate Objective Shortfall

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you.  You may _not_ price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company.  You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

### (d) Loan Pricing

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III. COMPENSATION

### (a) Your Draw

#### (1) In General

Please refer to the Schedule to determine whether you have a Draw.

#### (2) The Amount of Your Draw

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

### (b) Fully Recoverable Draw and Non-Recoverable Draw

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

#### (1) Fully Recoverable Draw.

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other compensation earned by you. By entering into this Agreement, you hereby expressly authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

#### (2) Non-Recoverable Draw

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

### (c) Your Commissions

#### (1) How We Calculate Your Commissions

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

### (2) Commission for Loans that you assist the Company to Close

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

### (3) Timing of Your Commission; Advances

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate, and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

### (4) Recapture Event

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

### (5) Monthly Commission Statement Must Be Accurate

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are an Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

**(b) Termination for Cause**

The Company may also terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company and/or exhibit poor performance, (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry, (vii) you violate a federal or state law or regulation applicable to the business of the Company, (viii) you engage in fraudulent acts, (ix) you misappropriate property belonging to the Company; or (x) you breach in any material respect of the terms of any confidentiality or proprietary information agreement with the Company.

**(c) Commissions Paid After Your Employment Ends**

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

**(d) Bonus not Paid After Your Employment Ends**

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V.   YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

**(a) Confidential Information**

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents,

materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, solicit or attempt to solicit, entice, recruit, influence, persuade, induce promote facilitate, encourage or assist in the solicitation of any Person employed/engaged by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment/engagement with the Company and/or join you as

a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship with which you become employed or affiliated, and/or   During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

   **(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

   (i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

   (ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI.   LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company. You must inform each vendor and potential vendor that

you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American Arbitration Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend

and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X.   MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Eirik Rorvig

_____
(Print your name here)

Eirik Rorvig
02E788E60CB7476
(Place your signature here)

12/27/2019
_____
(Date)

Guaranteed Rate, Inc.

_____
By: Nikolaos Athanasiou, Chief Operating Officer

12/27/2019
_____
(Date)

EXHIBIT A

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent.  One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

**"Cause"** has the meaning set forth in Section IV(b).

**"Commission"** means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a).

**"Corporate Objective"** means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Corporate Objective Shortfall"** means the amount of Net Loan Revenue that falls short of your Corporate Objective with respect to a loan originated by you.

**"Corporate Objective Surplus"** means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

**"Deductible Expenses"** include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

**"Draw"** means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

**"Early Payment Default"** means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Early Payoff"** means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

**"Earned Commission"** has the meaning set forth in Section III (c) (2).

 **"Eligible Loan"** means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

"**Net Loan Revenue**" means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

"**Outside Sales Employee**" means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

"**Person**" means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Recapture Event**" has the meaning set forth in Section III(c)(3) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage**" has the meaning set forth in Section III(b)(2) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Mortgage Lending.

## Out of State Referral Acknowledgement

As a licensed loan officer, you are obligated to ensure that you are complying with the SAFE Act to protect your license and the Company's licenses. The Company has designed a compliant method for a VP to refer a loan to a licensed individual in states in which he or she may not be licensed. Under the program, when an unlicensed individual receives an unsolicited lead in a state in which he or she is not licensed, the referral is to be sent to the DLO Desk. Below you will find a non-exhaustive list of what you may or may not do as the Process Manager:

The Process Manager may:

- Generally describe for a borrower the loan process from a high level/educational perspective (i.e. definition of a mortgage, LE, etc.)
- Provide general explanations or descriptions in response to consumer inquiries (but nothing specifically related to the consumer's situation)
- Help in arranging the loan closing or other aspects of the loan process, provided that any communication that includes a discussion about loan terms only verifies terms already agreed to by the borrower and the DLO

The Process Manager **MAY NOT** (ONLY the licensed VP may engage in these activities):

- Discuss particular loan programs, rates, credit qualification scenarios, etc. (e.g. state, "The best product for you would be a 7/1 ARM," "I think I could lock your rate at 4.65%," "I don't think you qualify for that bond program," etc.)
- Issue pre-approval letters, even if in the name of the licensed individual
- Complete, or assist directly or indirectly in taking, an applicant's 1003
- Run credit or lock the loan
- Discuss credit scores needed to qualify or other financial information related to a borrower's ability to qualify
- Discuss loan options or present a loan summary
- Solicit loan applications in states in which you're not licensed

By signing below, you acknowledge that if the Company determines you have engaged in unlicensed activity, it revokes your ability to refer loans in the future, or take other disciplinary action, up to and including termination as it deems appropriate. Furthermore, you will not be eligible to receive compensation for any referred transaction when unlicensed activity is identified. Lastly, your signature below confirms your complete understanding of the requirements around the SAFE Act and what constitutes licensable activity.

Signed: _Eirik Rornig_

Date: 12/27/2019

# EXHIBIT J

DocuSign Envelope ID: 6F8A8583-37BF-4426-BC3F-9FC40ED73705

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GUARANTEED RATE, INC.,

               Plaintiff,

    vs.

EIRIK RORVIG and NATIONS LENDING
CORPORATION,

               Defendant.

No. 22 CV 2342

Judge Robert W. Gettleman

Magistrate Judge Jeffrey Cummings

## **DECLARATION OF CARA SROGUS**

I, Cara Srogus, declare and state as follows:

1. I have personal knowledge of the matters set forth herein and if called to testify in this cause could competently testify to the matters asserted herein.

2. I am of sound mind and body, and over the age of 18 years old.

3. I am currently employed as a Producing Branch Manager at Guaranteed Rate, Inc. ("Guaranteed Rate"). I work out of Guaranteed Rate's branch in O'Fallon, Illinois ("O'Fallon Branch") and have been employed with Guaranteed Rate since December 2018.

4. Gregory Griffin was a Senior Vice President of Strategic Growth for Guaranteed Rate. Griffin was my regional manager until he resigned from Guaranteed Rate on June 29, 2022. Griffin currently works at Nations Lending Corporation ("Nations").

5. On or shortly after the day Griffin resigned from Guaranteed Rate, he called me and asked if I would be open to receiving a call from a Nations recruiter named John Owens. Griffin mentioned that he could not recruit me directly because of the non-solicitation obligations in his contract with Guaranteed Rate. As a result, Griffin told me that he would have Owens reach

DocuSign Envelope ID: 6F8A8E83-37B5-4426-BC3F-9FC40ED73706

out to me instead. On this call, Griffin talked up Nations and why I would like working there over working at Guaranteed Rate. Griffin also made clear that he had given Owens my name and contact information, and that he expected Owens to call me.

6.      I do not know Owens, nor have I ever given Owens my personal cell phone number.

7.      In the weeks after Griffin's resignation, I received several calls from Owens on my personal cell phone, which I did not answer. Owens left me voice messages asking to discuss the possibility of working at Nations. I did not return Owens' calls.

8.      On July 11, 2022, Griffin called me because he had heard that the Guaranteed Rate Midwest Divisional meeting was going to be held on July 13, 2022 in St. Louis, Missouri with Jim Eboli, head of the Guaranteed Rate Midwest Division. Griffin used to work in the Midwest Division, and I currently work in the Midwest Division. I do not recall what we discussed during this conversation.

9.      Griffin called me again on July 14, 2022. During this call, Griffin told me again the many ways in which he thought Nations was a better place to work than Guaranteed Rate. He also asked me why I would not connect with Owens to discuss working at Nations. I told Griffin that I was not interested in leaving Guaranteed Rate to work at Nations.

10.     Subsequently, and as recently as September 20, 2022, I received text messages from Owens, wanting to discuss working at Nations. I did not respond to these text messages.

11.     I am aware that Griffin has contacted other employees in the Guaranteed Rate Midwest Division about employment with Nations. Similar to my discussions with Griffin, Griffin tells the Guaranteed Rate employees to expect calls from Owens about leaving Guaranteed Rate and working for Nations. For example, I know that Griffin has reached out to Jason Chandler,

Chris Broadhurst and Mark Larsen. Broadhurst resigned from Guaranteed Rate on September 15, 2022 to go work at Nations.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 09-29-2022

_____

Cara Srogus

# EXHIBIT K



July 7, 2022

Yesha Hoeppner
Guaranteed Rate, Inc.
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: (773) 328-6431
yesha.hoeppner@rate.com

<u>**Via Email and UPS**</u>

Richard Demonica
11990 Yellowstone Dr.
Huntley, IL 60142
richard.demonica@gmail.com

      **Re:    Cease and Desist**

Dear Mr. Demonica:

As you know, effective May 16, 2022, your employment with Guaranteed Rate, Inc. ("Guaranteed Rate") ended. As part of your employment with Guaranteed Rate, you executed certain Terms and Conditions of Employment that both governed your time at Guaranteed Rate and also created certain post-employment obligations on your part (the "Agreement"). A copy of your Agreement is enclosed for your reference.

Specifically, you acknowledged and agreed that for a period of 24 months following any termination of employment with Guaranteed Rate ("Restricted Period"), you would not, directly or indirectly, hire, solicit, or encourage any employee to end their employment with Guaranteed Rate. (Agreement, p. 2.)

Additionally, you agreed not to disclose any "Confidential Information" you gained access to through your employment with Guaranteed Rate, as defined in your Agreement. (Agreement, p. 2.) This Confidential Information included, but was not limited to, information about Guaranteed Rate's operations, the identity of its top-performing employees, hiring criteria, and other personnel matters such as employee compensation. Under the terms of your Agreement, you are prohibited from utilizing this Confidential Information for the benefit of yourself or any other party, including any competitor of Guaranteed Rate. (*Id.*) Please be advised that the obligation to safeguard this Confidential Information survives the termination of your employment and remains in full force and effect indefinitely. (*Id.*)

Recently, two Guaranteed Rate employees with whom you worked or whom you directly managed resigned from Guaranteed Rate within days of each other: Brian Augustine (June 29, 2022) and Caise Hassan (July 5, 2022). We have reason to believe you solicited and/or encouraged these individuals to come work for or with you at your new employer, Nations Lending ("Nations"). Any such solicitation would be a violation of your contractual obligations to Guaranteed Rate.

We intend to investigate the above occurrences and any others and will take all appropriate legal actions. As a reminder, under the terms of your Agreement, you are liable for $50,000 in damages



for *each* solicitation that violates your Agreement, plus attorneys' fees and costs incurred in enforcing the Agreement. (Agreement, p. 2.) In the meantime, we demand that you confirm in writing, by **July 14, 2022**, your intention to abide by your contractual obligations to Guaranteed Rate. If we do not hear from you by that date, we will assume you have no interest in complying with your duties and obligations and will take necessary steps to enforce and protect Guaranteed Rate's rights.

Moreover, please note that Guaranteed Rate is currently involved in pending litigation against Nations and former Guaranteed Rate employee Eirik Rorvig. As such, Guaranteed Rate's concerns about your employment with Nations and/or any solicitation by you of Guaranteed Rate employees to follow you to Nations not only cover whether your employment with Nations violates any duty or obligation <u>you</u> owe to Guaranteed Rate, but also whether Nations in any way induced, encouraged and/or incentivized Timothy Dowling or any other former Guaranteed Rate employees to violate <u>their</u> obligations to Guaranteed Rate by recruiting and/or hiring you.

We are copying Nations on this correspondence to make it aware of your continuing obligations to Guaranteed Rate and these issues.

Finally, we demand that all parties take the necessary steps to maintain and preserve all documents of any kind related to these issues. The term "documents" is intended in its broadest sense to include, without limitation, emails (personal or work), voicemails/recordings, text messages, social media (including, without limitation, LinkedIn), and any other types of hard copy or electronic communications.

The foregoing is without prejudice to Guaranteed Rate's rights and remedies, all of which are expressly reserved.

Sincerely,

/s/ Yesha Hoeppner

Yesha Hoeppner
Assistant General Counsel, Litigation

CC:    Nations Lending
        Attn: General Counsel
        4 Summit Park Drive, Suite 200
        Independence, OH 44131

DocuSign Envelope ID: 0262GF94-6BA4-4E58-B9F1-869CD7EB3280



# EMPLOYMENT TERMS AND CONDITIONS AGREEMENT

This Terms and Conditions of Employment Agreement (the "**Agreement**") is entered into in connection with the commencement or the continuation of the undersigned individual's employment with Guaranteed Rate, Inc. ("**GRI**") and any of its Affiliates (collectively, the "**Company**"). For these purposes, an "**Affiliate**" means any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, GRI. The undersigned individual is referenced herein as "you" or "your." You and the Company are referenced herein together as the "Parties" and each individually, as a "Party."

1. **Employment Obligations**. You agree to this Agreement in exchange for the Company's offer to employ or, as applicable, continuing to employ, you and for any other good and valuable consideration provided, the sufficiency of which you hereby acknowledge. This Agreement shall be in effect at all times during the term of your employment at the Company with certain covenants, as detailed herein, surviving termination of your employment. This Agreement clarifies certain rights and duties of the Company and you. You hereby accept such employment and agree with the Company that: (a) you will perform all of your employment obligations in a manner that is ethical, fair and honest; (b) you will devote your working time and attention, as well as your best efforts and abilities, to the performance of your duties hereunder and to the affairs of the Company and shall not engage in any other gainful employment without the prior written consent of the Company; (c) you will not engage in any other activities that interfere with the proper discharge of your duties to the Company; (d) you will exercise the utmost care in safeguarding non-public personal information of applicants, borrowers, customers and employees; and (e) you will comply with all applicable Requirements. For purposes of this Agreement, "**Requirements**" means: (i) all Company policies, procedures, guidelines, and directives, including, without limitation, those set forth in the Company's Employee Handbook, which policies, procedures, guidelines, and directives the Company, in its sole discretion, may amend from time to time with or without notice (collectively, the "**Company Policies**"); (ii) all applicable laws, rules, regulations, and orders; (iii) all applicable agreements with third parties, including, without limitation, warehouse, investor and agency policies, procedures, guidelines and other requirements; (iv) all terms, conditions and obligations in this Agreement, and (v) all terms, conditions and obligations contained in any compensation schedule or plan or other agreements or arrangements you may enter into with the Company ("**Other Arrangements**").

2. **Compensation Matters**. Your compensation will be determined in accordance with the Company Policies and any applicable Other Arrangement and will be paid pursuant to the Company's applicable payroll schedule and practices and subject to all applicable withholdings. If the Company has determined you are a non-exempt employee, you are subject to all Company Policies regarding accurate time entries, overtime work and meal and rest period policies. You may also participate in the Company's employee benefits plans and programs (which may change from time to time) provided you enroll and meet all eligibility requirements.

3. **Termination of Employment**.

   (a) "At Will" Employment. Your employment with the Company is "AT-WILL." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. Nothing contained in this Agreement or any Other Arrangements shall be interpreted to alter or otherwise modify your status as an "at-will" employee or create any obligation for or right to employment for a specific term or duration.

   (b) Obligations upon Termination. Upon your termination of employment with the Company for any reason, or at any other time requested by the Company, you must immediately return to the Company all Company property (whether in hard-copy or electronic form) such as equipment, materials, data, files, and any other information, including, without limitation, all Confidential Information (as defined below) and copies thereof, in your possession. You may not retain any Confidential Information, or tangible or intangible (electronic) copies of any Confidential Information after your termination of employment for any reason. If requested by the Company, you shall disclose to the Company any passwords for your Company-issued computer or other access codes for anything associated with your employment with the Company, and shall not delete or modify or alter any property prior to its return to the Company. If requested by the Company, you also shall provide the Company with access to any personal computer, tablet, phone, external hard drives, flash drives, cloud-based storage platforms, or any other personal device or storage location that contains Company information, whether or not such information is designated as confidential or proprietary, so that the Company may review, collect, remove or delete any Company information.

   (c) Bonus After Termination. Except as may be required by applicable law or as expressly set forth in an Other Arrangement, if you are eligible for any bonus payment: (i) you must be employed by the Company and must otherwise satisfy all applicable conditions to earn and receive such bonus payments and (ii) you will not earn or receive any bonus payment which comes due following the end of your employment with the Company.

4. **Confidentiality and Non-Solicitation.** You must notify any prospective employer about your obligations in this Section 4 and that such prospective employer may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

   (a) Confidentiality.



(i)  Definition of Confidential Information.  During the course of your employment with the Company, you will learn about, help to develop, and will be entrusted in strict confidence with (A) confidential and proprietary information and trade secrets concerning the Company that are or will be owned by the Company and are not available to the general public or to the Company's competitors, including, without limitation, information about sales, operations, technology, marketing ,financial condition, financial projections, profit margins, the identity of the Company's top-performing employees, hiring criteria, training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure of services, customer or potential customer identities and information, customer relationship histories, customer records, customer service matters, customer preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, plans, specifications, manuals, forms, templates, software programs, source code, object code, research and development, methods, procedures, formulas, discoveries, inventions, improvements, intellectual property, innovations, concepts and ideas, and product and/or service specifications, features, advantages, disadvantages and/or limitations, and other confidential aspects of the Company and its businesses and operations; (B) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations with third parties; and (C) other matters, documents, materials and information belonging or relating to the internal affairs of the Company (collectively, "**Confidential Information**").  The Company has expended great time, expense and effort in obtaining and protecting the confidentiality of this Confidential Information and has a legitimate, protectable interest in the Confidential Information, including, without limitation, customer identities, customer preferences and other customer information.

(ii)  Use of Confidential Information. In consideration of your employment and compensation and other consideration described herein, you acknowledge and agree that: (A) as between you and the Company, the Confidential Information is, and at all times hereafter shall remain, the sole property of the Company; (B) you shall use your best efforts and the utmost diligence to guard and protect the Confidential Information from disclosure to any other person or entity, including, without limitation, any competitor, client or supplier of the Company; and (C) unless an officer of the Company gives you prior express written consent, during your employment and thereafter to the maximum extent permitted by applicable law, you shall not use for your own benefit, or disclose to or use for the benefit of any other person or entity, including, without limitation, any competitor, customer, vendor, supplier or referral partner any of the Confidential Information which you may obtain, learn about, develop, or be entrusted with as a result of your employment with the Company.  In addition, you may not seek or accept any third-party confidential information from any person or entity, except in connection with your employment duties and obligations under this Agreement.

(iii)  Defend Trade Secrets Act / Permitted Disclosures.  As required by the Defend Trade Secrets Act, the Company hereby notifies you that misappropriation or improper disclosure of Company trade secret or confidential information is protected by law if the disclosure is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or is made in a complaint or other document filed in a lawsuit or other proceeding, or in an anti-retaliation lawsuit, if the filing is made under seal, and there is no disclosure of trade secret information except pursuant to court order.  This immunity applies to trade secret law violations of any state or federal law and in both civil and criminal contexts. In addition, nothing in this Agreement is otherwise intended to prohibit you from making disclosures regarding violation of or non-compliance with law to the extent such disclosures are permitted by applicable law.

(b)  Non-Solicitation. In this Agreement, "**Restricted Period**" means the period beginning with the first day of your employment with the Company and ending twenty-four (24) months after any voluntary or involuntary termination of your employment.  The Restricted Period shall be extended by one month for each month or portion of each month during which you are in violation of this Section 4(b).

(i)  Employees**.** The Company devotes considerable resources to recruiting, retaining and training its employees, and the stability of the Company's workforce is critical to its ongoing success.  The Company takes significant steps to protect the relationships it has with its employees.  During the Restricted Period and to the maximum extent permitted by applicable law, you may not, directly or indirectly (i.e., working through others), hire, solicit, or encourage any person employed by the Company and with whom you had business contact during your last twelve (12) months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship.  You may ask the Company to provide you with written consent to engage in any of the foregoing activities.  The Company may approve or deny any such request in the Company's sole discretion.  **If you fail to comply with any provision of this Section 4(b)(i), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to $50,000 for each such instance of non-compliance because the calculation of actual damages to the Company from any improper solicitation may be difficult to ascertain**.  Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company.  You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section 4(b)(i), and is not a penalty.

(ii)  Customers, Vendors, Suppliers, or Referral Partners.  During the Restricted Period and to the maximum extent permitted by applicable law, you will not, for yourself or on behalf of any other person or entity, directly or indirectly (i.e., working through others), call on, solicit or service any (A) customer, (B) vendor, (C) supplier or (D) referral partner of the Company that you worked with,

DocuSign Envelope ID: 0262GF94-6BA4-4658-B9F1-869CD7EB3280



learned of, or otherwise had contact with during the twelve (12) month period prior to the termination of your employment in order to induce or attempt to induce such person or entity to cease doing business with the Company, reduce its business with the Company, or in any other way interfere with the relationship between the Company and that person or entity.

(c) <u>Enforcement; Remedies.</u> You covenant, agree and recognize that because the breach or threatened breach of any of the covenants contained in this Section 4 will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants contained in this Section 4 to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company from pursuing all equitable remedies that may be available to them for any such breach.

(d) <u>Construction</u>. You hereby expressly acknowledge and agree as follows: (i) the covenants set forth in this Section 4 are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and (ii) each of the covenants set forth in this Section 4 is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

5. **Representations, Warranties and Indemnity**

(a) <u>Representations and Warranties</u>. You represent and warrant to the Company that neither you nor anyone acting on your behalf has, without prior authorization: (i) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or other party; (ii) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or other party to the Company or its employees; (iii) used any confidential, proprietary or trade secret information of any former employer or other party in connection with your employment with the Company; or (iv) violated any post-employment restrictive covenants or obligations owed to any former employer (including without limitation any non-competition, non-solicitation, or confidentiality agreements). You further represent, warrant and covenant that you will not engage in any of the foregoing conduct during the course of your employment with the Company because the Company does not want you to breach any obligations you may have to any former employer or other party. You also understand that the Company may discipline you, up to and including termination of employment, in the event you breach any such obligations. By signing below, you represent and warrant that your prospective or current employment with the Company does not violate any non-compete or other obligations that you may have with or owe to any of your former employer(s).

(b) <u>Indemnity</u>. During your employment with the Company and thereafter, you shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Section 5.

6. **Intellectual Property Ownership**

(a) "<u>Assignment</u>. You hereby acknowledge and agree that the Employing Company (as defined below) owns the sole and exclusive right, title and interest in and to any and all Company Works (as defined below), including, without limitation, all copyrights, trademarks, service marks, trade names, slogans, inventions (whether patentable or not), patents, trade secrets and other intellectual property and/or proprietary rights therein in all countries and territories worldwide and under any international conventions, including, without limitation, all rights to sue for infringement thereof (collectively, "**IP Rights**"). The Employing Company's right, title and interest in and to the Company Works includes, without limitation, the sole and exclusive right to secure and own copyrights and maintain renewals throughout the world, the right to modify and create derivative works of or from the Company Works without any payment of any kind to you, and the right to exclusively register or record any IP Rights in the Company Works in the Employing Company's name. You agree that all Company Works shall be "works made for hire" for the Employing Company as that term is defined in the copyright laws of the United States or other applicable laws. To the extent that any of the Company Works is determined not to constitute a work made for hire, or if any rights in any of the Company Works do not accrue to the Employing Company as a work made for hire, you hereby assign and transfer to the Employing Company all of your rights, title and interest in and to any and all Company Works and all related IP Rights. You will promptly disclose all Company Works to the Employing Company. You further waive, to the extent permitted by applicable law, all "moral rights" you have in and to the Company Works. During your employment with the Employing Company and afterward, you may be required to sign additional documents and agreements related to the Employing Company's ownership and registration of IP Rights and you hereby agree to execute such other agreements without additional consideration. If the Employing Company is unable for any reason whatsoever, including the Employing Company's inability after expending reasonable efforts to locate you or your mental or physical incapacity, to secure your signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations or other intellectual property rights (or on any document transferring ownership thereof) covering IP Rights assigned to the Employing Company under this Agreement, you hereby irrevocably designate and appoint the Employing Company (and any successor or assign) and its duly authorized officers and agents as your agent and attorney-in-fact to act for and on your behalf and in your stead to execute

DocuSign Envelope ID: 0262CF94-6BA4-4558-B9F1-869CD7EB3280



and file any such applications and documents and to do all other lawfully permitted acts to further the prosecution and issuance of patents or copyright registrations or transfers thereof with the same legal force and effect as if executed by you. This appointment is coupled with an interest in and to the Company Works and related IP Rights and shall survive your death or disability. The term "**Employing Company**" means the entity employing you at the time that the applicable Company Work is conceived, created, developed, discovered, made or acquired, in whole or in part.

(b)  Works and Company Works. "**Works**" means any inventions, invention disclosures, developments, discoveries, improvements, modifications, trade secrets, brands, logos, designs, drawings, trademarks, service marks, trade names, documents, memoranda, data, databases, software programs, object code, source code, algorithms, ideas, know-how, methods, processes, graphics, images, audio and/or visual works, other works of authorship, or other intellectual property or information, including works-in progress**.** "**Company Works**" means any Works that you conceive, create, develop, discover, reduce to practice, make or acquire, in whole or in part, either solely or jointly with another or others, at any time during or pursuant to the course of your employment by the Company, and that relate directly or indirectly to the Company or its respective businesses, or to the Company's actual or demonstrably anticipated research or development, or that are made through the use of any of the Company's equipment, facilities, supplies, trade secrets or time, or that result from any work performed for the Company, or that is based on any information of, or provided to you by, the Company. All Company Works and related IP Rights shall be deemed the Confidential Information of the Company.

(c)  Prior Works. You agree not to incorporate, or permit to be incorporated, any Prior Works into any product, process, program, machine or other work done for the Company, including any software code created or developed on the Company's behalf or in which the Company has an ownership interest pursuant to the terms of this Agreement, without the Company's prior written consent. Notwithstanding the foregoing, if you incorporate a Prior Work into any Company Work or any Company product, process, program, machine or other work done for the Company (whether or not such Prior Work was disclosed and whether or not you had the written consent of the Company to do so), you hereby grant to the Company a nonexclusive, paid-up, royalty-free, irrevocable, perpetual, transferable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, copy, modify, use, sell, offer to sell, display, distribute and import such Prior Work. "**Prior Works**" means all Works that were made by you prior to your employment with the Company, you own or in which you have an interest, and which relate to the Company's current or proposed business, products, services, or research and development, and are not presently assigned by you to the Employing Company under this Agreement or otherwise.

(d)  Notice of Statutory Exception. You hereby are and have been notified by the Company that Company Works shall not include any invention that you develop entirely on your own time without using any equipment, supplies, facilities, or trade secret information of the Company unless (i) the invention: (A) relates at the time of conception or reduction to practice of the invention to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development; or (ii) the invention results from any work performed by you for the Company.

**7.**  **Limits of Authority.**  You are not authorized to: (a) originate any loan or engage in any licensed activity unless done so in your capacity as a licensed Company loan originator in accordance with all applicable Requirements, (b) underwrite or approve any loan, unless done so in your capacity as an approved Company underwriter or underwriting manager in accordance with all applicable Requirements; (c) bind the Company under any agreement, lease, commitment or other obligation unless approved by an authorized representative of the Company in writing; or (d) incur expenses on behalf of the Company, except insofar as such expense has been expressly approved in writing by an authorized representative of the Company.

**8.**  **ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION.**  By accepting employment or continuing employment with the Company, as applicable, the Parties agree to arbitration as set forth in the separate arbitration agreement and waiver of the right to sue and to bring any class or collective action (the "**Arbitration Agreement**") provided concurrently herewith or otherwise by the Company and incorporated herein by reference; provided that, in the event that for any reason the Arbitration Agreement is deemed not enforceable, any previously executed agreements between the Parties relating to the arbitration of disputes and waiver of the right to sue and to bring a class or collective action shall remain in full force and effect to the maximum extent permitted by applicable law.

**9.**  **Venue.**  To the extent any claim, action or proceeding is not otherwise subject to arbitration in accordance with the Arbitration Agreement, to the extent permitted by applicable law, you irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any claim, action or proceeding relating to or arising out of this Agreement and/or your employment with or termination from the Company.

**10.**  **Attorney's Fees and Injunctive Relief.**  To the extent permitted by applicable law, the prevailing Party in any dispute arising out of your employment with the Company or any termination thereof shall be entitled to recover all reasonable attorney's fees, expenses and costs incurred in any action or proceeding to pursue or defend such dispute. Because money damages for the breach or threatened breach of any obligations under this Agreement may be inadequate to properly compensate for losses resulting from a breach of this Agreement, either Party may seek injunctive relief, specific performance or other remedies in equity for such a breach or threatened breach,

DocuSign Envelope ID: 0262GF94-6BA4-4658-B9F1-869CD7EB3280



without first being obligated to post any bond or show actual damages.

**11.** <u>Miscellaneous.</u>

(a) <u>Complete Agreement</u>. Except as may be set forth in the Other Arrangements, this Agreement is complete and reflects all of the agreements, representations and warranties between you and the Company regarding the subject matter hereof and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement; provided that, any provisions in any previous agreements with the Company relating to confidentiality and restrictive covenants (including, without limitation, any non-solicitation obligations with respect to employees, customers, vendors, suppliers or referral partners) shall remain in full force and effect to the maximum extent permitted by applicable law. In addition, nothing in this Agreement or any Other Arrangement is intended to supersede or replace any specific restrictions previously agreed to by you and the Company with respect to non-mortgage licenses you may maintain, RESPA obligations and disclosures applicable to you, transactions involving parties related to you, conflicts of interest, outside employment, or any other specific conditions of your employment with the Company, which restrictions shall remain in full force and effect unless such restrictions are separately and specifically amended by you and the Company in writing. The Company, in its sole discretion, may amend this Agreement with prior written notice to you and execution of a written amendment by you and the Company. Notwithstanding the foregoing, the Company may unilaterally amend this Agreement at any time with prior notice to comply with any applicable law, rule, regulation or other requirement or to make any amendments that are generally applicable to all similarly situated employees (which amendments shall be effective immediately upon notice to you).

(b) <u>Severability and Reformation</u>. Should any one or more of the parts or subparts of a provision contained in this Agreement, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other part or subpart of a provision of this Agreement or any other jurisdiction, but the Parties agree that a court or arbitrator, as applicable, shall reform and construe this Agreement as if such invalid, illegal or unenforceable part or subpart of a provision had never been contained in this Agreement, and a court or arbitrator shall reform such part or subpart so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction. Without limiting the foregoing, the Parties intend that the parts and subparts in this Agreement shall be deemed a series of separate covenants and agreements. If, in any legal proceeding, a court or arbitrator shall refuse to enforce all the parts and subparts, it is the intention of the Parties that the remaining non-eliminated separate parts and subparts be enforced in such a proceeding.

(c) <u>Waiver</u>. No delay on the part of any Party in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise or waiver thereof by any Party of any right or remedy shall preclude the exercise or further exercise thereof or the exercise of any other right or remedy. No waiver is enforceable against the Company unless it is in writing signed by the Company .

(d) <u>Assignment</u>. You may not assign this Agreement or any rights under this Agreement or the Arbitration Agreement. The Company freely may assign its rights under this Agreement or the Arbitration Agreement, including without limitation, to any Affiliate or to any successor in interest, whether by merger, consolidation, sale of assets, or otherwise. This Agreement shall be binding whether between you and the Company or between you and any Affiliate, successor or assign of the Company .

(e) <u>Right to Consult an Attorney; No Duress</u>: You acknowledge that you may consult with your own attorney for advice concerning this Agreement. You further acknowledge that this Agreement is entered into voluntarily and that your signature was not coerced or made under duress. By accepting or continuing employment with the Company, you acknowledge and agree that you will be deemed to have assented to the terms of this Agreement.

(f) <u>Electronic Signatures</u>: The Parties acknowledge and agree that this Agreement may be executed by PDF, electronic or digital signature hereto, and any contract formation or record-keeping through electronic means shall have the same legal validity and enforceability as a manually executed signature or use of a paper-based recordkeeping system to the fullest extent permitted by applicable law, and the Parties hereby waive any objection to the contrary.

[SIGNATURES APPEAR ON NEXT PAGE]

v1221

DocuSign Envelope ID: 0262GF94-6BA4-4C58-B9F1-869CD7EB3280



*By signing below, you hereby acknowledge that you have read this Agreement and have had a sufficient opportunity to read and review it. You understand that this Agreement sets forth certain terms, conditions and obligations of your employment with the Company. You further acknowledge and understand that this Agreement contains certain waivers of rights, and that your waivers of such rights are entered knowingly and voluntarily. You agree to comply with and to be bound by this Agreement.*

Richard Demonica

_____
(Print your name here)

*Richard Demonica*
_____
396DZB0754654AZ...

(Place your signature here)


01/13/2022
_____
Date

**GUARANTEED RATE, INC.**

_____
E800CBD55871A478...

By: Nikolaos Athanasiou
_____

Title: Chief Operating Officer
_____


01/13/2022
_____
Date



**July 7, 2022**

**Yesha Hoeppner**
Guaranteed Rate, Inc.
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: (773) 328-6431
yesha.hoeppner@rate.com

<u>**Via Email and UPS**</u>

Brian Augustine
351 Melrose Ln
Village of Lakewood, IL 60014
bjjs0703@gmail.com

Re:     **Reminder of Your Post-Employment Obligations**

Dear Mr. Augustine:

I write to remind you of your continuing obligations to Guaranteed Rate, Inc. ("Guaranteed Rate"). As you know, effective June 29, 2022, your employment with Guaranteed Rate ended. As part of your employment with Guaranteed Rate, you executed certain Terms and Conditions of Employment that both governed your time at Guaranteed Rate and also created certain post-employment obligations on your part (the "Agreement"). A copy of your Agreement is enclosed for your reference.

Specifically, you acknowledged and agreed that for a period of 24 months following any termination of employment with Guaranteed Rate ("Restricted Period"), you would not, directly or indirectly, hire, solicit, or encourage any employee to end their employment with Guaranteed Rate. (Agreement, pp. 13-14.)

Additionally, you agreed not to disclose any "Confidential Information" you gained access to through your employment with Guaranteed Rate, as defined in your Agreement. (Agreement, pp. 12-13.) Under the terms of your Agreement, you are prohibited from utilizing this Confidential Information for the benefit of yourself or any other party, including any competitor of Guaranteed Rate. (*Id.* at 13.) Please be advised that the obligation to safeguard this Confidential Information survives the termination of your employment and remains in full force and effect indefinitely. (*Id.*)

Please review your Agreement so you are cognizant of and can abide by the specific post-employment obligations contained therein. If you have any questions in this regard, please let me know. We wish you the best going forward.

Sincerely,

/s/ Yesha Hoeppner

Yesha Hoeppner
Assistant General Counsel, Litigation



CC:    Nations Lending
       Attn: General Counsel
       4 Summit Park Drive, Suite 200
       Independence, OH 44131



All capitalized terms used in this Retail Sales Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

## I.   SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

a.   You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

b.   You must price all loans at or above your Corporate Objective, as defined below, and comply with all Requirements when quoting and locking loan prices.

c.   You must collect all loan fees and manage all loan application, processing and related services in a manner consistent with applicable Requirements throughout the loan transaction, from loan application through funding.

d.   You must ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

e.   You must ensure and confirm that each loan and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

f.   You must devote your full time and efforts to your employment with the Company.  During your employment, you may not be employed by any other Person.  You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

g.   You may offer only the loan products and programs approved by and made available through an origination channel of the Company.

h.   You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which you originate and/or intend to originate loans. The Company will terminate your employment if you (a) do not obtain any required license or other approval within 45 days after your date of employment, or (b) perform any services requiring a license or approval prior to obtaining such license or approval.

i.   You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee.**

As an Outside Sales Employee, you must visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc.  These meetings will normally and customarily occur outside of the office.  The Company is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II. CORPORATE OBJECTIVE AND LOAN PRICING

### (a) How We Calculate The Corporate Objective

The amount of your Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor in a manner that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, *other than* the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission. In the event that the deductions above are determined to be deductions from your Commission, you authorize the Company to deduct these costs, which are incurred directly for your benefit.

### (b) Corporate Objective Surplus

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses. If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may *not* receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise. For example, you may *not* offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

### (c) Corporate Objective Shortfall

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you. You may *not* price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

### (d) Loan Pricing

The amount at which you must price each loan is set forth in the Schedule.

DocuSign Envelope ID: B0ECDB95-A52A-4CF1-B329-241784000E9Q

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

## III. COMPENSATION

**(a) Your Draw.**

### (1) In General

Please refer to the Schedule to determine whether you have a Draw.

### (2) The Amount of Your Draw

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Recoverable Draw Subject to Minimum Wage**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Recoverable Draw Subject to Minimum Wage.

### (1) Fully Recoverable Draw.

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission earned by you. By entering into this Agreement, you authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

### (2) Recoverable Draw Subject to Minimum Wage

If your Draw is a Recoverable Draw Subject to Minimum Wage and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Recoverable Draw Amount Subject to Minimum Wage will be deducted from any future Commission earned by you, but never in an amount that would result in your being paid an amount less than minimum wage during the applicable pay period. By entering into this Agreement, you authorize the Company to deduct any Recoverable Draw Amount Subject to Minimum Wage and any other amounts that you owe to the Company from all future Commission until all Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment, but never in an amount that would result in your being paid an amount less than minimum wage during any applicable pay period.

**(c) Your Commissions**

**(1) How We Calculate Your Commissions**

Your Base Commission is based on a fixed percentage of the principal amount of each Eligible Loan that you originate, and is calculated in the specific manner described in the Schedule.

Please refer to the Schedule for a description of other Commissions that we will pay to you.

**(2) Commission for Loans that you assist the Company to Close**

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

**(3) Timing of Your Commission; Advances**

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices.  Your commission on each Eligible Loan that you originate and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

**(4) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower.  A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission for a loan you originated prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately.  If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation.  If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

**(5) Monthly Commission Statement Must Be Accurate**

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date.  You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued

DocuSign Envelope ID: B0ECDB95-A53A-4CF1-B339-244784000E9D

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are An Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination For Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Commissions Paid After Your Employment Ends

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company may, in its sole discretion, delay the advance of your unearned Commissions for any loan up to 120 calendar days from your last day of employment with the Company.

### (d) Bonus not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## V. YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to

confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the

remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

### (ii) Vendors

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

### (e) Enforcement; Remedies

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

### (f) Construction

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI. LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has

been expressly approved in writing by the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

### (a) Arbitration

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American Arbitration Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

### (b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

### (c) Exclusions.

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X.  MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Executive Vice President of Strategy and Integrated Operations. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

## XI.  DEFINITIONS

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

**"Cause"** has the meaning set forth in Section IV(b).

**"Commission"** means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a).

**"Corporate Objective"** means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower

DocuSign Envelope ID: B0ECDB95-A58A-4CF1-B928-244784000E90

Objective with respect to a loan originated by you.

"**Corporate Objective Surplus**" means the amount of Net Loan Revenue that exceeds your Corporate Objective with respect to an Eligible Loan originated by you.

"**Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"**Draw**" means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"**Early Payment Default**" means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Early Payoff**" means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Eligible Loan**" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

"**Net Loan Revenue**" means the net revenue received by the Company in connection with the funding and sale of an Eligible Loan.

"**Outside Sales Employee**" means an outside sales employee, as defined in Section 13(a)(1) of the Fair Labor Standards Act, who are exempt from both minimum wage and overtime pay requirements under the Fair Labor Standards Act.

"**Person**" means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Recapture Event**" has the meaning set forth in Section III(c)(3) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage**" has the meaning set forth in Section III(b)(2) of this Agreement.

DocuSign Envelope ID: B0ECDB95-A53A-4CF1-B339-24784900E90A

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Mortgage Lending.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

BRIAN AUGUSTINE
(Print your name here)

Brian Augustine
(Place your signature here)

9-28-18
(Date)

Guaranteed Rate, Inc.

By: Nikolaos Athanasiou, Executive Vice President

10/10/2018

(Date)



**July 7, 2022**

**Yesha Hoeppner**
Guaranteed Rate, Inc.
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: (773) 328-6431
yesha.hoeppner@rate.com

**Via Email and UPS**

Gregory Griffin
9 Wolfe Creek Ct.
Glen Carbon, IL 62034
ggriffin71@hotmail.com

     **Re:    Reminder of Your Post-Employment Obligations**

Dear Mr. Griffin:

I write to remind you of your continuing obligations to Guaranteed Rate, Inc. ("Guaranteed Rate"). As you know, effective June 29, 2022, your employment with Guaranteed Rate ended. As part of your employment with Guaranteed Rate, you executed certain Terms and Conditions of Employment that both governed your time at Guaranteed Rate and also created certain post-employment obligations on your part (the "Agreement"). A copy of your Agreement is enclosed for your reference.

Specifically, you acknowledged and agreed that for a period of 24 months following any termination of employment with Guaranteed Rate ("Restricted Period"), you would not, directly or indirectly, hire, solicit, or encourage any employee to end their employment with Guaranteed Rate. (Agreement, p. 15.)

Additionally, you agreed not to disclose any "Confidential Information" you gained access to through your employment with Guaranteed Rate, as defined in your Agreement. (Agreement, p. 14.) Under the terms of your Agreement, you are prohibited from utilizing this Confidential Information for the benefit of yourself or any other party, including any competitor of Guaranteed Rate. (*Id.*) Please be advised that the obligation to safeguard this Confidential Information survives the termination of your employment and remains in full force and effect indefinitely. (*Id.*)

Please review your Agreement so you are cognizant of and can abide by the specific post-employment obligations contained therein. If you have any questions in this regard, please let me know. We wish you the best going forward.

Sincerely,

/s/ Yesha Hoeppner

Yesha Hoeppner
Assistant General Counsel, Litigation



CC:    Nations Lending
        Attn: General Counsel
        4 Summit Park Drive, Suite 200
        Independence, OH 44131

DocuSign Envelope ID: C6AC2976-A086-4DB5-9D51-A81327D66FB4



**GREGORY GRIFFIN– PRODUCING REGIONAL MANAGER – CHESTERFIELD, MO (1321)**

All capitalized terms used in this Compensation Plan and Agreement (this "Agreement") have the meanings in Section XI below.

## I.   SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

(1)   You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

(2)   You must manage the Branches and your employees in a manner consistent with applicable Requirements.

(3)   You must recruit and hire employees who have the ethics and skills necessary to provide services to the Company in a manner consistent with applicable Requirements.

(4)   You and your Branch employees must enter into a Compensation Plans and Agreement that is reviewed and approved by the Company's legal department.

(5)   You may not open any operating accounts of the Company during the term of this Agreement.

(6)   You must train or cause to be trained all of your employees to ensure that they originate Eligible Loans and perform other services for the Company in a manner that complies with applicable Requirements.

(7)   You must cause your employees to ensure that each applicant's loan terms and conditions are consistent with the applicable loan program, investor Requirements and all other applicable Requirements.

(8)   You must cause your employees to ensure and confirm that each Eligible Loan document and related documents and information are processed and conducted only through the Company's approved loan origination system, approved automated underwriting systems, and the Company's payroll and accounting systems, as applicable.

(9)   You must devote your full time and efforts to your employment with the Company.  During your employment with the Company, you may not be employed by any other Person.  You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

(10)  You must cause your employees to ensure that applicants are offered only Eligible Loan products and programs approved by and made available through an origination channel of the Company.

(11)  You must obtain and renew any and all applicable licenses, registrations and/or approvals required by a State governmental authority for each State in which a Branch originates and/or intends to originate Eligible Loans.

(12) You must develop new business and business sources in the manner directed by the Company and consistent with applicable Requirements.

(13) You must direct, manage and supervise the overall operations of the Branches in your region in a manner consistent with applicable Requirements.

(14) You must prepare and execute budgets, forecasts and business plans in the manner directed by the Company and consistent with applicable Requirements.

(15) You must post and continuously display of all regulatory notices in the Branch that is required by HUD, ECOA, the Department of Labor or any other Authority under applicable Requirements.

(16) You must maintain a professional and secure working environment for the benefit of your Branch employees, consumers, business partners and clients.

(17) You must conduct all of your other employment services in compliance with all other Requirements.

**(b) Outside Sales Employee**

As an Outside Sales Employee, you must visit with clients and prospective clients, referral partners and potential referral partners in person to discuss the services that we offer, explain loan options, procedures, costs/benefits, etc. These meetings will normally and customarily occur outside of the office. GRI is committed to helping its employee be successful with this platform—if you believe you are not able to, or do not, comply with the duties set forth herein it is your obligation to notify the Company of any such deviation.

## II. CORPORATE OBJECTIVES AND LOAN PRICING

**(a) How We Calculate Your Personal Corporate Objective**

The amount of your personal Corporate Objective is set forth in the Schedule.

Your "Corporate Objective" is the amount of the Net Loan Revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

An "Eligible Loan" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"Deductible Expenses" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of the Eligible Loan, _other than_ the amount of your Commission and any Borrower Expenses credited back to the Borrower by the Company.

"Borrower Expenses" include all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

You may choose the amount of your Corporate Objective, subject to certain limits and conditions.

You understand and acknowledge that the deduction of the amounts above do not constitute deductions from your Commission. In the event that the deductions above are determined to be deductions from your Commission, you authorize the Company to deduct these costs, which are incurred directly for your benefit.

**(b) Corporate Objective Surplus**

Net Loan Revenue received by the Company in excess of your Corporate Objective is referred to in this Agreement as a "Corporate Objective Surplus."

You may use a Corporate Objective Surplus to pay for Borrower Expenses. If a Corporate Objective Surplus is not sufficient to pay all Borrower Expenses, the borrower must pay the remaining Borrower Expense directly.

Any Corporate Objective Surplus remaining after paying all Deductible Expenses and any Borrower Expenses may be credited back to the borrower at closing.

You may **not** receive any Corporate Objective Surplus at any time, whether in the form of a Commission or otherwise. For example, you may **not** offset a Corporate Objective Shortfall with some or all of a Corporate Objective Surplus.

**(c) Corporate Objective Shortfall**

In this Agreement, a "Corporate Objective Shortfall" means the amount of Net Loan Revenue received by the Company that falls short of your Corporate Objective with respect to a loan originated by you. You may **not** price a loan that will result in a Corporate Objective Shortfall unless approved in writing by an officer or employee designated by Executive Management of the Company. You understand and acknowledge that any such approval will be granted only under limited circumstances that comply with applicable Requirements.

If you price a loan that would result in a Corporate Objective Shortfall without written approval from a designated officer or employee of the Company, the Company may, in its sole discretion, refuse to close or fund that loan.

**(d) Loan Pricing**

The amount at which you must price each loan is set forth in the Schedule.

You must price each loan at an amount necessary to meet or exceed your Corporate Objective. For example, assume that your Corporate Objective is 150 basis points. When you originate a loan, you must review the investor's current rate sheet and lock-in an interest rate for the loan that will result in 150 basis points or more of Net Loan Revenue for the Company, after subtracting all Deductible Expenses and any Borrower Expenses credited back to the borrower.

**(e) Corporate Objectives of Your Branch Employees**

The amount of your employees' Corporate Objectives must be set forth in the Schedules to their respective Compensation Plans and Agreements. You should ensure that Branch employees are pricing Eligible Loans in amounts that meet or exceed their respective Corporate Objectives.

You must cause each Branch employee receives approval from a designated officer or employee of the Company prior to pricing an Eligible Loan that would result in a Corporate Objective Shortfall.

**III. COMPENSATION**

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw and Non-Recoverable Draw**

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw or a Non-Recoverable Draw.

### (1) Fully Recoverable Draw

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other compensation earned by you. By entering into this Agreement, you authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

### (2) Non-Recoverable Draw

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

## (c) Your Salary

### (1) In General

Please refer to the Schedule to determine whether you have a Salary.

### (2) Payment of your Salary

Your salary will be paid according to the Company's applicable payroll practices which may change without notice to you.

## (d) Your Commissions and Bonus

### (1) How We Calculate Your Commissions and Bonus

Your Commissions and Bonus are calculated in the manner described in the Schedule.

### (2) Commission for Loans that you assist the Company to Close

You will receive one hundred dollars ($100) per loan for any loan that you assist the Company to close because the initial loan originator has left the employment of the Company. Any loan that you assist in this manner will not be considered an Eligible Loan and will not be included in your Eligible Loan Volume as an eligibility requirement for President's Club, Production Bonuses or any other incentive in which Eligible Loan Volume is used as a measure.

### (3) Timing of Your Commission and Bonus; Advances

Your Commission for each Eligible Loan will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your commission on each Eligible Loan that you originate and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with the Eligible Loan. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your commission will be deemed earned ("Earned Commissions").

**(4) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Commission or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs before the Company has paid you the related Commission, the Company will not pay you part or all of the Commission, as the case may be.

If the Company has paid you a Commission prior to the occurrence of a Recapture Event, you must repay all or part of the Commission, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Commission or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

**(5) Monthly Commission Statement Must Be Accurate**

You must ensure that each of your monthly Commission statements are accurate by reviewing all of these Commission statements online approximately one week prior to each payroll date. You must submit any questions or concerns to the Commissions Department before the applicable pay date. The Company will deny any change submitted more than 15 days after any of your Commission statements is issued.

## IV. ENDING YOUR EMPLOYMENT WITH THE COMPANY

**(a) You Are Employee "At Will"**

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

**(b) Termination for Cause**

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action of fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

**(c) Bonus Paid After Your Employment Ends**

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

**(d) Commissions Paid After Your Employment Ends**

After your employment with the Company ends for any reason other than for "Cause," you will receive all earned Commissions for each Eligible Loan that was originated by you and was funded within 30 calendar days

DocuSign Envelope ID: C6AC3976-0086-4DB5-9051-A81327D66FB4

after your last day of employment, unless otherwise provided in this Agreement. You will not be paid any Commission for any loan that funds more than 30 calendar days after your last day of employment.

If the Company terminates your employment for "Cause," the Company will pay to you your then-current accrued and unpaid Commissions. The Company will not pay to you any other Commission that is not accrued.

The Company reserves the right to not advance commissions to terminated employees until the expiration of the Recapture Period.

## V.    YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section V, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

### (a) Confidential Information

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations; (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information"). The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

### (b) Use of Company's Confidential Information

As consideration for your employment, you will not use any Confidential Information for your own benefit, or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity. You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company. However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for your actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions, (iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

### (c) Representations and Warranties/Indemnification

You represent and warrant to the Company that neither you nor anyone acting on your behalf has: (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or

its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

**(d) Non-Solicitation**

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

**(i) Employees**

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section V(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance.** Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section V(d), and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section V(d).

**(ii) Vendors**

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

**(e) Enforcement; Remedies**

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section V hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section V to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

DocuSign Envelope ID: C6AC2976-A086-4DD5-9051-A81327D66FB4

**(f) Construction**

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section V are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section V is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect

In the event that any provision of this Section V shall be held invalid or unenforceable by a court of competent jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section V shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## VI. LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company, or (d) open any operating account on behalf of the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VII. MANDATORY ARBITRATION AND WAIVER OF RIGHT TO SUE AND RIGHT TO FILE ANY CLASS OR COLLECTIVE ACTION

**(a) Arbitration**

Any and all claims (legal or equitable), demands, disputes, or controversies between you and the Company must be resolved by **arbitration** in accordance with the rules of the American Arbitration Association then in existence. Such arbitration shall take place in Chicago, Illinois, the applicable law will be the laws of the State of Illinois without regard to the conflicts of law provisions therein and the decision of the arbitrator shall be final and binding on you and the Company. Without limiting the foregoing, the following claims must be resolved by arbitration:

(i) Claims related to your compensation with the Company brought under any federal, state or local statute, law, ordinance, regulation or order or the common law of any state, including without limitation claims relating to your wages, salary increases, bonuses, commissions, overtime pay, vacation pay, or severance pay whether or not such claim is based upon a legally protected right, whether statutory, contractual or common law; and

(ii) Claims brought under any federal, state, or local statute, law, ordinance, regulation, or order, or the common law of any state, alleging that you were or are being subject to discrimination, retaliation, harassment, or denial of equal employment opportunity based on sex, race, color, religion, national origin, disability, age, marital status, or any other category protected by law; and/or relating to your benefits or working conditions, including without limitation, claims related to leaves of absence, Employee benefit plans, Employee health and safety, and activity protected by federal labor laws.

**(b) Waiver of Right to Sue and Right to File any Action as a Class or Collective Action**

You and the Company expressly waive any right to resolve any dispute covered by this Agreement by filing suit

in court for trial by a judge or jury.

With respect to any and all claims made by you, there will be no right or authority for any dispute to be brought, heard or arbitrated under this Agreement as a class or collective action, private attorney general, or in a representative capacity on behalf of any Person.

**(c) Exclusions**

The mandatory arbitration provisions of this Agreement do not apply to: (i) any claim by you for workers compensation benefits or unemployment compensation benefits; (ii) any claim for injunctive or equitable relief, including without limitation claims related to unauthorized disclosure of confidential information, trade secrets or intellectual property; or (iii) any action brought relating to or arising out of any non-solicitation violations.

## VIII. APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## IX. ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## X. MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Chief Operating Officer. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable. Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

## XI. DEFINITIONS

**"Agreement"** means this Retail Sales Compensation Plan and Agreement and any Schedule hereto.

**"Authority"** means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

**"Basis Point"** means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

**"Borrower Expenses"** mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

**"Branches"** means the branch offices of the Company that you have recruited to join the Company and that you manage within your region.

**"Branch Production Commissions"** means the Commissions that you earn based on Eligible Loans originated by you and your Branch employees and funded by the Company during a calendar month, as described further in the Schedule.

**"Cause"** has the meaning set forth in Section IV(b) below.

**"Commission"** means the amount of your variable compensation earned from your loan origination activities and identified as commissions in this Agreement and in the Schedule.

**"Company"** means Guaranteed Rate, Inc.

**"Confidential Information"** has the meaning set forth in Section V(a) below.

**"Corporate Objective"** means the amount of net revenue that each of your Branch employees agree the Company will receive from the sale of each Eligible Loan that such employee originates, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

**"Corporate Objective Shortfall"** means the amount of Net Loan Revenue that falls short of the Corporate Objective of a Branch employee with respect to an Eligible Loan originated by that Branch Employee.

**"Corporate Objective Surplus"** means the amount of Net Loan Revenue that exceeds the Corporate Objective of a Branch employee with respect to an Eligible Loan originated by that Branch employee.

**"Deductible Expenses**" include all costs, third party fees, rate lock extension fees, expenses that would not otherwise have been incurred by the Company but for an error committed by an employee of the Company, and all other costs and expenses associated with the origination of an Eligible Loan, _other than_ the amount of the Branch employees' commissions and any Borrower Expenses credited back to a Borrower by the Company.

**"Earned Commission"** has the meaning set forth in Section III (c) (2).

**"Eligible Loan"** means each mortgage loan that (a) is originated by Branch employee, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount"** means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

**"Monthly Branch Volume"** means the dollar amount of Eligible Loans originated by you and your Branch employees and closed by the Company during a calendar month.

**"New Branch Employee"** means a Branch employee who is recruited and hired by you and who has been employed with the Company for 6 months or less.

**"New Branch Employee Loan Volume"** means the dollar volume of Eligible Loans that are (a) originated by each New Branch Employee, and (b) funded by the Company during the first 6 months of the New Branch Employee's employment with the Company.

**"Non-Recoverable Draw"** means a Draw which, when it exceeds the amount of your Commission during any month, may not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

**"Non-Recoverable Draw Amount"** is the amount by which your Draw exceeds the amount of your Commission during any month, which amount will not be recovered by the Company, as described further in Section III(b)(2) of this Agreement.

 **"Person"** means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

**"Personal Production Commissions"** means the Commissions that you earn based on Eligible Loans originated by you and funded by the Company during a calendar month, as described further in the Schedule**.**

**"Profitability"** means, with respect to the Branches, the Net Income of the Branches, expressed in Basis Points, all as reflected in the Company's financial statements.

**"Recapture Event"** has the meaning set forth in Section III(c)(3) of this Agreement.

**"Requirements"** means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

**"Schedule"** means the Compensation Schedule to this Agreement.

**"You"** or **"your"** means you, the employee, in your capacity as a Producing Regional Manager.

*I hereby acknowledge that I have reviewed the Guaranteed Rate Compensation Plan.  I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid.  I agree to comply with and to be bound by the terms of the Plan.*

Gregory Griffin

_____
(Print your name here)

_____
(Place your signature here)

02/08/2019
_____
(Date)

Guaranteed Rate, Inc.

_____
By: Nikolaos Athanasiou, Chief Operating Officer

03/11/2019
_____
(Date)



**September 15, 2022**

Yesha Hoeppner
Guaranteed Rate, Inc.
3940 N. Ravenswood Ave.
Chicago, IL 60613
Phone: (773) 328-6431
yesha.hoeppner@rate.com

<u>Via Email and UPS</u>

Christian White
203 Campbell Street
Tolono, IL 61880
Christianwhite68@gmail.com

<center>Re: <b>Reminder of Your Post-Employment Obligations</b></center>

Dear Mr. White:

I write to remind you of your continuing obligations to Guaranteed Rate, Inc. ("Guaranteed Rate"). As you know, effective August 31, 2022, your employment with Guaranteed Rate ended. As part of your employment with Guaranteed Rate, you executed certain Terms and Conditions of Employment that both governed your time at Guaranteed Rate and also created certain post-employment obligations on your part (the "Agreement"). A copy of your Agreement is enclosed for your reference.

Specifically, you acknowledged and agreed that for a period of 24 months following any termination of employment with Guaranteed Rate ("Restricted Period"), you would not, directly or indirectly, hire, solicit, or encourage any employee to end their employment with Guaranteed Rate. (Agreement, p. 10.)

Additionally, you agreed not to disclose any "Confidential Information" you gained access to through your employment with Guaranteed Rate, as defined in your Agreement. (Agreement, pp. 8-9.) Under the terms of your Agreement, you are prohibited from utilizing this Confidential Information for the benefit of yourself or any other party, including any competitor of Guaranteed Rate. (*Id.*) Please be advised that the obligation to safeguard this Confidential Information survives the termination of your employment and remains in full force and effect indefinitely. (*Id.*)

Please review your Agreement so you are cognizant of and can abide by the specific post-employment obligations contained therein. If you have any questions in this regard, please let me know. We wish you the best going forward.

Sincerely,

/s/ Yesha Hoeppner

Yesha Hoeppner
Assistant General Counsel, Litigation



CC:    Nations Lending
Attn: General Counsel
4 Summit Park Drive, Suite 200
Independence, OH 44131

DocuSign Envelope ID: C86EB6D6-CC89-4C3D-ADB0-B568EDC4DCA9



<div style="background-color:red; color:white;">

**COMPENSATION PLAN AND AGREEMENT**

**CHRISTIAN WHITE – VICE PRESIDENT OF MARKET GROWTH**

</div>

All capitalized terms used in this Compensation Plan and Agreement (this "Agreement") have the meanings as defined in Exhibit A attached hereto and incorporated herein by reference in the Agreement.

## I. SCOPE OF EMPLOYMENT

You and the Company agree as follows:

**(a) Your Employment Obligations**

As an employee of the Company, you must comply with all of the following requirements.

a. You must perform all of your employment obligations in a manner that is ethical, fair and compliant with all Requirements.

b. You are responsible for educating loan originators regarding the Company platform, product pricing and support.

c. You must build a high functioning sales team by calling new lead sources and prospecting the best loan originators.

d. You must use the Company approved software technology and tools to target and track your recruiting efforts.

e. You must devote your full time and efforts to your employment with the Company. During your employment with the Company, you may not be employed by any other Person. You also may not provide any services or assistance to any other Person in connection with any lending, financial, insurance, title or real estate-related activities.

f. You must conduct all of your other employment services in compliance with all other Requirements.

## II. COMPENSATION

**(a) Your Draw**

**(1) In General**

Please refer to the Schedule to determine whether you have a Draw.

**(2) The Amount of Your Draw**

If you have a Draw, the amount of that Draw is set forth in the Schedule.

If you have a Draw, it will be paid during each full month you are employed by the Company. The Company will pay you the Draw in two equal installments on the fifteenth day and last day of each month. We will deduct from your Draw any federal, state and local payroll taxes and any health, disability, life or other benefits that you elect to receive. We will also deduct the amount of your Draw from your Commission and any other compensation described below and in the Schedule.

**(b) Fully Recoverable Draw, Recoverable Draw Subject to Minimum Wage and Non-Recoverable Draw**

DocuSign Envelope ID: C86FB6D6-CC89-4G3D-ADB0-B568FDC4DCA9

Please refer to the Schedule to determine whether you have a Fully Recoverable Draw, a Recoverable Draw Subject to Minimum Wage or a Non-Recoverable Draw.

### (1) Fully Recoverable Draw

If your Draw is a Fully Recoverable Draw and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Fully Recoverable Draw Amount will be deducted from any future Commission and any other Compensation earned by you. By entering into this Agreement, you authorize the Company to deduct any Fully Recoverable Draw Amounts and any other amounts that you owe to the Company from all future Commission and any other compensation until all Fully Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Fully Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment.

### (2) Recoverable Draw Subject to Minimum Wage

If your Draw is a Recoverable Draw Subject to Minimum Wage and is greater than the amount of your Commission during any calendar month, you must repay the difference back to the Company. During your employment with the Company, any Recoverable Draw Amount Subject to Minimum Wage will be deducted from any future Commission and any other compensation earned by you, but never in an amount that would result in your being paid an amount less than minimum wage during the applicable pay period. By entering into this Agreement, you authorize the Company to deduct any Recoverable Draw Amount Subject to Minimum Wage and any other amounts that you owe to the Company from all future Commission and any other compensation until all Recoverable Draw Amounts and other such amounts have been repaid in full. If there is a Recoverable Draw Amount at the time your employment with the Company is ended, you must repay that amount to the Company no later than 10 days after your last day of employment, but never in an amount that would result in your being paid an amount less than minimum wage during any applicable pay period.

### (3) Non-Recoverable Draw

If your Draw is a Non-Recoverable Draw and is greater than the amount of your Commission during any calendar month, you will not be required to repay the difference back to the Company. This difference is referred to in this Agreement as the "Non-Recoverable Draw Amount." The Company will not deduct any Non-Recoverable Draw Amount from any of your future Commissions or other future compensation.

## (c) Your Bonus

### (1) How We Calculate Your Bonus

Your Bonus is based on a number of Basis Points multiplied by the principal amount of each Eligible Loan that a licensed loan originator originates and the Company funds and is calculated in the specific manner described in the Schedule.

### (2) Timing of Your Bonus; Advances

Your Bonus for the Eligible Loan Volume originated by the loan originators and funded by the Company will be calculated and advanced each month during the payroll period following the funding of the Eligible Loan in accordance with the Company's payroll practices. Your bonus on the loans that the loan originators originate and the Company funds is an advance and not earned until the Company has determined that a Recapture Event has not occurred in connection with any of the Eligible Loan originated and funded by the Company. The Recapture Event period expires 180 days after the sale of the Eligible Loan by the Company on the secondary market, at which point your Bonus will be deemed earned ("Earned Bonus").

**(3) Recapture Event**

A loan has a "Recapture Event" if (i) the Company determines that your Bonus or other compensation is greater than the correct amount owed under this Agreement, or there are any Fully Recoverable Draw Amounts, Recoverable Draw Amounts subject to Minimum Wage, or other negative balances or other amounts that you owe the Company under this Agreement, (ii) there has been an Early Payment Default, (iii) there has been an Early Payoff, (iv) the Company is unable to recover all or any part of an unforeseen increase in a settlement cost over the estimated settlement cost disclosed by the Company to the borrower, or (v) the Company is unable to recover all or any part of an unforeseen settlement cost that was not disclosed by the Company to a borrower. A settlement cost or an increase in a settlement cost is "unforeseen" if it occurs even though the disclosure provided to a borrower was consistent with the best information reasonably available to the Company at the time the settlement cost was disclosed to the Borrower.

If a Recapture Event occurs for a loan before the Company has paid you the related Bonus, the Company will not pay you part or all of the Bonus, as the case may be.

If the Company has paid you a Bonus for a loan that the loan originator originated prior to the occurrence of a Recapture Event, you must repay all or part of the Bonus, as the case may be, to the Company immediately. If you do not repay these amounts, the Company will deduct these amounts from your future Bonus or other future compensation. If you owe any of these amounts to the Company after your employment with the Company ends, you must pay all such amounts within ten calendar days after the last day of your employment.

## III.  ENDING YOUR EMPLOYMENT WITH THE COMPANY

### (a) You Are an Employee "At Will"

Your employment with the Company is "at-will." This means that either you or the Company may terminate your employment at any time, for any reason, or for no reason. See Section IV(c) below for information about the Company's payment of any Commission after your employment with the Company has ended.

### (b) Termination for Cause

The Company may terminate your employment for Cause if: (i) you are convicted of, or indicted for, criminal negligence or criminal acts in the work place, or you are convicted of a felony, (ii) you violate Company policies, procedures or directives, (iii) you fail to comply with the terms of this Agreement, (iv) you fail to perform duties reasonably requested by the Company, and (v) you are grossly negligent or exhibit willful misconduct in the performance of your employment duties, and (vi) you take an action or fail to take an action in connection with your employment that is inconsistent with standard practice in the residential mortgage industry.

### (c) Bonus not Paid After Your Employment Ends

You must be employed by the Company and must otherwise satisfy all applicable conditions to be eligible to receive any bonus payments. You will not receive any bonus payment which comes due following the end of your employment with the Company.

## IV.  YOUR CONFIDENTIALITY OBLIGATIONS; NON-SOLICITATION

You must notify any prospective employer or other Person for whom you plan to provide loan-related services about your obligations in this Section IV, and that such Person may obtain a copy of these obligations from the Company's Human Resources or Legal Department.

DocuSign Envelope ID: C86FB6D6-CC89-4C3D-ADB0-B568FDC4DCA9

**(a) Confidential Information**

During your employment with the Company, you may discover, develop, and/or be entrusted with (a) confidential and proprietary information and trade secrets that are or will be owned by the Company and are not available to the general public or the Company's competitors, including information about the Company's sales, operations, financial condition, financial projections, profit margins, personnel matters, the identity of the Company's top-performing employees, hiring criteria, and training techniques, business goals, strategic plans, promotional strategies, pricing and cost structure, client or potential client identities, client relationship histories, client records, client service matters, client preferences, identity of vendors and suppliers, special vendor and supplier relationships, pricing and delivery terms, computer programs and codes, and other confidential aspects of the Company and its business and operations); (b) information for which the Company is subject to confidentiality requirements due to contractual and/or regulatory obligations; and (c) other matters, documents, materials and information belonging or relating to the Company (collectively "Confidential Information").  The Company has developed and will develop a wealth of intimate knowledge regarding its Confidential Information and, for these and other reasons, the Company has a legitimate and protectable interest in the identity of its Confidential Information, including the identity of its clients and the method of operations utilized by the Company.

**(b) Use of Company's Confidential Information**

As consideration for your employment, you will not use any Confidential Information for your own benefit or divulge to or use the Confidential Information for the benefit of any competitor, customer, or any other Person or entity.  You may not seek or accept any Confidential Information from any Person, unless you are expressly authorized by the Company to do so in connection with your employment duties and obligations under this Agreement.

Confidential Information includes the identities of clients and borrowers for whom you originated loans while an employee of the Company.  However, you may contact and/or solicit these persons during or after your employment with the Company, provided that no such Person (i) has submitted a loan application to the Company at that time, or would have submitted a loan application to the Company but for you actions or omissions, (ii) has a loan in process with the Company at that time, or would have had a loan in process with the Company but for your act or omissions,(iii) has closed a loan with the Company and the Early Prepayment Period set forth in the loan purchase and sale agreement entered into by and between the Company and the investor has not expired.

**(c) Representations and Warranties/Indemnification**

You represent and warrant to the Company that neither you nor anyone acting on your behalf has:  (1) taken, accepted, copied, or misappropriated any confidential, proprietary, or trade secret documents, data, or information acquired from any former employer or otherwise; (2) transmitted, communicated or divulged any confidential, proprietary or trade secret information from any former employer or otherwise to the Company or its employees; (3) used any former employer's confidential, proprietary or trade secret information in connection with your employment with the Company, including but not limited to any loan origination activity; and (4) violated any post-employment restrictive covenants or obligations you owe any former employer. You further represent and warrant that you will not engage in any of the foregoing conduct during the course of your employment with the Company.

You shall indemnify the Company from and hold the Company harmless against any and all losses, damages, penalties, fines, liabilities, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Company may sustain arising out of, or in any way related to any claim, demand, defense or assertion based on or grounded upon, or resulting from a breach or alleged breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Subsection. In addition to any and all other obligations of you hereunder, you agree that you will pay the reasonable attorney's

DocuSign Envelope ID: C86FB6D6-CC89-4C3D-ADB0-B568FDC4DCA9

fees of the Company incurred in enforcing the obligations hereunder. The indemnification obligations hereunder shall survive the termination of this Agreement and your employment with the Company.

### (d) Non-Solicitation

In this Agreement, "Restricted Period" means the period beginning with the first day of your employment with the Company and ending 24 months after the last day of your employment.

#### (i) Employees

During the Restricted Period, you may not, directly or indirectly, hire, solicit, or encourage any Person employed by the Company during your last 12 months of employment with the Company or during the remainder of the Restricted Period to end their employment with the Company and/or join you as a partner, agent, employee, independent contractor or otherwise in a business venture or other business relationship. During the Restricted Period, you may not supervise, manage, or oversee the work of any former employee of the Company, the identity of which you learned during your employment with the Company.

You may ask the Company to provide you with written consent to engage in any of the foregoing activities. The Company may approve or deny any such request in the Company's sole discretion.

**If you fail to comply with any provision of this Section IV(d), you must pay to the Company as liquidated damages, and not as a penalty, an amount equal to fifty-thousand dollars ($50,000) for each such instance of non-compliance, and the Restricted Period will be extended an additional 24 months from the date of non-compliance**. Your payment of such liquidated damages will not relieve you of any other obligation or amounts that you owe the Company under this Agreement. You understand and acknowledge that the payment of these liquidated damages is fair and equitable consideration for any failure by you to comply with this Section IV(d) and is not a penalty. You must pay all of the Company's reasonable attorneys' fees and all costs and expenses relating to or arising out of any action to enforce, defend or prosecute any provision of this Section IV(d).

#### (ii) Vendors

During the Restricted Period, you will not, for yourself or on behalf of any other Person or entity, directly or indirectly, solicit, offer or provide services to, or seek services from, any past or present vendor or referral partner of the Company, the identity of whom you learned during your employment with the Company. This provision does not apply to any such Person, the identity of whom you learned prior to your employment with the Company.

### (e) Enforcement; Remedies

You covenant, agree and recognize that because the breach or threatened breach of the covenants, or any of them, contained in Section IV hereof will result in immediate and irreparable injury to the Company, the Company shall be entitled to an injunction restraining you from any violation of the covenants and agreements contained in this Section IV to the fullest extent allowed by law. Nothing herein shall be construed as prohibiting the Company, and its respective successors and assigns, from pursuing all legal or equitable remedies that may be available to them for any such breach, including the recovery of damages from you.

### (f) Construction

You hereby expressly acknowledge and agree as follows:

(i) the covenants set forth in Section IV are reasonable in all respects and are necessary to protect the legitimate business and competitive interests of the Company in connection with its business, which you agree, pursuant to this Agreement, to assist in maintaining and developing; and

(ii) each of the covenants set forth in Section IV is separately and independently given, and each such covenant is intended to be enforceable separately and independently of the other such covenants, including without limitation, enforcement by injunction, and that the invalidity or unenforceability of any provision of this Agreement in any respect shall not affect the validity or enforceability of this Agreement in any other respect.

In the event that any provision of this Section IV shall be held invalid or unenforceable by a court of competent

DocuSign Envelope ID: C86FB6D6-CC89-4G3D-ADB0-B568FDC4DCA9

jurisdiction by reason of the duration thereof of any such covenant, or for any other reason, such invalidity or unenforceability shall attach only to the particular aspect of such provision found invalid or unenforceable as applied and shall not affect or render invalid or unenforceable any other provision. This Section IV shall be construed as if the provision or other basis on which such provisions has been determined to be overly broad had been more narrowly drafted so as not to be invalid or unenforceable.

## V.   LIMITS ON YOUR AUTHORITY

You are not authorized to (a) underwrite or approve any loan, (b) bind the Company under any agreement, lease, commitment or other obligation, (c) incur expenses on behalf of the Company, unless such expense has been expressly approved in writing by the Company. You must inform each vendor and potential vendor that you are not authorized to bind the Company.

## VI.   ARBITRATION/CLASS AND COLLECTIVE WAIVER

Any disputes relating to this Schedule and the Compensation Terms are subject to the terms of the mutual arbitration agreement between You and the Company, whether set forth in the Employment Terms, Compensation Terms or a separate arbitration agreement which requires You to resolve disputes with the Company on an individual basis through final and binding arbitration.

## VII.   APPLICABLE LAW; VENUE

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to the conflicts of laws provisions therein. You irrevocably consent to the exclusive jurisdiction of the state and federal courts located in Cook County, Illinois, for the purposes of any action or proceeding relating to or arising out of this Agreement and/or your employment with the Company.

## VIII.   ATTORNEYS' FEES AND COSTS; INJUNCTIVE RELIEF

The Company may recover from you its attorneys' fees and costs relating to any action to enforce, defend and/or prosecute this Agreement. You acknowledge that a breach of any provision of this Agreement will cause irreparable harm to the Company and that monetary damages will be inadequate and may be difficult or impossible to ascertain. Therefore, in the event of any such breach, or threatened breach, in addition to all other remedies, the Company shall have the right to require you to fulfill your obligations by way of temporary and/or permanent injunctive relief.

## IX.   MISCELLANEOUS

This Agreement, together with any Schedule, is complete and reflects all of the agreements, representations and warranties between you and the Company and supersedes all other agreements (oral or written) in effect prior to the execution of this Agreement. The Company reserves the right to terminate or modify this Agreement at any time. Any delay or failure to enforce any provision of this Agreement by the Company shall not be considered a waiver of such provisions or any other provision of this Agreement.

This Agreement will be effective only after it has been fully executed by you and either the Company's President and CEO or the Executive Vice President of Strategy and Integrated Operations. This Agreement may only be amended, changed or modified by a writing executed by the Company and the Employee. Notwithstanding the foregoing, the Company may change or amend any Schedule or the amount or manner in which your compensation and related matters are calculated by providing written notice to you.

To the extent a court of competent jurisdiction determines any provision is not enforceable, the parties agree that the court may modify the provision to the minimum extent necessary to make the provision enforceable.

DocuSign Envelope ID: C86EB6D6-CC89-4C3D-ADB0-B568FDC4DCA9

Further, any such invalid provision shall not invalidate the remaining provisions, which shall remain in full force and effect.

You acknowledge and agree that the Company owns the sole and exclusive right, title and interest in and to any and all inventions, discoveries, designs, original works of authorship, developments, concepts, know-how, products, improvements or trade secrets that you conceive, create, develop, discover, reduce to practice, make or acquire, in whole or in part, either solely or jointly with another or others, during the course of your employment with the Company (collectively, "Works"). All Works shall be deemed the Confidential Information of the Company and you will promptly disclose all Works to the Company. You agree that all copyrightable Works that have been or are prepared by you within the scope of your employment are "works for hire" under the U.S. Copyright Act and that the Company will be considered the author thereof. To the extent that any of the Works is determined not to constitute a work made for hire, you hereby assign and transfer to the Company all of your rights, title and interests in and to any and all Works and all related copyrights, trademarks, patents, trade secrets, and other intellectual property and proprietary rights therein ("IP Rights"). You further waive, to the extent permitted by applicable law, all "moral rights" you have in and to the Works. During your employment with the Company and afterward, you agree to sign additional documents related to the Company's ownership and registration of IP Rights and you hereby agree to execute such other documents without additional consideration. If you fail to execute any such documents, you irrevocably appoint the Company and its authorized officers and agents as your agent and attorney-in-fact to act for to execute such documents on your behalf. This appointment is coupled with an interest in the Works and IP Rights. **NOTICE OF STATUTORY EXCEPTION: Notwithstanding the foregoing, you hereby are and have been notified by the Company that Works shall not include any invention that you develop entirely on your own time without using any equipment, supplies, facilities, or trade secret information of the Company unless (i) the invention: (A) relates at the time of conception or reduction to practice of the invention to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development; or (ii) the invention results from any work performed by you for the Company.**

*I hereby acknowledge that I have reviewed the Guaranteed Rate Sales Compensation Plan. I have had an opportunity to review its terms and understand that this document depicts the conditions of my employment and upon which any compensation will be determined and paid. I agree to comply with and to be bound by the terms of the Plan.*

Christian White
_____
(Print your name here)

*Christian White*
_____
3567C5CEFDBA46F... (Place your signature here)

03/03/2021
_____
(Date)

Guaranteed Rate, Inc.

_____
By: Nikolaos Athanasiou, Chief Operating Officer

03/03/2021
_____
(Date)

**EXHIBIT A**

---

"**Agreement**" means this Compensation Plan and Agreement and any Schedule hereto.

"**Authority**" means any federal, state or municipal governmental agency or regulatory authority, including, but not limited to, the Consumer Financial Protection Bureau, the U.S. Department of Justice, any State attorney general, and any state financial services or consumer protection regulatory authority.

"**Basis Point**" means a unit of measure equal to one hundredth of one percent. One basis point is equal to 1/100th of 1%, or 0.01% (0.0001).

"**Borrower Expenses**" mean all loan-related fees and costs that are payable by a borrower and permitted under applicable Requirements, including appraisal fees, rate lock extension fees and certain other fees.

"**Cause**" has the meaning set forth in Section III(b).

"**Company**" means Guaranteed Rate, Inc.

"**Confidential Information**" has the meaning set forth in Section IV(a).

"**Corporate Objective**" means the amount of net revenue that you agree the Company will receive from the sale of each Eligible Loan that you originate, after subtracting all Deductible Expenses and any Borrower Expenses credited back to a borrower.

"**Draw**" means the non-commissioned dollar amounts that an employer pays a loan officer as an advance of a Commission.

"**Early Payment Default**" means a loan originated by you that defaults during an "Early Payment Default Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Early Payoff**" means a loan originated by you that pays off in whole or in part during an "Early Prepayment Period," as defined in the Company's loan purchase and sale agreement with the investor that purchased the loan.

"**Earned Bonus**" has the meaning set forth in Section II (c) (2).

"**Eligible Loan**" means each first-lien closed-end mortgage loan that (a) is originated by you, (b) is closed and funded by the Company, (c) is sold to an investor at a price that complies with all Requirements in this Agreement, (d) is not the subject of a Recapture Event, and (e) otherwise complies with all applicable Requirements.

"**Fully Recoverable Draw**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Fully Recoverable Draw Amount**" means the dollar amount by which your monthly Draw exceeds your Commission during any month, which amount may be recovered by the Company, as described further in Section III(b)(1) of this Agreement.

"**Manager**" means your direct supervisor.

"**Non-Recoverable Draw**" has the meaning set forth in Section III(b)(2) of this Agreement.

"**Non-Recoverable Draw Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section III(b)(2) of this Agreement.

"**Person**" means any natural Person, corporation, limited liability, partnership, sole proprietorship or any other entity.

"**Recapture Event**" has the meaning set forth in Section II(c)(3) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage**" has the meaning set forth in Section II(b)(2) of this Agreement.

"**Recoverable Draw Subject to Minimum Wage Amount**" means a Draw which, when it exceeds the amount of your Commission during any month, may be recovered by the Company, in the manner described further in Section II(b)(2) of this Agreement.

"**Requirements**" means all (a) applicable laws, rules, regulations, and orders, (b) Company policies, procedures, guidelines and directives (Links to the Company's policies and procedures can be found on the Company's Intranet and also in the Company's employee handbook), (c) applicable investor policies, procedures, guidelines and other requirements, and (d) terms, conditions and obligations in this Agreement.

"**Schedule**" means the Compensation, Corporate Objective and Loan Pricing Schedule to this Agreement.

"**You**" or "**your**" means you, the employee, in your capacity as a Vice President of Market Growth.